IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, *et al.*,

    Plaintiffs,

v.

PUEBLO COUNTY, COLORADO, *et al.*,

    Defendants.

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS [DOC. 17]**

## I. INTRODUCTION

On February 22, 2022, Defendant Pueblo County Sherriff's ("PCSO") Officer Charles McWhorter shot Richard Ward in the chest three times from point blank range. Defendant McWhorter did this in the parking lot of Mr. Ward's younger brother's middle school, as classes were letting out for the day. After Defendant McWhorter killed Mr. Ward, other named PCSO Defendants unconstitutionally arrested Mr. Ward's mother, Kristy Ward Stamp, at the scene and seized her property.

Defendants now seek dismissal of Plaintiffs' lawsuit. Rather than address the facts alleged, Defendants have repeatedly insisted that they cannot understand what Plaintiffs have claimed. However, Plaintiffs' Complaint clearly alleges violations of Plaintiffs' federal and state constitutional rights, as against: (1) Defendants McWhorter and Gonzales for using excessive force against Mr. Ward up to and including shooting him to death; (2) Defendants Mahan, Spencer, Berumen, Quintana, Ragan, McWhorter, and Gonzales for acting in concert to handcuff and arrest Ms. Ward Stamp, and taking her to jail without probable cause and in retaliation for her First Amendment protected speech; and (3) all Pueblo County Defendants present at the

scene for acting in concert to seize Ms. Ward Stamp's property, including her vehicle, cell phone, and identification. Defendants' present motion bears no relation to Plaintiffs' Complaint: the assertions made by Defendants are erroneous, and they fail to address the clear, specific allegations Plaintiffs have made regarding the acts of each named Defendant as expounded in Plaintiffs' detailed 37-page Complaint. This Court must deny the Motion to Dismiss and allow Plaintiffs' plausibly alleged claims to proceed to discovery.

## II.  FACTS ALLEGED

On February 22, 2022, Mr. Ward and his mother, Ms. Ward Stamp, went to Liberty Point International Middle School in Pueblo to pick up Ms. Ward Stamp's younger son (and Mr. Ward's younger brother) from school. [Doc. 1] at ¶ 25. As they waited in the parking lot, Mr. Ward exited his mother's vehicle to go for a walk. *Id.* at ¶ 27. Mr. Ward returned and mistakenly got into the wrong vehicle—a similar white SUV to his mother's. *Id.* at ¶ 28. Mr. Ward immediately left the other car, with an apology to the surprised driver. *Id.* He then found his mother's SUV, re-entered it, and told his mother about what had just happened. *Id.* at ¶ 29.

Minutes later, Defendant McWhorter approached the SUV to contact Mr. Ward. *Id.* at ¶ 30. He grabbed Mr. Ward's elbow at the beginning of their interaction and Mr. Ward asked him to let go. *Id.* ¶ 31. Mr. Ward told Defendant McWhorter that he was anxious around law enforcement because he had previously suffered excessive force. *Id.* at ¶ 32. Defendant McWhorter explained that he had received a report about Mr. Ward attempting to open car doors, and Mr. Ward calmly explained to him that he had mistakenly entered the wrong SUV. *Id.* at ¶¶ 33-36. During this conversation, Defendant Gonzales arrived on the scene and stood feet away so that she could observe the entire interaction. *Id.* at ¶ 37. Defendant McWhorter asked Mr. Ward if he had his identification, to which Mr. Ward responded that he might and began searching his pockets. *Id.* at ¶ 38. As Mr. Ward looked for his ID, Defendant McWhorter asked if

he had any weapons, and Mr. Ward told him that he did not think so but might have a pocketknife. *Id.* at ¶ 39. Mr. Ward did not have a pocketknife or any other weapon; he removed lighters from his pocket and showed them to Defendant McWhorter. *Id.* at ¶ 41.

