## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp, and
KRISTY WARD STAMP,

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity
PUEBLO COUNTY BOARD OF COUNTY COMMISSIONERS,
DEPUTY CHARLES MCWHORTER, in his individual and official capacity;
DEPUTY CASSANDRA GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official capacity;
DEPUTY CHRISTINE SPENCER, in her individual and official capacity;
DEPUTY NICOLAS BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and official capacity,
SERGEANT JOSH RAGAN, in his individual and official capacity, and
CAPTAIN SHELLEY BRYANT, in her individual and official capacity,

      Defendants.

---

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

### I. INTRODUCTION

On the afternoon of February 22, 2022, Plaintiff Kristy Ward Stamp was sitting in her car in the student pick-up line at Liberty Point International Middle School, waiting to pick up her young, autistic son from the school, for whom she was the primary caregiver. Ms. Ward Stamp was accompanied by Tommy Brown, her boyfriend at the time who was the car's driver, and by Richard Ward, her adult son, the backseat passenger. As the trio awaited Ms. Ward Stamp's younger son, Defendant Pueblo County Sheriff's Office (PCSO) Deputy Charles McWhorter approached Ms. Ward Stamp's vehicle and spoke with Mr. Ward. After approximately two minutes of conversation with Mr. Ward, Deputy McWhorter and Defendant PCSO Deputy

Cassandra Gonzales engaged in a use of force against Mr. Ward, which concluded when Deputy

McWhorter shot Mr. Ward three times in the torso from point blank range, killing him.

After the shooting, numerous other PCSO personnel arrived on scene, including

Defendant Deputies Jacob Mahan, Christine Spencer, Nicolas Berumen, and Robert Quintana,

Defendant Sergeant Josh Ragan, and Defendant Captain Shelley Bryant. At Defendant

McWhorter's behest, Defendant Mahan first seized Ms. Ward Stamp and Mr. Brown in her

vehicle for several minutes, then removed them from the vehicle and handcuffed them with the

assistance of Defendant Berumen. Defendants Spencer and Berumen searched Ms. Ward Stamp.

Defendants moved Ms. Ward Stamp into different PCSO vehicles, leaving her handcuffed

throughout. She was indisputably not free to leave. After approximately thirty-four minutes of

Defendants holding Ms. Ward Stamp in PCSO vehicles on scene, Defendant Quintana transported

Ms. Ward Stamp to the Pueblo County Sheriff's Annex. There, Ms. Ward Stamp, still not free to

leave, was placed in an interview room for approximately two hours, during which she was

repeatedly questioned by PCSO and Pueblo Police Department ("PPD") personnel. Finally, over

three hours after Deputy McWhorter killed her son, Ms. Ward Stamp was released from custody

and driven to her home by PCSO personnel in a PCSO vehicle. At no point during those three

hours that Ms. Ward Stamp was in custody was she free to leave the custody of PCSO personnel.

Ms. Ward Stamp's car was seized that day and was not returned to her until October 2022.

Each of the individual Defendants, along with Pueblo County Sheriff Lucero on behalf of

PCSO as a 30(b)(6) witness, testified that the officers never had probable cause to arrest Ms.

Ward Stamp. Nonetheless, the Defendants took the above-described actions, which legally

constituted an arrest. Defendants also seized her vehicle without a warrant and impounded it for

nearly eight months. Defendants did so pursuant to the policies, procedures and training that they

received from PCSO. For these reasons, Defendants are liable for violating Ms. Ward Stamp's clearly established rights to be free from unlawful arrest, and this Court should grant Summary Judgment to Ms. Ward Stamp on Claims Four and Five of her Second Amended Complaint, alleging wrongful arrest under the United States and Colorado Constitutions. *See* [Doc. 112].

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Undisputed Material Facts Demonstrating Defendants Arrested Ms. Ward Stamp

1.  On February 22, 2022, at approximately 3:27 P.M., Defendant Pueblo County Sheriff's Deputy McWhorter entered the Liberty Point International School parking lot in his marked Pueblo County Sheriff's Office (PCSO) SUV. **Mov't Appx. 1**, *McWhorter BWC*, 00:00.[1]

2.  Defendant McWhorter exited his SUV and approached Plaintiff Kristy Ward Stamp's vehicle, which was parked in the student pick-up loop at the school. **Mov't Appx. 1,** *McWhorter BWC,* 00:07-00:32.

3.  When Defendant McWhorter approached Ms. Ward Stamp's vehicle, Ms. Ward Stamp sat in the front passenger seat; her son, Richard Ward, sat in the rear passenger seat; and Tommy Brown, sat in the driver's seat. **Mov't Appx. 1,** *McWhorter BWC,* 00:33.

4.  Defendant McWhorter and Richard Ward engaged in a conversation over the following approximately two minutes. **Mov't Appx. 1,** *McWhorter BWC,* 00:30-2:22. During this conversation, Defendant PCSO Deputy Gonzales arrived in her marked PCSO SUV, and took up a position a few feet behind Defendant McWhorter. **Mov't Appx. 2,** *Gonzales BWC,* 00:00.

5.  After approximately two minutes of conversation with Richard Ward, Defendant McWhorter and Defendant Gonzales engaged in a use of force against Richard Ward. **Mov't Appx. 2,** *Gonzales BWC,* 00:00-1:05*;* **Mov't Appx. 1,** *McWhorter BWC,* 00:30-2:50*.*

---

[1] Appendix Nos. 1, 2, 3, 9, 18, 23, 39, 41 are submitted herewith conventionally on a flash drive pursuant to Section 4.8(f) of this Court's Electronic Case Filing Procedures.