At this point, though Mr. Ward had done nothing to threaten anyone, Defendant McWhorter recklessly pulled his pistol out of his holster. *Id.* ¶ 42. As Mr. Ward was looking for his ID, he came upon an anti-anxiety pill in his pocket and put it in his mouth. *Id.* at ¶¶ 43-44. Defendant McWhorter saw him take the pill and immediately grabbed Mr. Ward and pulled him from the vehicle while demanding to know what he had put in his mouth. *Id.* at ¶ 45. Mr. Ward pleaded that it was just a pill. *Id.* at ¶ 46. Defendant McWhorter did not offer Mr. Ward an opportunity to leave the vehicle on his own power and instead threw him to the ground. *Id.* at ¶¶ 47-54. Defendant Gonzales observed this interaction and instead of intervening to prevent Defendant McWhorter's use of excessive force, she joined in on the use of force pulling Mr. Ward out of the car and taking him to the ground. *Id.*

Both Defendants McWhorter and Gonzales then continued using unjustified force against Mr. Ward. *Id.* at ¶¶ 51-58. While Mr. Ward remained unarmed and pinned to the ground by the two officers, Defendant McWhorter drew his pistol and shot Mr. Ward three times, point blank, in the chest. *Id.* at ¶¶ 51-60. Defendant McWhorter killed Mr. Ward approximately twenty seconds after he had unjustifiably pulled Mr. Ward out of the car and threw him to the ground. *Id.* at ¶ 61. Rather than de-escalate the situation, Defendants McWhorter and Gonzales escalated the situation at every turn and created any need they felt to use force. *Id.* at ¶¶ 62-68. After Defendant McWhorter shot Mr. Ward, both Defendants McWhorter and Gonzales stood over Mr. Ward and watched him die, rather than rendering any form of medical aid. *Id.* at ¶¶ 69-77.

Mr. Ward died minutes later on the ground of the middle school parking lot, where his

3

younger brother was about to be let out with the rest of his peers. *Id.* at ¶ 78. In the moments after McWhorter shot Mr. Ward, Ms. Ward Stamp, begged the officers to tell her whether they had shot her son. *Id.* at ¶ 79. Instead of responding, Defendant McWhorter ordered her to stay in the SUV. *Id.* at ¶ 80. Soon thereafter, Defendant Mahan arrived on the scene and addressed Ms. Ward Stamp. *Id.* at ¶ 83. She again begged to know whether her son had been shot and whether he was alive; Defendant Mahan refused to answer her. *Id.* at ¶ 84.

Defendant Mahan ordered Ms. Ward Stamp to keep her hands up, though she was not suspected of any crime. *Id.* at ¶ 85. She complied, but then Defendant Mahan ordered Defendant Merumen to handcuff her, though she had done nothing wrong. *Id.* at ¶¶ 86-90. Defendant Christine Spencer then searched Ms. Ward Stamp, seized her belongings, and locked her in the back of a police cruiser. *Id.* at ¶ 90. Defendant Sergeant Josh Ragan then ordered Defendant Quintana to drive the handcuffed and arrested Ms. Ward Stamp to jail. *Id.* at ¶ 91. Defendants held Ms. Ward Stamp in the jail for approximately two hours, while interrogating her. *Id.* at ¶ 91. Ms. Ward Stamp had done nothing wrong and had only repeatedly begged to know if her son was alive—Pueblo County Sheriff's Officers did not tell her of his death until after she had been interrogated, hours after he had been pronounced dead in the parking lot of the middle school. *Id.* at ¶¶ 92-94. The PCSO Defendants on scene then seized Ms. Ward Stamp's vehicle and other property without justification and held it for months after they had killed her son. *Id.* at ¶¶ 94-97.

Defendant Pueblo gave Defendant McWhorter a firearm and returned him to duty within days of killing Mr. Ward. *Id.* at ¶ 97. Defendant Pueblo did not discipline or counsel Defendants McWhorter and Gonzales and instead determined that their concerted use of force was taken according to Pueblo customs, policy, and training. *Id.* at ¶¶ 98-102. Defendant Pueblo failed to properly train its officers on the proper use of deadly force, which resulted in Defendant

4

McWhorter unjustifiably killing Mr. Ward. *Id.* at ¶¶ 104-107.

### III. LEGAL STANDARD

"There is a strong presumption against the dismissal of claims under [Fed. R. Civ. P. 12(b)(6)]." *Blevins v. Reid*, 2008 U.S. Dist. LEXIS 46168, at *9 (D. Colo. June 12, 2008)(citing *Cottrell, Ltd. v. Biotrol Intern., Inc.*, 191 F.3d 1248, 1251 (10th Cir. 1999)). Evaluating a Rule 12(b)(6) motion, a court must accept as true "all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011)(citation omitted). Generally, a complaint will survive a Rule 12(b)(6) motion if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausible" does not mean "likely to be true," but is, instead, a nudge beyond "conceivable." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

### IV. ARGUMENT

Plaintiffs' allegations are clear and plausible as to each claim. Defendants' purported inability to comprehend them, *see* [Doc. 17] at 3-5, 10-12, is not grounds for dismissal.