6.      At the outset of the use of force, Defendant McWhorter pulled Richard Ward from Ms. Ward Stamp's vehicle. The use of force continued for approximately 30 seconds, during which Defendant McWhorter and Defendant Gonzales struggled with Mr. Ward within a few feet of Ms. Ward Stamp's vehicle. **Mov't Appx. 2,** *Gonzales BWC,* 00:38-1:05.

7.      At approximately 3:30:38 p.m., Defendant McWhorter shot Richard Ward three times, resulting in Mr. Ward's death. **Mov't Appx. 2,** *Gonzales BWC,* 01:00-01:05.

8.      Both Ms. Ward Stamp and Mr. Brown remained in Ms. Ward Stamp's vehicle during the use of force against Richard Ward. Neither Mr. Brown nor Ms. Ward Stamp were involved in the use of force. **Mov't Appx. 2,** *Gonzales BWC.*

9.      Seconds after the shooting, both Mr. Brown and Ms. Ward Stamp asked Defendants Gonzales and McWhorter whether Richard Ward had been shot. Neither Defendant Gonzales nor Defendant McWhorter replied. **Mov't Appx. 2,** *Gonzales BWC,* 01:20-1:40.

10.     At 3:31:17 p.m., approximately 35 seconds after the shooting, Ms. Ward Stamp opened her car door, and Defendant McWhorter ordered her to "Stay in the car." Ms. Ward Stamp closed the door and stayed in the car in compliance with Defendant McWhorter's order. **Mov't Appx. 2,** *Gonzales BWC,* 01:38-4:30.

11.     At 3:33:24 p.m., Defendant PCSO Deputy Jacob Mahan approached Defendant Gonzales, who stood near Ms. Ward Stamp's car. **Mov't Appx. 2,** *Gonzales BWC,* 03:47-4:34; **Mov't Appx. 3,** *Mahan BWC,* 3:07-3:48. Defendant Gonzales advised Defendant Mahan that the woman in Ms. Ward Stamp's car was apparently Mr. Ward's mother, and that she didn't know who the other person in the car was. *Id.*

12.     Defendant Mahan moved to the driver's side of Ms. Ward Stamp's vehicle, and Defendant McWhorter advised him not to let Ms. Ward Stamp or Mr. Brown out of the car.

**Mov't Appx. 3,** *Mahan BWC,* 3:50-3:57; **Mov't Appx. 1,** *McWhorter BWC,* 6:19-6:23.

13.     Defendant Mahan then repeatedly ordered Mr. Brown and Ms. Ward to "Keep your hands where I can see them." Mr. Brown and Ms. Ward Stamp complied and held their hands up. **Mov't Appx. 3,** *Mahan BWC,* 4:05-4:15, 4:40-5:10.

14.     Defendant Mahan testified that Ms. Ward Stamp was not free to leave at this point. **Mov't Appx. 7,** *Mahan Dep. Transcript,* 116:1-116:11.

15.     At approximately 3:42:12 p.m., Defendant Mahan summoned nearby Defendant PCSO Deputy Nicolas Berumen to Ms. Ward Stamp's vehicle. Defendant Mahan told Defendant Berumen to assist him in getting Ms. Ward Stamp and Mr. Brown out of the vehicle. **Mov't Appx. 3,** *Mahan BWC,* 11:50-12:10.

16.     At approximately 3:42:20 p.m., Mr. Brown stepped out of the vehicle, and Defendant Mahan first ordered him to put his hands behind his back and then placed him in handcuffs. **Mov't Appx. 3,** *Mahan BWC,* 13:00-13:39.

17.     At approximately 3:44:04 p.m., Defendant Berumen ordered Ms. Ward Stamp to move across her vehicle so that she could exit through the front driver's side door; Ms. Ward Stamp complied. **Mov't Appx. 8,** *Berumen BWC 1,* 9:02-9:51.

18.     At approximately 3:44:50 p.m., Defendant Berumen handcuffed Ms. Ward Stamp. **Mov't Appx. 9,** *Berumen BWC 1,* 9:50-10:10.

19.     Deputy Berumen testified that Ms. Ward Stamp was not free to leave at this point. **Mov't Appx. 11-12,** *Berumen Dep. Transcript,* 132:19-133:22.

20.     Defendant Berumen escorted Ms. Ward Stamp to a PCSO SUV. As they walked to the SUV, Ms. Ward Stamp informed Defendant Berumen that she was at the school to pick up her son, and that her son was autistic. **Mov't Appx. 9,** *Berumen BWC 1,* 10:10-11:09.

21.    Defendant Berumen directed Defendant PCSO Deputy Christine Spencer to place Ms. Ward Stamp in Deputy Spencer's PCSO SUV. **Mov't Appx. 9,** *Berumen BWC 1,* 10:55-11:08; **Mov't Appx. 18,** *Spencer BWC,* 15:14-15:25.

22.    Defendant Spencer asked Ms. Ward Stamp for her name and date of birth, which Ms. Ward Stamp readily provided and conducted a pat-down of Ms. Ward Stamp's person. **Mov't Appx. 9,** *Berumen BWC 1,* 11:07-11:50; **Mov't Appx. 18,** *Spencer BWC,* 15:36-16:05.