**A. Plaintiffs have plausibly pleaded that Defendants McWhorter and Gonzales violated Mr. Ward's clearly established Fourth Amendment and state constitutional rights.**

As detailed above, Plaintiffs' Complaint alleges that Defendants McWhorter and Gonzales unjustifiably pulled Mr. Ward out of his mother's car, threw him to the ground, and then within seconds, Defendant McWhorter shot him three times point blank in the chest, without warning or any legal basis. Mr. Ward was not suspected of any crime, was unarmed, and had not threatened either officer or anyone else.

When analyzing a claim of excessive deadly force, courts consider "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or

5

others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Estate of Smart v. City of Wichita*, 951 F.3d 1161, 1171 (10th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "[O]fficers are not justified in using deadly force unless objectively reasonable officers in the same position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1213-14 (10th Cir. 2019). Regarding the threat posed, the Tenth Circuit has considered non-exclusive factors, including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon toward[] the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). Since 1985, the *sine qua non* of the constitutional use of deadly force has been "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). In *Garner*, the Supreme Court examined the history of deadly force, nothing that officers had often been allowed to kill or attempt to kill people they believed to be fleeing felons. *Id.* at 12-19. The Court concluded that "[i]t is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11.

Defendants McWhorter and Gonzales were simply talking to Mr. Ward, who was suspected of *no crime*. Mr. Ward was unarmed, and his "manifest intentions" indicated that he was not a threat to anyone. *Estate of Larsen*, 511 F.3d at 1260. Thus, Defendants McWhorter and Gonzales did not have "probable cause to believe that [Mr. Ward] pose[d] a threat of serious

6

physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. After *Garner* and its progeny, such facts constitutionally prohibited McWhorter from shooting Mr. Ward.

Under clearly established law, reasonable officers in Defendants McWhorter's and Gonzales' position would have known that their conduct was unlawful. For example, the Tenth Circuit has reversed a grant of qualified immunity to officers who shot a suicidal man holding a knife, concluding that the man posed a danger only to himself. *See Walker v. City of Orem*, 451 F.3d 1139, 1144-45, 1160 (10th Cir. 2006); *see also Estate of Harmon v. Salt Lake City*, 2021 U.S. App. LEXIS 39942, at *7-15 (10th Cir. Nov. 10, 2021) (reversing district court's dismissal of excessive force claim where plaintiff had plausibly pleaded that decedent was not a threat to the officer, despite some physical contact between the two, when the officer shot him). This Circuit has long made clear that the law does not provide that "any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death." *Cordova v. Aragon*, 569 F.3d 1183, 1190-95 (10th Cir. 2009); *Ceballos*, 919 F.3d at 1218 ("the mere possibility that [the suspect] might have presented a threat to the general public" was not sufficient to justify the officer's use of deadly force).

Moreover, "[t]he excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force . . . if the conduct is 'immediately connected' to the suspect's threat of force." *Allen*, 119 F.3d at 840 (citing cases); *Casey*, 509 F.3d at 1283, 1285; *Fogarty*, 523 F.3d at 1159. Nothing about Mr. Ward's actions justified the officers even going hands-on. Put simply, Defendants' actions in grabbing Ward, pulling him out of the car, and throwing him to the ground "took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tack[.]" *Smith v. Ray*, 781 F.3d 95, 104 (4th Cir.

7

2015) (denying qualified immunity based on this fact alone).

Based on the circumstances Defendant McWhorter observed, any reasonable officer—who was not "plainly incompetent" or "knowingly violat[ing] the law"—would have known that he was constitutionally prohibited from using deadly force against Mr. Ward; therefore, he is not entitled to qualified immunity on Plaintiffs' allegations. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (stating that qualified immunity is inappropriate if the right was "sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right," and stressing that clearly established law does "not require a case directly on point, [as long as] existing precedent…[has] placed the statutory or constitutional question beyond debate").