23.    At 3:46:57 p.m., Defendant Spencer ordered Ms. Ward Stamp to sit in the back of her PCSO SUV, and Ms. Stamp complied. Defendant Spencer closed the SUV's rear door, leaving Ms. Ward Stamp handcuffed inside. **Mov't Appx. 18,** *Spencer BWC,* 16:04-16:23.

24.    Deputy Spencer later testified that Ms. Ward Stamp was not free to leave during Deputy Spencer's contact with her. **Mov't Appx. 20,** *Spencer Dep. Transcript,* 49:2-11.

25.    Approximately sixteen minutes elapsed between the time that Defendant McWhorter ordered Ms. Ward Stamp to remain in her vehicle to the time that Defendant Spencer placed Ms. Ward in the rear seat of her PCSO SUV. **Mov't Appx. 18,** *Spencer BWC,* 16:04-16:23; **Mov't Appx. 2,** *Gonzales BWC,* 01:38-4:30.

26.    Shortly after Defendant Spencer placed Ms. Ward Stamp in her PCSO SUV, Defendant PCSO Sergeant Josh Ragan approached and Defendants Ragan, Spencer, Mahan, and Berumen briefly discussed where they should move Ms. Ward Stamp, and Defendant Ragan ordered the deputies to transfer her to Defendant Mahan's PCSO vehicle. **Mov't Appx. 18,** *Spencer BWC,* 17:03-17:36; **Mov't Appx. 3,** *Mahan BWC,* 18:10-19:20.

27.    Defendant Spencer removed Ms. Ward Stamp from her PSCO SUV and stood with her while they awaited Defendant Mahan's PCSO vehicle. Ms. Ward Stamp remained handcuffed. **Mov't Appx. 18,** *Spencer BWC,* 17:36-20:31.

28.     As they continued to wait, Ms. Ward Stamp advised Defendant Spencer that she was supposed to be picking up her younger son from school, that her younger son was autistic, and that she was concerned for him. **Mov't Appx. 18,** *Spencer BWC,* 18:40-19:15.

29.     At approximately 3:51:30, Defendant Spencer placed Ms. Ward Stamp in the back of Defendant Mahan's PCSO SUV and closed the door. Ms. Ward Stamp remained handcuffed. **Mov't Appx. 18,** *Spencer BWC,* 20:35-20:56.

30.     Defendant Spencer advised Defendant Mahan that Ms. Ward Stamp was "clear/valid," meaning that Ms. Ward Stamp had a valid identification and did not have any outstanding warrants. **Mov't Appx. 18,** *Spencer BWC,* 21:11-21:18.

31.     Defendant Mahan testified that Ms. Ward was not free to leave when she was moved into his PCSO SUV. **Mov't Appx. 7,** *Mahan Dep. Transcript,* 131:12-131:16.

32.     Defendant Berumen spoke with Defendant Ragan, advised him that Ms. Ward Stamp and Mr. Brown were still handcuffed, and asked Defendant Ragan if they should remain handcuffed. Defendant Ragan responded to the effect that they should remain handcuffed. **Mov't Appx. 9,** *Berumen BWC 1,* 28:30-28:43.

33.     At approximately 4:08:45, Defendant Robert Quintana arrived at Liberty Point International School. **Mov't Appx. 23,** *Quintana BWC,* 00:19. Shortly after his arrival, Defendant Quintana briefly spoke with Defendant Berumen, who directed him to move Ms. Ward Stamp from Defendant Mahan's SUV into Defendant Quintana's SUV and to then drive Ms. Ward Stamp to the PCSO Annex. **Mov't Appx. 23,** *Quintana BWC,* 00:42-1:01.

34.     Defendant Berumen testified that Ms. Ward Stamp was not free to leave at this point. **Mov't Appx. 15,** *Berumen Dep. Transcript,* 185:16-186:1.

35.     Defendant Mahan testified that Ms. Ward Stamp was not free to leave the scene at

any time. **Mov't Appx. 7,** *Mahan Dep. Transcript,* 116:16-116:23.

36.    Defendant Ragan testified that there was no point at which Ms. Ward Stamp was free to leave the scene. **Mov't Appx. 28,** *Ragan Dep. Transcript,* 130:17-130:25.

37.    Captain Shelley Bryant instructed Defendant Ragan to have Ms. Ward Stamp and Mr. Brown transported to the PCSO Annex rather than question them at the scene of the shooting. **Mov't Appx. 25,** *Ragan Dep. Transcript,* 91:15-92:13.

38.    Defendant Bryant testified that she has no reason to doubt the truth of Defendant Ragan's testimony that she instructed him to transport Ms. Ward Stamp and Mr. Brown to the PCSO Annex rather than question them at the scene of the shooting. **Mov't Appx. 31,** *Bryant Dep. Transcript,* 79:23-81:7.

39.    Defendant Bryant had the authority to decide whether Ms. Ward Stamp would be questioned at the scene or transported to the PCSO Annex for questioning. **Mov't Appx. 26,** *Ragan Dep. Transcript,* 93:17-93:24.

40.    At 4:09:41 p.m., another PCSO deputy removed Ms. Ward Stamp from Deputy Mahan's SUV as Defendant Quintana looked on.  **Mov't Appx. 23,** *Quintana BWC,* 1:15-1:37.