Defendants' present motion does not address the detailed and specific factual allegations in Plaintiffs' Complaint. [Doc. 17] at 12-14, or even cite the legal standard for the use of deadly force. Rather, Defendants recite the law of qualified immunity but do not apply it to the relevant facts or the applicable law. *Id.* Because Defendants make no argument warranting dismissal of Plaintiffs' excessive force and related state law claims, this Court must deny the motion and allow Plaintiffs' excessive force claim against them to proceed.[1]

**B. <u>Plaintiffs have plausibly pleaded Claims Four through Nine.</u>**

Plaintiff Kristy Ward Stamp has also plausibly pleaded that the specific named Defendants violated her federal and state[2] constitutional rights to be free from unlawful arrest, First Amendment retaliation, and unlawful seizure of her property. *See* [Doc. 1] at ¶¶ 79-97, 169-247. Defendants' present motion does not include the legal standard for wrongful arrest,

---

[1] Defendants make no argument in support of dismissal of Plaintiffs' Claims 2 and 3, each of which concerns McWhorter's shooting of Mr. Ward, and each is alleged under Colorado state law, for which Defendants have no recourse to qualified immunity. *See, e.g.,* [Doc. 17] at 12-14.

[2] Defendants' motion makes no particularized argument as to Plaintiffs' state law claims, [Doc. 17] at 10-12, and the motion to dismiss should be denied as to those claims.

First Amendment retaliation, or unlawful seizure. Likewise, Defendants' argument again ignores the allegations in Plaintiffs' Complaint, neither citing nor addressing the nearly 20 factual allegations that detail Defendants' various violations of Ms. Ward Stamp's rights.

Because an arrest is "the most intrusive of Fourth Amendment seizures," an arrest is "reasonable only if supported by probable cause." *United States v. White*, 584 F.3d 935, 944-45 (10th Cir. 2009) (internal quotation marks omitted). Accordingly, "[i]t has long been established that an arrest . . . without probable cause that a crime has been committed violates the Fourth Amendment." *Shroff v. Spellman*, 604 F.3d 1179, 1188 (10th Cir. 2010). Additionally, "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To succeed on a First Amendment retaliation claim, a plaintiff must show that (1) he engaged in a constitutionally protected activity; (2) Defendants' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) Defendant's actions were substantially motivated as a response to his exercise of First Amendment rights. *Nielander v. Bd. of Ctny. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009).

Defendants misconstrue and willfully turn a blind eye toward Plaintiff's fundamental allegations: each of the individually named Defendants was present at the scene after Defendant McWhorter unjustifiably killed Mr. Ward. While present at the scene, each of these officers acted in concert to wrongfully arrest Ms. Ward Stamp in retaliation for her First Amendment protected speech, and then acted together to unlawfully seize her property. Each individually named Defendant either ordered Ms. Ward Stamp to be arrested, physically handcuffed her, or drove her, under arrest, to jail, and the particular conduct of each Defendant is specifically alleged. *See* [Doc. 1] at ¶¶ 79-96. At the very least, each individually named Defendant failed to

intervene to prevent their fellow officers' multiple clear violations of Ms. Ward Stamp's rights. *See, e.g., Walton v. Gomez*, 745 F.3d 405, 421-423 (10th Cir. 2014) (making clear officers' duty to intervene to prevent constitutional violations and explaining how such a duty can overlap with law enforcement officers who act in concert to violate constitutional rights).

Defendants, together, concertedly, arrested Ms. Ward Stamp with no probable cause that she had committed or was about to commit any crime. This was a violation of her Fourth Amendment and related Colorado constitutional rights. Defendants did so only after she screamed and cried that Defendant McWhorter had shot her son. Her outpouring of grief and shock was protected speech. Even so, this was all she had done after McWhorter killed her son and before Pueblo officers arrested her. Once Defendants had arrested Ms. Ward Stamp without probable cause and in retaliation for her protected speech, they unlawfully seized her property and held it for months—all in violation of her First Amendment and Colorado constitutional rights. For these reasons and because Defendants have made no argument based on Plaintiffs' actual allegations, the motion to dismiss must be denied as to Claims Four through Nine.

### C. Pueblo County is a proper Defendant.

Plaintiffs have properly alleged municipal liability against Pueblo. Ultimately, as Defendants' leading case reasons, the naming niceties for a municipal liability claim like Plaintiffs' "does not matter" because "whether the sheriff's office or the county is sued, the county would pay any judgment." *Chavez v. Bd. of Cty. Comm'rs*, 426 F. Supp. 3d 802, 809 (D. Colo. 2019).[3]

---

[3] If this Court determines that the Pueblo County Sheriff, in his official capacity, would be the proper Defendant for *Monell* purposes, then judicial economy would militate in favor of an Order allowing a substitution of parties rather than a dismissal. In real terms, this would make no difference to the litigation; Defendants' current lawyers are representing them for the underlying legal violations as well as municipal liability, and these same lawyers would continue to do so with a change to the caption.