41.    Defendant Quintana directed Ms. Ward Stamp to his PCSO SUV and walked with her to the SUV. **Mov't Appx. 23,** *Quintana BWC,* 1:38-1:54.

42.    Though Ms. Ward Stamp had already been searched by Defendant Spencer, and although she remained handcuffed, Defendant Quintana patted her down again. **Mov't Appx. 23,** *Quintana BWC,* 1:50-2:34.

43.    At approximately 4:11:00 p.m., Defendant Quintana directed Ms. Ward Stamp to step into his vehicle, and she complied. **Mov't Appx. 23,** *Quintana BWC,* 2:34-2:38.

44.    At approximately 4:12:11 p.m., Defendant Quintana entered his SUV and began to

drive Ms. Ward Stamp to the PCSO Annex. **Mov't Appx. 23,** *Quintana BWC, 3:46-3:55.* The

drive took approximately 17 minutes, and they arrived at the Annex at approximately 4:28:43

p.m. **Mov't Appx. 23,** *Quintana BWC,* 20:08-20:17.

      45.     As Defendant Quintana drove Ms. Ward Stamp to the Annex, she informed him

that she was the CNA [certified nursing assistant] for her younger son, and that she needed to

arrange for his care if she would not be allowed to return to him in a timely manner. **Mov't Appx.**

**23,** *Quintana BWC, 11:30-11:44.*

      46.     At approximately 4:32:51 p.m., Defendant Quintana opened the rear passenger

door of his SUV and directed Ms. Ward Stamp to exit the SUV; he then escorted her toward the

entrance to the PCSO Annex, still handcuffed. **Mov't Appx. 23,** *Quintana BWC,* 24:21-25:04.

      47.     Defendant Quintana testified that Ms. Ward Stamp was in custody from the time

that he met her at the scene to the time that he left her in the interview room at the Annex. **Mov't**

**Appx. 37,** *Quintana Dep. Transcript,* 96:2-96:6.

      48.     After a brief discussion with Defendant Berumen, at 4:33:56 p.m., Defendant

Quintana removed Ms. Ward Stamp's handcuffs. **Mov't Appx. 23,** *Quintana BWC,* 25:22-26:06.

      49.     Defendant Berumen testified that Ms. Ward Stamp was not free to leave when she

was placed in the interview room. **Mov't Appx. 16-17,** *Berumen Dep. Transcript*, 208:22-209:3.

      50.     Defendants left Ms. Ward Stamp alone in the interview room until approximately

4:51:25 p.m., at which point she knocked on the door and explained that she needed to make

arrangements for her son's care and ensure that he had been picked up by another family member,

as she had been at the school to pick him up before PCSO brought her to the Annex. **Mov't**

**Appx. 39,** *Ward Stamp Interview Video,* 4:51:25-4:52:14.

      51.     At approximately 5:00:50 p.m., Ms. Ward Stamp told a PCSO deputy and another

law enforcement official that she did not wish to make a statement, and that she wanted to go

home. She again emphasized that her son was autistic and that she was his CNA, and that she

needed to return home to care for him. The law enforcement officials did not respond to her stated

desire to go home, and instead told her to "be patient" and again closed the door to the interview

room. **Mov't Appx. 39,** *Ward Stamp Interview Video,* 5:00:50-5:01:33.

52.    Finally, at approximately 5:27:23 p.m., PCSO Detective Amy Liles and Pueblo

Police Department Detective Carly Gustin arrived at the interview room to interview Ms. Ward

Stamp. **Mov't Appx. 40,** *Ward Stamp Interview Transcript*, p. 1; **Mov't Appx. 39,** *Ward Stamp*

*Interview Video,* 5:27:23. The interview continued until approximately 5:41:45 p.m., at which

point Detective Liles and Detective Gustin left the room. **Mov't Appx. 39,** *Ward Stamp Interview*

*Video,* 5:41:45.

53.    At approximately 6:19:06 p.m., Pueblo Police Department Detective Medina

entered the room to discuss her cell phone, which he informed her would be kept by law

enforcement after it was retrieved from her vehicle. He further explained that the vehicle itself

along with all of its contents, such as Ms. Ward Stamp's purse, would be confiscated by law

enforcement. **Mov't Appx. 39,** *Ward Stamp Interview Video,* 6:19:06-6:28:17.

54.    Ms. Ward Stamp again stated that she needed to go home, and again noted that she

needed to go to her autistic son. **Mov't Appx. 39,** *Ward Stamp Interview Video,* 6:20:20-6:20:34.

55.    At 6:29:07 p.m., Ms. Ward Stamp and Mr. Brown were led out of the interview

room by Defendant Berumen. **Mov't Appx. 39,** *Ward Stamp Interview Video,* 6:28:55-6:29:10;

**Mov't Appx. 41,** *Berumen BWC 2,* 00:20-1:00.

56.    Eventually, Defendant Berumen and other PCSO personnel drove Ms. Ward

Stamp and Mr. Brown to Ms. Ward Stamp's home. Ms. Ward Stamp exited the PCSO vehicle at

approximately 6:56:19—approximately 3 hours and 26 minutes after Defendant McWhorter shot

and killed her oldest son only a few feet from where she sat waiting for her younger son to be

dismissed from middle school. **Mov't Appx. 41,** *Berumen BWC 2,* 27:52-28:10; **Mov't Appx. 2,**

*Gonzales BWC,* 01:00-01:05.