10

Plaintiffs have alleged, based on federal law, that Pueblo County *itself* is a "person" subject to suit under 42 U.S.C. § 1983 for the unconstitutional policies, customs, and practices, executed by Defendants, that caused Mr. Ward's death and the violations of his mother's rights. *See, e.g.*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-701 (1978) ("Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."). Although Plaintiffs did not sue the County "through the Board of County Commissioners," the Motion to Dismiss pretends that it does, *see* [Doc. 17] at 9-10, and then seeks dismissal because it is improper to do so. Fundamentally, Defendants' argument fails because it presumes a *state* statute, C.R.S. § 30-11-105, can govern the prosecution of a *federal* civil rights lawsuit under 42 U.S.C. § 1983. This argument ignores both the Supremacy Clause of the Constitution and the history of § 1983, "the very purpose of [which] was to interpose the federal courts between the states and the people, as guardians of the people's federal rights." *Patsy v. Bd. of Regents*, 457 U.S. 496, 503 (1982); *Felder v. Casey*, 487 U.S. 131 (1988) (state's notice of claim statute cannot govern § 1983 action by virtue of Supremacy Clause); *Howlett v. Rose*, 496 U.S. 356 (1990); *see also Haywood v. Drown*, 556 U.S. 729 (2009)("[F]ederal law is as much the law of the several States as are the laws passed by their legislatures."). Numerous courts presiding over Section 1983 actions in this District have correctly concluded that the county that employs the defendant law enforcement officers is the proper defendant because counties are "persons" under § 1983. *See Lounsbury v. Darr*, 2012 U.S. Dist. LEXIS 33904, at *3-4 (D. Colo. Mar. 14, 2012) (Babcock, J.) ("Defendants Adams

11

County Detention Facility and Adams County Sheriff's Office are improper parties to this action. The detention facility and the sheriff's department are not separate from the local government of Adams County, Colorado, and, therefore those entities are not persons subject to suit under § 1983."); *Cross v. Denver Sheriff's Dep't*, 2014 U.S. Dist. LEXIS 147731, at *6-7 (D. Colo. Oct. 15, 2014); *O'Neill v. El Paso County Sheriff's Dep't*, 2014 U.S. Dist. LEXIS 106412, at *2 (D. Colo. Aug. 4, 2014) (Shaffer, J.); *Dodds v. Trinity Group*, 2014 U.S. Dist. LEXIS 32675, at *2 (D. Colo. Mar. 13, 2014) (Pueblo County Sheriff's Department).

Even assuming, *arguendo*, that reference to state law might guide this Court's determination under federal civil rights law of the appropriate designation of the municipal defendant, Defendant Pueblo is correct that under state law, boards of county commissioners have no active role in the policymaking of sheriff's departments. C.R.S. 30-10-506 (sheriff has exclusive power to appoint deputies and to fix their salaries, subject only to the board of county commissioners' approval). Likewise, the Colorado Constitution treats sheriffs and county commissions as separate entities. *See* Colo. Const. Art. XIV, § 6 (election of county commissioners); *id.* §§ 8, 8.5 (election of sheriffs and other county officers; qualification for office of county sheriff). Thus, because the ultimate responsible municipal "person" over the Pueblo County Sheriff's Office is Pueblo, Colorado (with no reporting channels whatsoever through the Board), the county is the proper Defendant even when accounting for state law. Thus, Pueblo, Colorado is the proper Defendant in this matter.

### D. **Plaintiffs have plausibly pled that Pueblo County is liable for causing its Defendant Officers' violations of Plaintiffs' constitutional rights.**

A municipality is liable for constitutional torts if the municipality's policy, practice, or custom caused an injury of constitutional dimensions. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978). To show municipal liability, Plaintiffs must establish "(1) that a municipal

employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). A policy or custom can be established in many ways, including demonstrating the existence of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation omitted).