57.    Ms. Ward Stamp's car and personal belongings that were in the car were seized.

Her personal belongings were returned days later, but her car was held by law enforcement until

October 2022. **Mov't Appx. 43-44,** *Kristy Depo.* 179:2-180:5; 206:10-207:18.

**B.  Undisputed Material Facts Establish Conclusively That Defendants Did Not Have
Probable Cause to Arrest Ms. Ward Stamp**

58.    As detailed below, Defendants McWhorter, Gonzales, Berumen, Mahan, Spencer,

Quintana, and Ragan each testified that they never had probable cause to arrest Ms. Ward Stamp.

59.    Defendant McWhorter testified that he did not have sufficient contact with Ms.

Ward Stamp and Mr. Brown to determine if either one of them had committed a crime. **Mov't**

**Appx. 47,** *McWhorter Dep. Transcript,* 283:9-22, 284:19-28:8.

60.    Defendant Gonzales testified that she did not know of anything that Ms. Ward

Stamp and Mr. Brown did that could constitute probable cause to justify their arrest. **Mov't**

**Appx. 50,** *Gonzales Dep. Transcript*, 220:15-21.

61.    Defendant Captain Bryant agreed that there was never probable cause to arrest Ms.

Ward Stamp. **Mov't Appx. 33,** *Bryant Dep.*, 130:25-131:23.

62.    Asked whether he had probable cause to arrest Ms. Ward Stamp based on the

information he had, Defendant Berumen testified that he did not have probable cause at the time

of the contact with Ms. Ward Stamp. **Mov't Appx. 13,** *Berumen Dep. Transcript,* 142:2-12.

63.    Asked if there was probable cause to justify arresting Ms. Ward Stamp, Defendant

Ragan testified, "Just from my initial contact in securing the scene and getting ready for CIT, I

did not have any probable cause." **Mov't Appx. 27,** *Ragan Dep. Transcript,* 114:25-115:5.

64.     Defendant Quintana agreed that there was no probable cause to believe that Ms. Ward Stamp had committed or was committing any criminal offense. **Mov't Appx. 35-36,** *Quintana Dep. Transcript,* 89:4-24, 75:2-6.

65.     Defendant Spencer testified that there was no legal justification to arrest Ms. Ward Stamp at any time, and that no probable cause was ever ascertained to justify her arrest. **Mov't Appx. 21-22,** *Spencer Dep. Transcript,* 56:18-57:23.

66.     Asked whether he had a warrant or probable cause to arrest Ms. Ward Stamp, Defendant Mahan testified that there was no warrant for Ms. Ward Stamp's arrest and that he only had reasonable suspicion to detain her. **Mov't Appx. 5,** *Mahan Dep. Transcript,* 48:12-19.

67.     Sheriff David Lucero, testifying on behalf of PCSO as a 30(b)(6) witness, stated that Ms. Ward Stamp never did anything that constituted probable cause to believe she had committed a crime. **Mov't Appx. 56,** *Lucero Dep. Transcript,* 184:8-18.

68.     Sheriff Lucero testified that Ms. Ward Stamp was not free to leave when she was transported to the PCSO Annex in a PCSO vehicle, nor was she free to leave when she was held in an interview room in the Annex prior to her interview. **Mov't Appx. 57,** *Lucero Dep. Transcript,* 191:12-192:17.

**C. The Individual Defendants Acted Pursuant to Pueblo County's Policies, Customs, and Training.**

69.     Sheriff Lucero testified on behalf of PCSO that everything that happened in the Richard Ward case happened pursuant to Pueblo County policy and training.  **Mov't Appx. 54,** *Lucero Dep. Transcript,* 61:19-61:24.

70.     Sheriff Lucero testified on behalf of PCSO that handcuffing and detaining Ms. Ward Stamp, moving her to different PCSO vehicles, searching her repeatedly, and transporting

her to the Annex were fully consistent with the training and policies of the Pueblo County

Sheriff's Office. **Mov't Appx. 55,** *Lucero Dep. Transcript,* 89:11-89:22.

71.     Sheriff Lucero testified that there were no changes made to PCSO policy or

training as a result of this case. **Mov't Appx. 54,** *Lucero Dep. Transcript,* 61:15-61:18.

## III. STANDARD OF REVIEW

Summary judgment is "designed to secure the just, speedy and inexpensive determination

of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). When the moving party

demonstrates that there is "no genuine issue as to any material fact," it is "entitled to a judgment

as a matter of law." FED. R. CIV. P. 56(c). The inquiry is essentially "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

(1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue

of material fact, *Celotex Corp*, 477 U.S. at 325, at which time the burden shifts to the nonmoving

party to show that there is a genuine issue of material fact left for trial. *Anderson*, 477 U.S. at 256.