Courts have routinely held that a custom or practice may be inferred from the conduct of a municipality after an incident when no steps are taken to reprimand the officer involved or otherwise respond to plainly unconstitutional conduct. Ratification or approval of an employee's unconstitutional conduct provides compelling evidence that the officer's conduct was indeed engaged in pursuant to official municipal policy, custom or practice. Ratification creating municipal liability under § 1983 occurs where "a subordinate's position is subject to review by the municipality's authorized policymakers," and those policymakers "approve a subordinate's decision and the basis for it." *Moss v. Kemp,* 559 F.3d 1155, 1169 (10th Cir. 2009) (citation omitted). While a municipality could rebut the assumption that conduct conformed with municipality practice by disciplining or terminating the officer, when, instead, the municipality approves of and defends the officer's conduct, a powerful inference is raised that the conduct was engaged in pursuant to municipality custom and practice. Indeed, there may be no better way to determine whether an officer's conduct was "pursuant" to a municipality's standard operating procedure than by assessing that municipality's response to the event.

Defendant Pueblo concluded that Defendant McWhorter had acted according to Pueblo customs, policy, and training; indeed, Defendant Pueblo armed Defendant McWhorter and put him back to work on the street days after he killed Mr. Ward (and months before the district attorney cleared him of criminal liability for the shooting). This exoneration makes clear that Defendant McWhorter acted because of Defendant Pueblo's customs and policy; had Defendant McWhorter acted outside of policy, he would have been disciplined or at least re-trained. Likewise, when Plaintiffs are allowed to proceed to discovery, Defendant McWhorter—and his supervisors—will inevitably defend his actions by asserting under oath that his use of force was in accordance with the training, policies, and customs of the PCSO. Such testimony is plainly sufficient to maintain Pueblo as a municipal defendant *See Harris*, 489 U.S. at 389-91; *Moore v. Miller*, 2014 U.S. Dist. LEXIS 72452, at *27 (D. Colo. 2014) ("[I]f Defendant Police Officers testify that they acted in accordance with their training and it is found that they committed constitutional violations, the reasonable inference is that, had the City implemented a different training policy on the use of force, [plaintiff] would not have been subjected to the amount force used in this case."); *Ortega v. Denver,* 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013).

Deliberately indifferent training can be shown "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Municipal "policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). "Given the known frequency

14

with which police attempt to arrest fleeing felons and the 'predictability that an officer lacking specific tools to handle that situation will violate citizens' rights,' . . . a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011).

Plaintiffs' allegations are sufficient at the pleading stage to show a deficiency in policy or training. "[A] plaintiff, as an outsider to municipal government, is not expected to have information about a city's official policies, practices, or training programs at the pleading stage." *Walker v. Zepeda*, 2012 U.S. Dist. LEXIS 74386, at *14 (D. Colo. May 29, 2012). "In the context of municipal liability, as opposed to individual . . . liability, it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842 (S.D. Tex. 2011). Requiring Plaintiff to allege specific details of PCSO policy beyond those Plaintiffs did would risk "foreclosure of [a] legitimate § 1983 claim[] that, after appropriate discovery, turn[s] out to have evidentiary support." *Walker*, 2012 U.S. Dist. LEXIS 74386, at *15-16.[4]

Plaintiffs have adequately alleged that Defendant Pueblo's training and customs led to Defendant McWhorter's and Gonzales' unconstitutional uses of force against Mr. Ward, and Plaintiffs' claims of municipal liability should be allowed to proceed to discovery.

## V.  CONCLUSION

For the reasons set forth above, this Court should deny the Motion to Dismiss.

---

[4] *See also Petty v. Cnty. of Franklin, Ohio*, 478 F.3d 341, 348 (6th Cir. 2007) ("We wonder how [the plaintiff] would necessarily know, at the point of his *complaint,* and without the benefit of discovery, whether such a custom or policy might exist, and if it does exist, what its contours might be or how exactly it effected a violation of his constitutional rights.").

15

Respectfully submitted this 9th day of June 2023.

    KILLMER LANE & NEWMAN, LLP

    *s/ Mari Newman*

    ―――――――――――――――――――
    Darold Killmer
    Mari Newman
    Reid Allison
    KILLMER LANE & NEWMAN, LLP
    1543 Champa Street, Suite 400
    Denver, CO 80202
    (303) 571-1000
    (303) 571-1001- facsimile
    dkillmer@kln-law.com
    mnewman@kln-law.com
    rallison@kln-law.com

    ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Sean Lane
Allison J. Warren
William O'Donnell
Lane Law PC
5105 DTC Parkway
First National Bank Building Suite 475
Greenwood Village, CO 80111- 2764
720-464-4215
slane@lanelawpc.com
awarren@lanelawpc.com
wodonnell@lanelawpc.com

*Attorneys for Defendants*

    */s/ Jesse Askeland*
    Paralegal