## IV. ARGUMENT

### A.   Defendants Violated Plaintiff's Clearly Established Fourth Amendment Rights.[2]

Because an arrest is "the most intrusive of Fourth Amendment seizures," an arrest is

"reasonable only if supported by probable cause." *United States v. White*, 584 F.3d 935, 944-45

(10th Cir. 2009) (internal quotation marks omitted). Accordingly, "[i]t has long been established

---

[2] Plaintiff's state law wrongful arrest claim (Claim 5) should be analyzed the same as the analyses below
(for Claim 4), which are founded on decades worth of federal case law. *See, e.g., Woodall v. Godfrey*, 2024
COA 42 ¶ 13 (Colo. Ct. App. Apr. 25, 2024) (reasoning that federal cases interpreting the Fourth
Amendment are persuasive authority for the analogous sections of the Colorado Constitution). Of course,
Defendants are not entitled to qualified immunity on Claim 5, because any such immunity is forbidden by
the state statute. *See* C.R.S. 13-21-131(2).

that an arrest . . . without probable cause that a crime has been committed violates the Fourth
Amendment." *Shroff v. Spellman*, 604 F.3d 1179, 1188 (10th Cir. 2010). "Probable cause exists
where the facts and circumstances within the arresting officer's knowledge and of which they had
reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable
caution to have the belief that an offense has been or is being committed by the person to be
arrested." *United States v. Alonso*, 790 F.2d 1489, 1496 (10th Cir. 1986).

    "If a police-citizen encounter exceeds the limits of a *Terry* [investigative] stop, the
detention becomes an arrest that must be supported by probable cause." *United States v.
Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008) (quotation omitted). "An arrest is
distinguished from an investigative *Terry* stop by the involuntary, highly intrusive nature of the
encounter." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc) (cleaned up).
"An investigative detention may last too long under the specific circumstances of a given case and
on that basis may be transformed into a de facto arrest." *United States v. White*, 584 F.3d 935,
952-53 (10th Cir. 2009); *see also Cortez*, 478 F.3d at 1116 (holding force used during seizure, as
well as its duration, turned investigative detention into "a full custodial arrest").

    For decades it has been established that:

> There is no doubt that at some point in the investigative process, police procedures
> can qualitatively and quantitatively be so intrusive with respect to a suspect's
> freedom of movement and privacy interests as to trigger the full protection of the
> Fourth and Fourteenth Amendments. . . . And our view continues to be that **the line
> is crossed when the police, without probable cause or a warrant, forcibly
> remove a person from his home or other place in which he is entitled to be and
> transport him to the police station, where he is detained**, although briefly, for
> investigative purposes. We adhere to the view that such seizures, at least where not
> under judicial supervision, are sufficiently like arrests to invoke the traditional rule
> that arrests may constitutionally be made only on probable cause.

*Hayes v. Florida*, 470 U.S. 811, 815-16 (1985) (emphasis added). This clearly established law has
been reiterated time and again. *See, e.g., Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (per curiam)

("Such involuntary transport to a police station for questioning is sufficiently like arrest to invoke the traditional rule that arrests may constitutionally be made only on probable cause.") (internal quotation omitted); *United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996) ("Transportation of a defendant to the police station can not be justified absent probable cause to believe the defendant committed a crime.").

As detailed above, it is indisputable that after Defendant McWhorter shot and killed Ms. Ward Stamp's son in the parking lot of a middle school, and, afterwards, the Individual Defendants acted in concert to handcuff Ms. Ward Stamp, lock her in the back of multiple police cars, and drive her to the Sheriff's Office. Ultimately, she was held against her will for well over three hours before PCSO officers finally released her. Under clearly established law, Defendants' actions constituted an arrest.

Because Defendants' handcuffing of Ms. Ward Stamp, driving her to the police station, and holding her against her will for well over three hours constituted an arrest, the state and federal Constitutions required that Defendants' actions be supported by probable cause to believe she had engaged in criminal activity. However, as made clear above, no Defendant in this case **even claims** to have had probable cause to suspect Ms. Ward Stamp of any crime. Indeed, Defendants have disavowed having probable cause and at most have speculated that they might have had reasonable suspicion.[3] *See* **Mov't Appx. 56,** *Lucero Dep.,* 184:8-18; **Mov't Appx. 33,** *Bryant Dep.*, 130:25-131:23; **Mov't Appx. 47,** *McWhorter Dep.,* 283:9-22, 284:19-28:8; **Mov't Appx. 50,** *Gonzales Dep.*, 220:15-21; **Mov't Appx. 13,** *Berumen Dep.,* 142:2-12; **Mov't Appx. 27,** *Ragan Dep.,* 114:25-115:5; **Mov't Appx. 35-36,** *Quintana Dep.,* 89:4-24, 75:2-6; **Mov't Appx. 21,** *Spencer Dep.,* 56:18-57:23; **Mov't Appx. 5,** *Mahan Dep.,* 48:12-19. Without probable

---

[3] They are probably wrong about that, too, but for purposes of this motion, it is undisputed that they did not have probable cause to make an arrest, and they in fact arrested Ms. Ward Stamp.

cause, the Defendant officers were not constitutionally permitted to arrest Ms. Ward Stamp as

they did, and this Court must grant her summary judgment on her federal and state unlawful arrest

claims (Claims 4 and 5).

    **B.**   **Defendants Acted Pursuant to the Customs, Policies, and Training of Pueblo
County making Pueblo County Municipally Liable.**

The Individual Defendants acted as they did because of the policies, customs, and training

established by Pueblo County. A municipality is liable for constitutional torts of its agents if the

alleged unconstitutional acts implicate a policy or custom of the local government, and the

execution of a policy or custom caused an injury of constitutional dimensions. *Monell v. Dep't of

Soc. Servs.*, 436 U.S. 658, 690-94 (1978); *D.T. v. Indep. Sch. Dist.*, 894 F.2d 1176, 1187 (10th

Cir. 1990). Plaintiff must establish "(1) that a municipal employee committed a constitutional

violation, and (2) that a municipal policy or custom was the moving force behind the

constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316

(10th Cir. 1998). Unconstitutional training also forms the basis for *Monell* liability. *City of

Canton v. Harris*, 489 U.S. 378, 390 (1989). There are multiple bases for holding Pueblo County

liable, based upon undisputed facts.

First, Defendant Sheriff Lucero testified in a Rule 30(b)(6) deposition on behalf of PCSO

that his officers' actions in this case were engaged in pursuant to the County's policies, customs,

and training. **Mov't Appx. 54-55,** *Lucero Dep. Transcript,* 61:19-61:24, 89:11-89:22. Sheriff

Lucero "is a final policymaker with regard to [the operations of the Pueblo County Sheriff's

Office], such that his actions 'may fairly be said to be those of the municipality.'" *Lopez v.

LeMaster*, 172 F.3d 756, 763 (10th Cir. 1999) (quoting *Bd. of the Cty. Comm'rs v. Brown*, 520

U.S. 397, 404 (1997)); *Layton v. Bd. of Cty. Comm'rs*, 512 F. App'x 861, 870-72 (10th Cir.

2013); *Cortese v. Black*, 838 F. Supp. 485, 495-96 (D. Colo. 1993); *Carrillo v. Suthers*, 2014 U.S.

Dist. LEXIS 184359, *32 (D. Colo. December 29, 2014). His testimony stating that Pueblo County's policies caused the violation of Ms. Ward Stamp's rights is nearly dispositive.

Second, every involved Pueblo County law enforcement officer testified that they acted in accordance with the training, policies, customs, and practices of Pueblo County while engaging in the conduct which forms the basis of Plaintiff Ward Stamp's claims. **Mov't Appx. 14,** *Beruman Dep.* 153:3-11*;* **Mov't Appx. 30,** *Bryant Dep. 28:20-24;* **Mov't Appx. 6,** *Mahan Dep. 49:11-50:14;* **Mov't Appx. 38,** *Quintana Dep. 104:6-22;* **Mov't Appx. 21-22,** *Spencer Dep. 56:18-57:23;* **Mov't Appx. 27,** *Ragan Dep. 114:2-115:5;* **Mov't Appx. 46,** *McWhorter Dep. 278:19-23;* **Mov't Appx. 51-52,** *Gonzales Dep. 320:12-321:11.* Such testimony is conclusive and undisputed evidence that the officers acted as they did because that is how Pueblo County trained and expected them to act. *See, e.g., Moore v. Miller*, 2014 U.S. Dist. LEXIS 72452, at *27 (D. Colo. 2014)(Kane, J.)("[I]f Defendant Police Officers testify that they acted in accordance with their training and it is found that they committed constitutional violations, the reasonable inference is that, had the City implemented a different training policy on the use of force, [plaintiff] would not have been subjected to the amount force used in this case."); *Ortega v. City & Cnty. of Denver*, 944 F. Supp. 2d 1033, 1038-39 (D. Colo. 2013) (Martinez, J.) (finding that law enforcement officers' use of excessive force in accordance with their training established a *Monell* claim for failure to train); *Surat v. Klamser*, No. 19-cv-0901-WJM-NRN, 2021 U.S. Dist. LEXIS 129950, at *16 (D. Colo. July 13, 2021) (Martinez, J.) (holding that "a reasonable juror could conclude that the City's sanctioning of this policy" from testimony from multiple officials that an officer acted in accordance with the municipality's training and policy "constituted deliberate indifference to the rights of those with whom the officers come into contact"); *Estate of Jeffrey Melvin v. City of Colo. Springs*, Civil Action No. 20-cv-00991-CMA-

STV, 2023 U.S. Dist. LEXIS 39850, at *43 (D. Colo. Mar. 8, 2023) (Arguello, J.) ("Because the
Officers testified that they acted in accordance with their training, a reasonable jury could
determine that the Officers would not have used excessive force—*e.g.*, multiple, repeated Taser
deployments—had they been trained differently.").

Third, courts considering municipal liability have held that evidence showing "multiple
harms that occurred to the plaintiff," "misconduct that occurred in the open," and "the
involvement of multiple officials in the misconduct" is determinative of whether officers acted in
accordance with a municipality's customs, policies, practices, and training. *Arakji v. Hess*, Civil
Action No. 15-cv-00681-CMA, 2015 U.S. Dist. LEXIS 161600, at *16-17 (D. Colo. Dec. 2,
2015) (quoting *Taylor*, 2011 U.S. Dist. LEXIS 97985, at *3). Here, after Defendant McWhorter
killed Ms. Ward Stamp's son, half a dozen PCSO officers acted in concert to unlawfully arrest her
and seize her property. These officers did so out in the open, in a middle school parking lot with
students and parents (and each other) watching on. And each officer participated directly in the
unconstitutional acts, rather than doing anything to intervene to stop the violations of Plaintiff's
rights. Because of the many separate wrongful actions (and inactions) committed by Defendants,
the events underlying the Defendants' violations of Ms. Ward Stamp's rights alone is sufficient
evidence of a custom, policy, and practice to hold Pueblo County liable under *Monell*. *See Jacoby
v. DuPage Cty. Ill.*, No. 12 CV 6539, 2013 U.S. Dist. LEXIS 89934, at *9 (N.D. Ill. June 26,
2013) (holding that where there was evidence that employees "repeatedly" violated an
individual's rights there was a plausible inference "that there was a widespread practice that had
the force of policy"); *Rykard v. City of Dothan*, No. l:10-cv-868-MHT [wo], 2011 U.S. Dist.
LEXIS 101135, at *9 (M.D. Ala. Aug. 9, 2011) ("[t]here are reasonable facts to infer that a policy
and custom exists where multiple city employees repeatedly" violated an individual's rights); *see*

*also Smith v. Corr. Corp. of Am., Inc.*, 674 F. Supp. 2d 201, 206 (D.D.C. 2009).

Finally, no Defendant was reprimanded or disciplined for their actions. Such evidence

further buttresses the conclusion, explicitly acknowledged by all Defendants in the case already,

that the law enforcement officers' conduct was authorized by the policies, customs, practices, and

training of Pueblo County that existed at the time Ms. Ward Stamp's constitutional rights were

violated, and approved of by the command staff that reviewed the events surrounding the killing

of Richard Ward and the arrest of Kristy Ward Stamp:

> The disposition of the policymaker may be inferred from his conduct after the events
> of that night. Following this incompetent and catastrophic performance, there were
> no reprimands, no discharges, and no admissions of error. The officers testified at
> [their depositions] that no changes had been made in their policies. If that episode
> of such dangerous recklessness obtained so little attention and action by the City
> policymaker, the jury was entitled to conclude that it was accepted as the way things
> are done and have been done in the City... If prior policy had been violated, we
> would expect to see a different reaction. If what the officers did and failed to do …
> was not acceptable [], changes would have been made. This reaction to so gross an
> abuse [] says more about the existing disposition of the City's policymaker than
> would a dozen incidents [].

*Grandstaff v. Borger*, 767 F.2d 161, 171-72 (5th Cir. 1985) (cited with approval in *Cordova v.*

*Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009));[4] *Johnson v. City of Roswell*, No. 15-1071

GBW/CG, 2016 U.S. Dist. LEXIS 109994, at *55-56 (D.N.M. Aug. 18, 2016) (holding that

plaintiffs' allegations that the city "failed to investigate or take disciplinary actions against

subordinate officers or provide any avenue of redress for complaining citizens, despite being

aware of the pattern of conduct… presumed true, may create the plausible inference of a

---

[4] While some courts have rejected subsequent command staff ratification as the sole probative
evidence of *Monell* liability, since subsequent events cannot, by definition, "cause" the event
being ratified, such command staff reaction (or lack of reaction) can support the allegation that the
conduct at issue *was customary or within policy*. This makes sense, as post-event evidence may
evince an ongoing custom and practice that was in place before – and a moving force in the use of
excessive force – while a post-event ratification, due to the constraints of linear time, cannot be
rationally claimed to have *caused* the constitutional violation, which is not claimed here.

widespread unlawful custom… Accordingly, plaintiff has sufficiently stated a claim for the existence of an actionable municipal custom."); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) (holding that "[p]olicy or custom may be inferred if, after the [incident] . . . officials took no steps to reprimand or discharge the guards, or if they otherwise failed to admit the guards' conduct was in error"); *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (finding that failure to take remedial steps after violations is evidence of a policy or custom); *Santibanes v. City of Tomball*, 654 F. Supp. 2d 593, 613-14 (S.D. Tex. 2009) (noting that supervisor's decision not to view certain evidence that raises questions about plausibility of a subordinate's explanation after the incident supports a finding of that municipality viewed subordinate's actions in accordance with custom, policy, and practice of municipality). The fact that there was no discipline meted out or remedial training provided, is evidence that this Court can rely upon to determine whether the officers' conduct conformed with, or deviated from, Pueblo County custom, policy, practice, and training. And inferences aren't even needed here; the ultimate conclusion of whether Defendants' conduct was pursuant to the customs, policies, practices, and training of Pueblo County is itself undisputed, as all Defendants testified that it was.

For these reasons, this Court must grant Ms. Ward Stamp summary judgment on her municipal liability claim regarding unlawful arrest, in violation of the Fourth Amendment.

## V. CONCLUSION

Plaintiff Kristy Ward Stamp respectfully requests that this Court grant her Motion for Partial Summary Judgment as to Claims Four and Five.

DATED this 25th day of October 2024.

KILLMER LANE, LLP

*s/ Darold W. Killmer*

_____

Darold W. Killmer
Reid Allison
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 fax
dkillmer@killmerlane.com
rallison@killmerlane.com

Mari Newman
Andy McNulty
NEWMAN MCNULTY, LLC
1490 N. Lafayette Street, Suite 304
Denver, CO 80218
(720) 850-5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following. I also certify that copies of the conventionally submitted exhibits, which were previously provided to counsel for Defendants in Plaintiffs' Disclosures, will be provided via Dropbox.

Sean Lane
William O'Donnell
Brittney Townsley
The Lane Law Firm, P.C.
3131 S Vaughn Way Suite 220
Aurora, CO 80014
Tel: 720-464-4215
slane@lanelawpc.com
wodonnell@lanelawpc.com
btownsley@lanelawpc.com

*Attorneys for Defendants*

*/s/ Jesse Askeland*
Paralegal