**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp, and
KRISTY WARD STAMP,

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity
PUEBLO COUNTY BOARD OF COUNTY COMMISSIONERS
DEPUTY CHARLES MCWHORTER, in his individual and official capacity;
DEPUTY CASSANDRA GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official capacity;
DEPUTY CHRISTINE SPENCER, in her individual and official capacity;
DEPUTY NICOLAS BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and official capacity,
SERGEANT JOSH RAGAN, in his individual and official capacity, and
CAPTAIN SHELLEY BRYANT, in her individual and official capacity,

      Defendants.

---

**BODY -WORN CAMERA VIDEO OF DEFENDANT CHARLES MCWHORTER
(CONVENTIONALLY SUBMITTED)**

---

      The electronic **Body-Worn Camera Video of Defendant Charles McWhorter**, which has been disclosed to all Parties with the name and Bates number, "Ward (116) - PCSO - BWC - McWhorter," is being conventionally filed with the Court on a flash drive pursuant to Section 4.8(f) of this Court's Electronic Case Filing Procedures.  A copy of these materials is being delivered via Dropbox to all counsel, as stated in the Certificate of Service for Plaintiffs' Motion for Partial Summary Judgment.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp,
and
KRISTY WARD STAMP,

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity
PUEBLO COUNTY BOARD OF COUNTY COMMISSIONERS
DEPUTY CHARLES MCWHORTER, in his individual and official capacity;
DEPUTY CASSANDRA GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official capacity;
DEPUTY CHRISTINE SPENCER, in her individual and official capacity;
DEPUTY NICOLAS BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and official capacity,
SERGEANT JOSH RAGAN, in his individual and official capacity, and
CAPTAIN SHELLEY BRYANT, in her individual and official capacity,

      Defendants.

---

**BODY -WORN CAMERA VIDEO OF DEFENDANT CASSANDRA GONZALES
(CONVENTIONALLY SUBMITTED)**

---

      The electronic **Body-Worn Camera Video of Defendant Cassandra Gonzales**, which

has been disclosed to all Parties with the name and Bates number, "Ward (117) - PCSO - BWC –

Gonzales," is being conventionally filed with the Court on a flash drive pursuant to Section

4.8(f) of this Court's Electronic Case Filing Procedures.  A copy of these materials is being

delivered via Dropbox to all counsel, as stated in the Certificate of Service for Plaintiffs' Motion

for Partial Summary Judgment.

**MOV'T APPX 2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp, and
KRISTY WARD STAMP,

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity
PUEBLO COUNTY BOARD OF COUNTY COMMISSIONERS
DEPUTY CHARLES MCWHORTER, in his individual and official capacity;
DEPUTY CASSANDRA GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official capacity;
DEPUTY CHRISTINE SPENCER, in her individual and official capacity;
DEPUTY NICOLAS BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and official capacity,
SERGEANT JOSH RAGAN, in his individual and official capacity, and
CAPTAIN SHELLEY BRYANT, in her individual and official capacity,

      Defendants.

---

**BODY -WORN CAMERA VIDEO OF DEFENDANT JACOB MAHAN
(CONVENTIONALLY SUBMITTED)**

---

      The electronic **Body-Worn Camera Video of Defendant Jacob Mahan**, which has been disclosed to all Parties with the name and Bates number, "Ward (118) - PCSO - BWC - Mahan," is being conventionally filed with the Court on a flash drive pursuant to Section 4.8(f) of this Court's Electronic Case Filing Procedures.  A copy of these materials is being delivered via Dropbox to all counsel, as stated in the Certificate of Service for Plaintiffs' Motion for Partial Summary Judgment.

**MOV'T APPX 3**

*AB Litigation Services*

**Page 1**

```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT COURT OF COLORADO
Civil Action No. 23-CV-00473-CNS-MDB
-------------------------------------------------
VIDEOCONFERENCE DEPOSITION OF JACOB DAVID MAHAN
NOVEMBER 29, 2023
-------------------------------------------------
ESTATE OF RICHARD WARD, by and through its personal
representative Kristy Ward Stamp, and
KRISTY WARD STAMP,
      Plaintiffs,
v.
PUEBLO, COLORADO; DEPUTY CHARLES McWHORTER, in his
individual and official capacity; DEPUTY CASSANDRA
GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official
capacity; DEPUTY CHRISTINE SPENCER, in her individual
and official capacity; DEPUTY NICOLAS BERUMEN, in his
individual and official capacity; DEPUTY ROBERT
QUINTANA, in his individual and official capacity;
and SERGEANT JOSH RAGAN, in his individual and
official capacity,
      Defendants.
-------------------------------------------------
APPEARANCES:
      KILLMER LANE & NEWMAN LLP
        By Darold W. Killmer, Esq.
          1543 Champa Street, Suite 400
          Denver, Colorado 80202
            Appearing remotely for Plaintiffs
```

**Page 2**

```
 1   APPEARANCES:
 2      NEWMAN McNULTY LLC
          By Mari Newman, Esq.
 3          Andrew McNulty, Esq.
            1490 North Lafayette Street, Suite 304
 4        Denver, Colorado 80218
            Appearing remotely for Plaintiffs
 5
 6      THE LANE LAW FIRM, P.C.
          By William O'Donnell, Esq.
 7          5105 DTC Parkway
            First National Bank Building, Suite 475
 8        Greenwood Village, Colorado 80111-2764
            Appearing remotely for Defendants
 9
10      Also Present:  Kristy Ward Stamp
                       Sam Weiner
11                     Cassandra Gonzales
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1         Pursuant to Notice and the Federal
 2   Rules of Civil Procedure, the videoconference
 3   deposition of JACOB DAVID MAHAN, called by
 4   Plaintiffs, was taken on Wednesday, November 29,
 5   2023, commencing at 9:13 a.m. before Kathy L. Davis,
 6   Registered Professional Reporter, Certified Realtime
 7   Reporter, and Registered Merit Reporter within and
 8   for the State of Colorado.
 9
10
11              I N D E X
12   VIDEOCONFERENCE DEPOSITION OF JACOB DAVID MAHAN
13   EXAMINATION                              PAGE
14        By Ms. Newman                        6
15
16   EXHIBITS                       INITIAL REFERENCE
17   Exhibit 30  Defendant Mahan's Responses To   9
                 Plaintiffs' Discovery Requests
18               To The Individual Defendants
19   Exhibit 31  3/8/2023 PCSO IA Investigation   11
                 Number IA23-006
20
     Exhibit 32  PCSO IA Investigation Number     18
21               IA20-002
22   Exhibit 33  3/20/2018 memo of a verbal       21
                 counseling relating to release
23               of Delarosa
24   Exhibit 34  9/11/2018 memo of a verbal       23
                 counseling relating to release
25               of Trujillo
```

**Page 4**

```
 1   EXHIBITS (continued)           INITIAL REFERENCE
 2   Exhibit 35  3/29/2021 written complaint by   26
                 Lucero of Beckwith, Mahan, and
 3               Chavez
 4   Exhibit 36  6/20/2016 memo from Parsons to    37
                 Phillips, Re:  Criminal History
 5               review Detentions Specialist
                 Applicant Jacob Mahan
 6
 7   Exhibit 37  Document titled Polygraph         40
                 Summary Jacob Mahan, Date of
 8               examination:  July 10, 2016
 9   Exhibit 38  NEOGOV Insight - Application      42
                 Detail for Mahan
10   Exhibit 39  Supplemental report of Mahan     104
11   Exhibit 40  Defendant Mahan's Responses To   170
                 Plaintiffs' Requests For
12               Admission To All Defendants
13   Exhibit 41  Nicoletti-Flater Associates,     175
                 PLLP, Preemployment
14               Psychological Evaluation,
                 Pueblo County Sheriff's Offices
15               for Mahan
16
17   PREVIOUSLY MARKED EXHIBITS      INITIAL REFERENCE
18   Exhibit 10  Pueblo County Sheriff's Office    95
                 Office Of Professional
19               Standards & Internal Affairs
                 IA-2203, Deputy Charles
20               McWhorter, Inspector John Romo
21
22   Exhibit 15  Document titled                   74
                 Officer-Involved Incident
23               Protocol Of The Tenth Judicial
                 District
24
25
```

*AB Litigation Services*

Page 45

1    Q    What you wrote here, though, is that you
2  left for a better opportunity, even though you knew
3  you were fired, correct?
4    A    Yes.
5    Q    And you know that that's a lie, don't
6  you?
7    A    I don't lie -- as I said, I don't believe
8  what I put in there was a lie.  But as I said, when I
9  spoke to the individual who did the background check,
10  I told him that I was fired from there.
11    Q    Did you tell the person who did the
12  background check that you were accused of theft by
13  Wells Fargo?
14    A    I don't recall if that was said or not.
15    Q    Did you tell your employer, Subaru,
16  Colorado Springs, that you had been fired from Wells
17  Fargo under accusations of theft?
18    A    I don't recall if that was brought up.
19    Q    In any event, even though you had lied on
20  your job application and you had been disqualified
21  for not having -- or for having had that driver's
22  license revocation, you were in fact hired by Pueblo
23  County Sheriff's Office in July of 2016, right?
24    A    Yes.
25    Q    And you were hired as a -- as a detention

Page 46

1  specialist?
2    A    Yes.
3    Q    Then you were promoted in September to
4  detention deputy?
5    A    Yes.
6    Q    When was your next promotion?
7    A    It was September of 2000 [sic].
8    Q    To what position?
9    A    I was promoted to patrol deputy.
10    Q    And that's the position you still hold?
11    A    Correct.
12    Q    Have you read the lawsuit in this case?
13    A    Briefly, yes.
14    Q    What is your understanding of the claims
15  that are brought -- have been brought against you?
16    A    One of the claims was unlawfully
17  arresting.
18    Q    Anything else?
19    A    I believe there are some other ones.  I
20  don't remember exactly what they were.
21    Q    And you would agree with me that in order
22  to arrest Ms. Ward Stamp you would have been required
23  to either have a warrant or probable cause, correct?
24    A    I don't believe I arrested her in any way
25  or put her in any handcuffs or detained her.

Page 47

1    Q    Your testimony is that you did not arrest
2  Ms. Ward Stamp?
3    A    I did not put her in handcuffs or
4  anything.
5        (Ms. Gonzales left the deposition.)
6    Q    (BY MS. NEWMAN)  You -- you concede, I
7  take it, that you had some role in holding her
8  against her will, whatever it is we call it, don't
9  you?
10    A    I would say that I had a role in having
11  her stay in the vehicle that she was in.
12    Q    All right.  Let me -- we'll -- and we'll
13  talk a lot about that, but let's -- let's kind of
14  break this down, all right?
15        You would agree that if you were to
16  arrest Ms. Ward Stamp you would be required legally
17  to have either a warrant or probable cause, right?
18    A    To arrest somebody, yes.
19    Q    Correct.  And if you -- in order -- you
20  would agree with this -- just this basic legal
21  principle.  In order to legally detain Ms. Ward
22  Stamp, you would have to have particularized
23  reasonable suspicion that she had engaged in some
24  kind of criminal activity, correct?
25    A    Yes.

Page 48

1    Q    And I deposed Sergeant Ragan yesterday,
2  and I'll just tell you what he said, and we'll see
3  whether or not you have -- you have the same opinion,
4  okay?
5    A    Okay.
6    Q    So Sergeant Ragan yesterday testified
7  that he never had probable cause or a warrant to
8  arrest Ms. Stamp, correct?  Is that consistent with
9  what you thought?
10    A    I don't -- I don't know.  I can't say
11  what he thought.
12    Q    I asked that question badly.
13        So Sergeant Ragan testified that he never
14  had a warrant or probable cause to arrest Ms. Ward
15  Stamp.  Would you answer the same way, that you also
16  never had a warrant or probable cause to arrest
17  Ms. Ward Stamp?
18    A    There was no warrant, no, but we had
19  reasonable suspicion to detain her.
20    Q    What particularized reasonable suspicion
21  did you have to detain Ms. Ward Stamp?
22    A    There was -- it was unknown if she was
23  involved in any way.
24    Q    So what you're calling reasonable
25  suspicion is that it was unknown whether she was

*AB Litigation Services*

1  involved?
2       A    Her being in the direct vicinity of the
3  area where the incident happened, it was unknown how
4  she was involved or if she was involved.
5       Q    What specific suspicion did you have that
6  she had engaged in any kind of criminal activity, if
7  any?
8       A    At that point it was unknown if she had
9  any, so until further investigation was done she was
10 detained.
11      Q    So your sworn testimony is that the
12 reasonable suspicion was that it was unknown whether
13 she had engaged in any kind of criminal activity?
14      A    It was unknown her involvement.
15      Q    Well, it's true for every single person
16 there, right?
17      A    In the direct vicinity, yes.
18      Q    And tell me all of the specific evidence
19 that you had to justify your reasonable suspicion, as
20 you put it, that Ms. Ward Stamp had engaged in some
21 kind of criminal activity.
22      A    With her being in the direct vicinity of
23 the incident, as I said, it was unknown how directly
24 she was involved or if she was involved in any way,
25 shape, or form.  So until further investigations

1  could have been done, she was detained.
2       Q    All right.  And so that is the entirety
3  of the basis for your so-called reasonable suspicion
4  that she had engaged in criminal activity?
5       A    There was -- yes.  There was -- it had to
6  be investigated further.
7       Q    All right.  That's what you're calling
8  reasonable suspicion?
9       A    Yes.
10      Q    Have you ever been trained regarding
11 reasonable suspicion?
12      A    Yes.
13      Q    Where did you receive that training?
14      A    In the academy.
15      Q    And have you received any training from
16 the Pueblo County Sheriff's Office about what legally
17 constitutes reasonable suspicion?
18      A    I believe so, yes.
19      Q    You agree that the law is clearly
20 established that you're required to have
21 particularized reasonable suspicion in order to
22 detain a person?
23      A    Yes.
24      Q    And specifically you agree the law is
25 clearly established that you have particular- -- that

1  you need to have particularized reasonable suspicion
2  that a person has engaged in criminal activity in
3  order to justify detaining them, correct?
4       A    Yes.
5       Q    And in this instance the so-called
6  reasonable suspicion that you had that Ms. Ward Stamp
7  had engaged in some kind of criminal activity is
8  simply that you didn't know one way or the other, but
9  she was in the vicinity so you wanted to investigate
10 it?
11      A    We just didn't know her involvement.
12      Q    Now, you said that you hadn't handcuffed
13 Ms. Ward Stamp.  Do you believe that that -- why do
14 you make that point to me?
15      A    Because you asked if I arrested her, and
16 I --
17      Q    You --
18      A    I never placed handcuffs on her, so . . .
19      Q    Is -- is placing handcuffs on somebody
20 the indicator that they are legally under arrest?
21      A    Not -- not all of the time.  It's an
22 indicator that they're detained at that moment.
23      Q    You did handcuff Tommy Brown, who was
24 driving the car, right?
25      A    Yes.

1       Q    Was he under arrest?
2       A    No.  He was detained.
3       Q    And what particularized reasonable
4  suspicion did you have to believe that Mr. Brown had
5  engaged in any criminal activity?
6       A    Just the same as I stated before.  It was
7  unknown how he was involved or what his involvement
8  was, so he was detained until further investigation
9  could be completed.
10      Q    All right.  And so that was the
11 reasonable suspicion that you -- that you believe
12 justifies detaining Mr. Brown as well?
13      A    Yes.
14      Q    What is your understanding as to the
15 length of detention that is allowed under the law?
16           Well, let me ask you it this way,
17 actually.  This is much easier.  You would agree with
18 me that the law is clearly established that at some
19 point more than a brief detention becomes an arrest
20 under the law, right?
21      A    I don't believe just because they're
22 detained for a certain period of time constitutes of
23 them being arrested.  And I believe also saying
24 that -- a brief portion is kind of subject to
25 opinion.

*AB Litigation Services*

Page 113

1  crime scene because it was still being investigated.
2      Q    And to the extent that it was a crime
3  scene, it was a crime scene that included the car
4  immediately behind them as well, right?
5      A    I don't -- I don't know if the vehicle
6  directly behind it was deemed inside the crime scene.
7      Q    Well, and the way to find out whether
8  anybody in the car behind them was actively involved
9  would be to go and ask them questions, correct?
10     A    Yes.
11     Q    And ultimately you did that?
12     A    I believe it was two cars behind.
13     Q    And you -- the reason you asked them
14 questions is to find out what they saw and how they
15 were involved, correct?
16     A    It was what they saw, yes.
17     Q    Did you -- now, you're aware -- and not
18 just you're aware, but you know that it's clearly
19 established law that a law enforcement officer has a
20 duty to reasonably investigate all information on the
21 scene in making the reasonable suspicion or probable
22 cause determination?
23     A    Yes.
24     Q    Did you get any information from the
25 eyewitnesses on scene to determine whether or not

Page 114

1  there was reasonable suspicion or probable cause to
2  believe that Kristy Ward Stamp had engaged in any
3  criminal activity?
4      A    The witness that I spoke to, no.
5      Q    You didn't even ask if Kristy Ward Stamp
6  was engaged in any criminal activity, did you?
7      A    No.
8      Q    You didn't ask a single question about
9  Kristy Ward Stamp or what her role might have been,
10 correct?
11     A    I didn't ask her specifically, no.
12     Q    You didn't ask anybody any questions at
13 all about what Ms. Ward Stamp's role might have been,
14 correct?
15     A    Not directly, no.
16     Q    Well, even indirectly.  You didn't ask
17 anybody a single question directly or indirectly
18 about what Ms. Ward Stamp's role was, did you?
19     A    I believe the question I asked is what
20 that individual saw.
21     Q    Right.  You asked the person in the car
22 back behind what they saw.  That's what you asked
23 them?
24     A    Correct.
25     Q    All right.  But to my question, you never

Page 115

1  asked a single person any information at all
2  regarding Kristy Ward Stamp's role, correct?
3      A    Not specifically, no.
4      Q    Or even generally, right?
5      A    I feel like asking what somebody saw is a
6  general of -- could be considered what her
7  involvement was, if they saw something that she was
8  involved in.
9      Q    Okay.  And there was no -- no witness
10 told you that Kristy Ward Stamp was in any way
11 involved, correct?
12     A    No one told me specifically, no.
13     Q    Nobody provided any information at all to
14 you that led you to believe that Ms. Ward Stamp was
15 in any way involved in criminal activity, correct?
16     A    Not to me, no.
17     Q    Or to anybody else, as far as you were
18 aware?
19     A    I -- I don't know what other people were
20 told.  I don't know exactly what everybody was told
21 by witnesses.
22     Q    Did you ever hear anything at all from
23 any source that led you to believe that Kristy Ward
24 Stamp might be involved in any criminal activity?
25     A    I was never told anything, no.

Page 116

1      Q    What would have happened at that point if
2  Kristy Ward Stamp and Tommy Brown had tried to leave?
3      A    They would have been detained.  Are you
4  talking about when they were inside the vehicle?
5          (Ms. Gonzales reentered the deposition.)
6      Q    (BY MS. NEWMAN)  Well, when they were
7  inside the vehicle or at any point thereafter was
8  Kristy Ward Stamp free to leave?
9          (Mr. McNulty entered the deposition
10         room.)
11     A    At that point, no, she was not.
12     Q    (BY MS. NEWMAN)  Was she ever free to
13 leave?
14     A    I don't -- I don't know after that point.
15 I cannot speak on afterwards.
16     Q    Well, you -- you do know because you know
17 that she was handcuffed and put into a series of
18 police cruisers.  You know that, don't you?
19     A    She was -- I know that she was placed
20 into one vehicle, yes.
21     Q    So there was any time at which Kristy
22 Ward Stamp was free to leave the scene?
23     A    At that point, no.
24     Q    And if Kristy Ward Stamp had ever tried
25 to leave the scene, what would have happened?

*AB Litigation Services*

Page 129

1    Q    Did you ever advise him that he was not
2  required to consent to your searching his wallet?
3    A    No.
4    Q    Did you ever advise Ms. Ward Stamp that
5  she was not required to consent to being searched?
6    A    I did not advise her of that, no.
7    Q    Did you ever make sure anybody else
8  advised Ms. Ward Stamp that she was not required to
9  consent to being searched?
10   A    I did not make sure if anybody else
11 advised her of that, no.
12   Q    Did you ever advise Ms. Ward Stamp that
13 she was not required to consent to having her
14 property searched?
15   A    I did not advise her of that, no.
16   Q    Did you ever make sure anybody else
17 advised her, Ms. Ward Stamp --
18   A    I did not make sure if anybody else
19 advised her of that.
20   Q    All right.  The next thing that happened
21 was Ragan ordered you to pull around and put Ms. Ward
22 Stamp in your car, right?
23   A    Correct.
24   Q    And Sergeant Ragan was your supervisor?
25   A    He was the shift supervisor, yes.

Page 130

1    Q    And you walked by Deputy Gonzales and
2  asked her if she needed anything or told her to let
3  her know if she needed anything, right?
4    A    Correct.
5    Q    What specifically could you have provided
6  her?
7    A    Moral support if she needed to talk to
8  somebody about anything.
9    Q    You were in the process of detaining two
10 witnesses, right?
11   A    Correct.
12   Q    So you weren't really in a position to be
13 chitchatting about moral support, were you?
14   A    We weren't chit-- -- we weren't
15 chitchatting.
16   Q    Well, you were -- let's just put it this
17 way.  You were in the process of detaining two
18 witnesses, so you weren't in a position to provide
19 moral support with her, were you?
20   A    No.  And I never said that it had to be
21 at that time.
22   Q    So you actually put Ms. Ward Stamp into
23 your car, correct?
24   A    Yes.
25   Q    And she was still cuffed at that point,

Page 131

1  right?
2    A    I believe so, yes.
3    Q    So you detained Ms. Ward Stamp in your
4  police cruiser?
5    A    I placed her in my vehicle, yes.
6    Q    And she was not free to leave, correct?
7    A    At that point she was placed in my
8  vehicle due to the weather, and I didn't want her to
9  be outside.  And I believed the vehicle that she was
10 in prior needed to be used for something else.  I
11 don't know, though.
12   Q    When you put Ms. Ward Stamp into your
13 police cruiser was she free to leave?
14   A    She was placed into my vehicle for the
15 weather, yes.  She was -- she was not free to leave
16 at that point.
17   Q    And she was still cuffed?
18   A    I believe so, yes.
19   Q    Did you also search her?
20   A    I don't believe I did.
21   Q    Um, were you required to search her when
22 you were putting her into your vehicle?
23   A    No, because she was searched prior to
24 that.
25   Q    You knew she had already been searched by

Page 132

1  Deputy Spencer because she had been in her vehicle
2  before?
3    A    Correct.
4    Q    And there's no requirement that you
5  perform an additional search once she's been searched
6  by a different deputy?
7    A    I don't believe so.
8    Q    And in fact Deputy Spencer told you that
9  she had already been searched, right?
10   A    I believe so.
11   Q    She provided you with a envelope that had
12 Ms. Ward Stamp's possessions in it, correct?
13   A    I believe so, yes.
14   Q    She also let you know that she had called
15 her in and she was cleared and didn't have any
16 warrants, correct?
17   A    I believe so, yes.
18   Q    And at this point you still didn't have
19 any probable cause to justify arresting Ms. Ward
20 Stamp.  Do you agree with that?
21   A    There was reasonable suspicion to detain
22 her, yes.
23   Q    And that is still the same thing that
24 you've said all along, that the reasonable suspicion
25 was the possibility that she could have maybe been

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp, and
KRISTY WARD STAMP,

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity
PUEBLO COUNTY BOARD OF COUNTY COMMISSIONERS
DEPUTY CHARLES MCWHORTER, in his individual and official capacity;
DEPUTY CASSANDRA GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official capacity;
DEPUTY CHRISTINE SPENCER, in her individual and official capacity;
DEPUTY NICOLAS BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and official capacity,
SERGEANT JOSH RAGAN, in his individual and official capacity, and
CAPTAIN SHELLEY BRYANT, in her individual and official capacity,

      Defendants.

---

**BODY -WORN CAMERA VIDEO ONE OF DEFENDANT NICOLAS BERUMAN
(CONVENTIONALLY SUBMITTED)**

---

      The electronic **Body-Worn Camera Video One of Defendant Nicolas Berumen**, which

has been disclosed to all Parties with the name and Bates number, "Ward (147) - PCSO - BWC -

Suspicious_Pers (27)," is being conventionally filed with the Court on a flash drive pursuant to

Section 4.8(f) of this Court's Electronic Case Filing Procedures.  A copy of these materials is

being delivered via Dropbox to all counsel, as stated in the Certificate of Service for Plaintiffs'

Motion for Partial Summary Judgment.

*AB Litigation Services*

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 23-cv-00473-CNS-MDB

_____

DEPOSITION OF NICOLAS BERUMEN
April 11, 2024

_____

ESTATE OF RICHARD WARD, by and through its personal
representative Kristy Ward Stamp, and KRISTY WARD
STAMP,

Plaintiff,

vs.

PUEBLO COUNTY, COLORADO; DEPUTY CHARLES McWHORTER, in
his individual and official capacity; DEPUTY
CASSANDRA GONZALES, in her individual and official
capacity; DEPUTY JACOB MAHAN, in his individual and
official capacity; DEPUTY CHRISTINE SPENCER, in her
individual and official capacity; DEPUTY NICOLAS
BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and
official capacity; and SERGEANT JOSH RAGAN, in his
individual and official capacity,

Defendants.

_____

APPEARANCES:
   KILLMER LANE, LLP
      By Darold W. Killmer, Esq.
         Reid Allison, Esq.
         1543 Champa Street
         Suite 400
         Denver, Colorado 80202
         303.571.1000
         dkillmer@killmerlane.com
         rallison@killmerlane.com
            Appearing on behalf of Plaintiffs

**Page 2**

1  APPEARANCES CONTINUED:
2
3     NEWMAN McNULTY, LLC
3        By Mari Newman, Esq.
           Andy McNulty, Esq.
4           1490 N. Lafayette Street
            Suite 304
5           Denver, Colorado 80218
            720.850.5770
6           mari@newman-mcnulty.com
            andy@newman-mcnulty.com
7              Appearing on behalf of Plaintiffs
8
9     THE LANE LAW FIRM, PC
9        By William O'Donnell, Esq.
           3131 S. Vaughn Way
10          Suite 220
            Aurora, Colorado 80014
11          303.830.0500
            wodonnell@lanelawpc.com
12             Appearing on behalf of Defendants
13
14    ALSO PRESENT:  Cassandra Gonzales
                     Kristy Ward
15                   Sam Weiner
                     Shelley Bryant
16
17
18
19
20
21
22
23
24
25

**Page 3**

1          Pursuant to Notice and the Federal Rules of
2  Civil Procedure, the deposition of NICOLAS BERUMEN,
3  called by Plaintiffs, was taken on Thursday, April
4  11, 2024, commencing at 9:04 a.m., via remote
5  videoconference, before Barbara J. Davalos,
6  Registered Merit Reporter and Certified Realtime
7  Reporter within and for the State of Colorado.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1               I N D E X
2
   EXAMINATION                                    PAGE
3
   BY MS. NEWMAN                                     6
4  BY MR. O'DONNELL                               251
   BY MS. NEWMAN                                  255
5
6  CERTIFIED QUESTIONS                            PAGE
7  BY MS. NEWMAN                                  105
                                                  106
8
9  EXHIBIT        DESCRIPTION       INITIAL  REFERENCE
10
   **Exhibits 65 and 67 to be provided at a later
11 date.**
12 Exhibit 60   Termination letter for Nick        15
                Berumen, 7/14/23
13
14 Exhibit 61   Application file for Nicolas       18
                Berumen
15 Exhibit 62   Order - Motion to Dismiss in       24
                Twiford v. Correctional
16              Health Partners, et al.
17 Exhibit 63   Defendant Berumen's Responses      32
                to Plaintiffs' Discovery
18              Requests to the Individual
                Defendants
19
   Exhibit 64   Office Of Professional            42
20              Standards & Internal Affairs
                IA23-005, Deputy Nicolas
21              Berumen, 5/2/23
22 Exhibit 65   Video                            198
23 Exhibit 66   Deputy Report for Incident       209
                22S004894 prepared by Nicolas
24              Berumen, 3/29/22
25

*AB Litigation Services*

Page 129

1    A    I don't recall her ever saying that she
2  didn't want to go anywhere, from my recollection.
3    Q    Did Ms. Ward Stamp have a choice as to
4  whether or not to go to the annex?
5    A    I don't recall, honestly.
6    Q    Did you ever give Ms. Ward Stamp a choice?
7    A    I don't recall.  I know that when we
8  brought them out of the vehicle essentially she was
9  passed off to Deputy Spencer, if I believe correctly.
10 As to where that interaction took place after that,
11 I'm not really too sure.
12   Q    All right.  The question I asked -- and
13 just for this -- for the duration of this deposition
14 if you could just listen really carefully to my
15 questions and answer the questions I ask, it will go
16 a lot more smoothly.  All right?
17   A    Yes, ma'am.
18   Q    The question I asked is, did you ever give
19 Ms. Ward Stamp a choice of whether or not to go to
20 the annex?
21   A    I don't recall if I did or not, ma'am.
22   Q    If she had said, I don't want to go, would
23 you have allowed her to leave?
24   A    I more than likely would have conferred
25 with my supervision to see what they would have

Page 130

1  wanted to do in that situation.
2    Q    You were the person who handcuffed Ms.
3  Ward Stamp, right?
4    A    Yes, ma'am.
5    Q    Did you ever give her a choice as to
6  whether or not to be handcuffed?
7    A    I don't recall.  I know I did advise her
8  that she was being detained, from my understanding,
9  but I did clarify that and at least try to chat with
10 her, you know, to ease the tension, more so, I guess,
11 that was there, you know.
12   Q    All right.  Well, when you advised her
13 that she was being detained, the point of that was
14 that she was not free to leave, correct?
15   A    It was to more so to kind of get her out
16 of the predicament she was in at that point just
17 because she was in an active crime scene, and then
18 also kind of like, you know, the weather that we had
19 taking place there and just getting into a vehicle
20 that was out of the way, in a sense, and we can have
21 a conversation, just -- not, more so, me have a
22 conversation but a conversation could take place
23 later down the road just to see what actually
24 occurred.
25   Q    Did you ever have conversation with Ms.

Page 131

1  Ward Stamp to see what had occurred?
2    A    I believe the extent of it was -- I don't
3  know how it came to fruition, but she did advise me
4  that it was her son.  And I didn't ask anything in
5  reference to, you know, her son or anything of the
6  sort or what actions did take place.
7    Q    So other than her advising you that the
8  person that the -- that your colleague had shot was
9  her son, did you ever have any conversation with Ms.
10 Ward Stamp to find out what had occurred?
11   A    The only other thing that I would remember
12 in reference to her being there, in a sense, I guess,
13 more so, would be her son who was autistic.  She said
14 -- I can't remember the child's name -- Chase or
15 something of the sort, but that she was there for her
16 son.
17        And then that kind of confused me because
18 I didn't know which one we were talking about at the
19 time.  But that was pretty much where that was left.
20   Q    So the two pieces of information that you
21 learned from Ms. Ward Stamp on the scene were that
22 the person who had been shot was her son and that she
23 was there at the school to pick up her son, Chase,
24 who was autistic, right?
25   A    And I believe that was after we -- I know

Page 132

1  it was after we exited the vehicle.  So I'm not sure
2  kind of where I found out that information.  So that
3  would probably be on the walk over to the vehicles, I
4  would imagine.
5    Q    All right.  But the question -- just
6  listen to the question I'm asking here.  The two --
7  the only two pieces of information that you learned
8  from Ms. Ward Stamp on the scene were that the person
9  who sheriff's had shot was her son and that the
10 reason she was at the school was to pick up her other
11 son, who was autistic?
12   A    That I can recall, yes, ma'am.
13   Q    You didn't ask her any other questions as
14 to what was going on or what her involvement was,
15 correct?
16   A    No, ma'am.
17   Q    Correct?
18   A    Yes.
19   Q    You advised her she was being detained.
20 In that she was being detained, that means she was
21 not free to leave, correct?
22   A    I mean, there's different variables that
23 come into play with that.  But at the time we wanted
24 to move them out of the area just -- I mean, we
25 didn't know the factors at play, right.  We don't

*AB Litigation Services*

**Page 133**

1  know the incident took place, you know, the players,
2  the suspects, the witnesses, the victims, you know,
3  stuff of the sort.
4        So more it would be she was detained to
5  conduct the investigation initially and then kind of
6  see her opinion or her side of what took place later
7  down the road when another entity came in to speak
8  with her.
9    Q    All right.  But when she was detained she
10 wasn't free to leave, correct?
11   A    As of when she was detained she did walk
12 to the vehicle.  But, like I said, she didn't give me
13 any rebuttal, I guess, more so.  It was just to get
14 her out of the area.  So the intentions initially
15 were just to get her out of the area of the crime
16 scene, was the reason for the detainment that I knew
17 of.
18   Q    I feel like you're maybe not understanding
19 what I'm asking.  I'm asking a very specific
20 question.  When you detained Ms. Ward Stamp, was she
21 free to leave?
22   A    At that time, no, I don't believe she was.
23   Q    And was she ever free to leave at any
24 time?
25   A    I'm not sure.  I wasn't with her the whole

**Page 134**

1  time, ma'am.
2    Q    During the entirety of the event that
3  you're aware of, was Ms. Ward Stamp ever free to
4  leave?
5    A    I'm unsure of that just because we had
6  different players in it that chatted with her, you
7  know.
8    Q    You agree that in order to arrest Ms. Ward
9  Stamp you would either have to have a warrant or
10 probable cause to believe that she was engaged in a
11 crime, correct?
12   A    There's different variables to the whole
13 thing.  I mean, there's -- it's kind of a simplistic
14 question for an articulated answer that's really
15 extravagant, in a sense.  There's a lot of variables
16 that can come into play that factor into the
17 decision-making process of the detainment.
18   Q    Okay.  Listen to my question.  My question
19 was about arrest.  Okay?
20        Do you agree with me that in order to
21 arrest Ms. Ward Stamp, you would have to either have
22 a warrant or probable cause to believe that she was
23 engaged in a crime?
24   A    I could see that would be something we
25 would look for.

**Page 135**

1    Q    I'm not asking if it's something you would
2  look for.  I'm asking what would be -- what would
3  allow you to legally arrest a person.  What are the
4  factors that allow you to legally arrest a person?
5    A    Probable cause, in a sense, knowing that
6  the crime was committed, kind of along those lines,
7  depending on different circumstances.  A warrant
8  could take place asking for the arrest of said
9  individual.
10   Q    So in order to arrest somebody, is it true
11 that you would either have to have a warrant to
12 arrest them or have probable cause to believe that
13 they had engaged in a crime?
14   A    Yeah, I would say, more or less.
15   Q    More or less, or yes?
16   A    Can you repeat the question for me,
17 please.
18   Q    In order to arrest somebody, do you agree
19 that you would have to have a warrant or probable
20 cause to believe that they had engaged in a crime?
21   A    Yes.
22   Q    Have you been trained regarding probable
23 cause?
24   A    Yeah, in the academy and then throughout
25 years of our classes and even, you know, certain

**Page 136**

1  aspects of policing that aren't even necessarily
2  related to it.  I know the topics came up when we've
3  discussed or kind of expounded upon it to ensure we
4  all understand the processes and when to act.
5    Q    Okay.  And have you been trained regarding
6  reasonable suspicion?
7    A    Yes, ma'am.
8    Q    Do you understand that in order to legally
9  detain somebody, you have to have reasonable
10 suspicion to believe that they've engaged in a crime?
11   A    I know -- I mean, there's a bunch of
12 different factors that I would say in detainment.  I
13 mean, from medical aspects, escape, flight, you don't
14 know what took place, you know, investigatory stops,
15 stuff of the sort.  You know what I mean?  A Terry
16 frisk after the fact.  There's a lot of variables in
17 play that are more than just that, I would say, in my
18 opinion.
19   Q    All right.  Well, you didn't have any
20 concern that Ms. Ward Stamp was a flight risk, did
21 you?
22   A    I don't know her history, you know.
23 Possibly.
24   Q    I mean, other than mere speculation, you
25 didn't have any information that led you to believe

*AB Litigation Services*

Page 141

1  build the direction we want to go, or whoever is
2  going to take over the investigation itself.
3      Q    (BY MS. NEWMAN)  So at that point the only
4  information relating to her involvement was the fact
5  that she was in the car that Mr. Ward got into,
6  right?
7      A    At that time, yes, ma'am, I believe that's
8  all I had.
9      Q    But you just didn't know of any
10  involvement one way or the other?
11      A    Just the vehicle aspect of it.
12      Q    Just that she was sitting in the car?
13      A    Yeah, and Mr. Ward got into that vehicle
14  itself.
15      Q    All right.  And you would agree with me
16  that you never had probable cause to justify
17  arresting Ms. Ward Stamp, correct?
18      A    I don't know necessarily just because the
19  investigation -- the detainment and investigation
20  took place, more so, after my contact, right.  So I
21  don't know if anything came to fruition after the
22  fact or could have with further questioning.
23          As I said, I didn't question her any
24  further, just on the magnitude of the actions that
25  took place.  You know, I didn't want to tread in that

Page 142

1  water, in a sense.
2      Q    Right.  So let's talk about the
3  information you had.  You didn't have probable cause
4  to arrest Ms. Ward Stamp, correct?
5      A    At the time of the contact, no.  Like I
6  said, it's -- the answer is just -- it's hard to give
7  a straight answer on that.
8      Q    Well, did you ever -- you personally, did
9  you ever have probable cause to arrest Ms. Ward
10  Stamp?
11      A    Without further investigation at the time,
12  probably not without further investigation.
13      Q    Did you ever have reasonable suspicion to
14  believe that Ms. Ward Stamp was involved in any
15  crime?
16      A    Due to the act of him getting into the
17  vehicle with her, she was possibly part of it.  But
18  like I said, even a victim.  You know, I don't know
19  if he hopped into someone unknowing's vehicle and
20  what have you.
21          So the suspicion was there that the crime
22  was being committed, right.  And I don't know if Ms.
23  Ward Stamp and Tommy were getaway drivers, lookouts
24  or what have you.  So like I said, the variables are
25  just astronomical, in the sense, of what could have

Page 143

1  actually taken place to what the result was.  It's
2  just a very hard answer to give on a simplistic
3  question.
4      Q    Well, you said there are various
5  variables.  But my question is actually quite
6  specific.  Did you ever have reasonable suspicion to
7  believe that Ms. Ward Stamp had committed any crime?
8  And, if so, tell me exactly what that reasonable
9  suspicion was based on.
10      A    I would say yes, on the basis of, like I
11  said, the -- getting into the vehicle, right.  Like,
12  apparently they were observant of what Mr. Ward was
13  doing, right.  It would be kind of hard not to be,
14  especially if he was seen tugging on doors, or what
15  have you, and then comes back to the vehicle itself.
16  You know, that's suspicious.
17          I mean, if they're there to pick up the
18  child, then I understand, in a sense.  But, then
19  again, why is Richard pulling on vehicle doors then?
20  The car is waiting.  To make a quick get away?  I
21  don't know, you know.  But I believe at that time we
22  did have enough suspicion to do that.
23      Q    All right.  So you believe that you --
24  sorry.
25      A    I was going to say me, more so.

Page 144

1      Q    Is there any other information that you
2  believe gave you reasonable suspicion to believe that
3  Ms. Ward Stamp was engaged in any crime besides what
4  you've just said?
5      A    I mean, it's -- I mean, just the oddity of
6  it all, in a sense.  I mean, in a sense, when
7  something like that takes place, right, you know,
8  where you hear a suspicious person at a school, your
9  mind obviously goes to school shootings, stuff of the
10  sort, Sandy Hook, stuff of the sort.  That's where
11  you don't want to go, but that's where it goes to
12  prevent, you know, life, right -- or keep life alive,
13  right.
14          I mean, at the time the suspicion I had
15  was the vehicle.  But, then again, like I said, the
16  magnitude could have expounded a lot further, took
17  more factors, right.  I've -- personally in my career
18  I've went to welfare check and got shot at.  So I
19  kind of understand where things go off the rails.
20          And I think it's better to be safe than
21  sorry in that aspect to kind of see what was going --
22      Q    Well, I'm asking you a pretty specific
23  question here.  So I'm asking you to give me every
24  single bit of data that gave you what you believe was
25  reasonable suspicion to believe that Ms. Ward Stamp

*AB Litigation Services*

1  wouldn't develop our own initial reasonable suspicion
2  for the detainment itself.
3      Q    You're required to develop your own
4  information to justify whether or not there's
5  reasonable suspicion to detain somebody, correct?
6      A    Right, yes, ma'am, yep.
7      Q    And the way that you conducted yourself in
8  this case, was everything you did pursuant to your
9  training and the customs, policies and practices of
10 the Pueblo County Sheriff's Office?
11     A    Yes, ma'am.
12     Q    You're trained in the policies around use
13 of force, aren't you?
14     A    Yes, ma'am.
15     Q    You've been trained that handcuffing
16 itself is a use of force, correct?
17     A    Yeah.  It's on the use of force continuum.
18     Q    And you've been trained specifically that
19 handcuffing itself is a use of force?
20     A    Yes, ma'am.
21     Q    Can you please provide to me every
22 justification for your decision to handcuff Ms. Ward
23 Stamp.
24     A    So it would be, like I divulged earlier,
25 in reference to it would be the initial call for

1  service, responding on the scene.  The initial call
2  that took place was a male party pulling on the door
3  handles and then returning to a vehicle, said vehicle
4  the occupants were Mr. Brown -- I believe his last
5  name is -- and Ms. Ward Stamp.
6          So that would kind of give me -- or that
7  would give me the suspicion that they were possibly
8  involved in the crime, like I dictated earlier, you
9  know, and/or different -- there's different factors
10 at play with that.  But the reason for detainment to
11 be -- as well as that initial suspicion, but to
12 remove them from a crime scene, because they were
13 still in the active crime scene.  Of course, the
14 inclement weather that was taking place at that time.
15 You know, it was freezing.  Just kids coming out of
16 school, stuff of the sort, you know.
17         I mean, that's the last thing a parent
18 wants to see is -- or a kid wants to see, more so, is
19 someone lying on the ground, unfortunately, and then
20 people getting brought out of the vehicle in
21 handcuffs.  So just the perception of the children,
22 in a sense.
23         I mean, that's why we had them leave
24 through the other doors.  There's just many, many
25 factors as to why, but those would be some of the

1  ones that I took into account when I initially
2  contacted Ms. Ward Stamp.
3      Q    So one option you had is you could have
4  asked Ms. Ward Stamp to come with you without
5  handcuffing her, correct?
6      A    Yeah.  But the -- so the thing that's
7  concerning about that is we don't know what took
8  place, right.  So in the sense of is she armed,
9  right.  We don't know when she is sitting in the
10 vehicle.
11         She didn't, you know, show anything to me,
12 of course, but you don't know if she has some sort of
13 weapon on her or something of the sort or has any
14 other intentions.
15     Q    Did you ask her ever whether she had a
16 weapon on her?
17     A    I don't know if they did prior to me
18 arriving, but, myself, I did not.  I don't --
19     Q    So you -- sorry.
20     A    I said I don't believe I did.
21     Q    So you immediately cuffed her before even
22 asking her if she had a weapon, right?
23     A    Well, I asked her out of the vehicle and
24 then asked -- she said, This way.  I believe she
25 pointed.  And I said, Yeah, come this way over here.

1  I'm sorry, this going to be uncomfortable, ma'am.
2          And then she exited towards me.  And then
3  I asked her to face away from me, and that's when I
4  detained her and I placed her in hand restraints.
5  And I did advise her, You're being detained, not
6  arrested.
7      Q    Right.  So you immediately handcuffed her
8  before even having any kind of conversation with her,
9  right?
10     A    Yeah.  I detained her, yes, ma'am.
11     Q    And specifically you handcuffed her,
12 correct?
13     A    Yes.  That's part of the detainment, yes,
14 ma'am.
15     Q    One option you had is you didn't need to
16 handcuff her, did you?  You could have chosen not to.
17     A    Like I said, there's just -- there's too
18 many unknowns.  And I've been in enough altercations
19 without putting handcuffs on people where they either
20 fled, fought, what have you.
21         Like I said, she didn't give me any
22 indicators of flight, but you never know.  There's
23 too many unknowns in that world, in a sense, you
24 know.  It's -- a black and white answer in a gray
25 world is very hard to give, you know.

*AB Litigation Services*

1  supervision.  I didn't ask it there, but it would
2  have been, more so, a supervisorial discretion of
3  what they wanted to do if that question did arise,
4  which it didn't.
5      Q    She was still handcuffed in the back of a
6  patrol car, correct?
7      A    I'm not sure.  I wasn't with her at that
8  time.
9      Q    Well, you had directed her at that point
10 to be put in the back of -- by that time she had been
11 moved around from car to car.  But you understood she
12 was still cuffed in the back of a patrol car, didn't
13 you?
14     A    I was with Mr. Brown.  I don't know if she
15 was or not.
16     Q    When you directed Deputy Quintana to take
17 Kristy Ward Stamp to the annex, where did you believe
18 she was?
19     A    More than likely -- I'm guessing more than
20 likely in the back of his vehicle, I would imagine.
21     Q    So was Ms. Ward Stamp free to leave?
22     A    At that time, due to the totality of the
23 circumstances with everything that took place and her
24 still needing to be spoken with by interviewed, more
25 so, by that separate entity, the agency, which I

1  believe was Pueblo Police, at that time she was not.
2      Q    Was Mr. Brown free to leave?
3      A    Essentially the same response that I gave
4  for Ms. Ward Stamp.  He was not.
5      Q    Have you been trained on any kind of
6  policy about when a witness should be taken down to
7  the annex for questioning?
8      A    I'm sure we've covered it throughout.
9  Like I said previously, the same thing with
10 everything else.  It's -- we've -- I'm assuming we've
11 had a class at some point in time.  I'd guess we had
12 a class at some point in time, and then it gets
13 touched on here and there throughout trainings
14 throughout the year or block training, what have you.
15     Q    There was a time on your body camera
16 footage when you're having a conversation with Tommy
17 Brown in the car, and he said -- he asks you if he's
18 being interviewed because he was driving.  And you
19 said he was being interviewed because he was
20 involved.  Do you generally recall that?
21     A    I believe, yeah, he replied to me -- or I
22 replied to him he was involved.  And I think he kind
23 of got worked up a little bit.  He was like, No no, I
24 wasn't involved, I wasn't involved.  And then I
25 expounded upon it, Well, you were there and we kind

1  of need to see what was going on with the whole
2  interaction itself.
3      Q    And other than the fact that he was there,
4  you didn't have any specific reason to believe he was
5  involved, correct?
6      A    Like I said, the initial call for service
7  that's kind of what we dictate a lot on in reference
8  to it.  And we didn't go into in-depth questioning at
9  all, by any means.  Like I said previously, it was
10 that separate entity that did so.
11     Q    I understand.  But he immediately told you
12 that he wasn't involved, right?
13     A    In the vehicle I believe he did say that
14 he wasn't involved yes, he did.
15     Q    Yes, he did say that he wasn't involved?
16     A    I guess, I think that's what he did say,
17 if I remember correctly.
18     Q    And the question I have for you is, at
19 that point, other than the initial information that
20 you were going with, that he was in the car that
21 Mr. Ward got into, you didn't have any reason to
22 believe he was involved other than that, correct?
23     A    Well, the initial call -- like I said, the
24 initial call.  But, also, I mean, how many people
25 have we arrested that have said, I'm innocent, you

1  know.  And you find out later down the road that they
2  weren't so much innocent.  So it could be dictated
3  the same way, right.
4           I mean, not to go overboard with it, but
5  like the theater shooting, right, he was just a
6  patron of the theater itself, you know.  So people --
7  what is the phrase, to hide in sheep's clothing or
8  something of the sort, a wolf in sheep's clothing,
9  something of the sort.  So you never know kind of who
10 you're dealing with or what the truthful facts are
11 before the question dictates what actually did
12 happen.
13     Q    You clarified to Mr. Brown that all you
14 meant by saying he was involved was just that he was
15 there, correct?
16     A    I only clarified it because I didn't
17 have -- I didn't ask any more questions in reference
18 to it, but I didn't want him to get worked up more
19 so.  And I know given his demeanor prior he probably
20 would get worked up again if I dictated something a
21 certain way.
22           And then I, like, kind of elaborated on my
23 role, I believe, as to what I did.  I believe I even
24 called myself a taxi driver at one point in time to
25 kind of just tell him, Hey, I'm just here to give you

*AB Litigation Services*

Page 205

1  to Ms. Ward Stamp prior to this are, first, her son
2  was shot in front of her, correct?
3      A    I wasn't there. I don't know. I wasn't
4  there.
5      Q    You don't know if her son was shot in
6  front of her?
7      A    When I got there she was facing forward.
8  So I'm not sure if she was looking back when the
9  altercation took place.
10     Q    What you know is Ms. Ward's son was shot
11 within feet of her, correct?
12     A    Yes, ma'am.
13     Q    And then she was taken out of her car and
14 immediately put in handcuffs by you, correct?
15     A    Yes, ma'am.
16     Q    She was then moved from patrol car to
17 patrol car to patrol car, correct?
18     A    She was advised she was detained and under
19 arrest and then moved to a vehicle due to inclement
20 weather, yes, ma'am.
21     Q    And she was detained in handcuffs all of
22 that time, correct?
23     A    I am not sure of that. I don't know if
24 they took her out of hand restraints in a separate
25 vehicle, or what have you. I was with Mr. Brown.

Page 206

1      Q    You know that Ms. Ward Stamp was searched,
2  correct?
3      A    I believe she was searched as policy would
4  dictate any time we're transporting an individual in
5  a vehicle, yes, ma'am.
6      Q    And you were aware that she -- that her
7  personal belongings were taken, correct?
8      A    I wasn't aware of that, no, ma'am.
9      Q    And then she was transported down in
10 handcuffs to the station. So that's all of the
11 things that led up to this moment, right?
12     A    I mean, there's more -- there's different
13 things involved, in a sense, of like the location of
14 me telling or advising Ms. Ward Stamp that she was
15 detained, not arrested, different aspects. I don't
16 know the conversations they took with the other
17 officers.
18         My part was taking out of the vehicle,
19 like I said, advising her she was detained, not under
20 arrest, and then handing her off, in a sense, to
21 another deputy. So I'm not sure what took place with
22 those other officers or deputies or what have you.
23 In a sense, this is, I guess, where I pick up the
24 next part of my interaction with Ms. Ward Stamp.
25     Q    Right. What you know is she has been

Page 207

1  handcuffed in the back of various patrol cars and
2  handed off from deputy to deputy to deputy, right?
3      A    I don't recall how many deputies, but I
4  know she has at least moved one time to a different
5  vehicle out of --
6      Q    So you know -- sorry.
7      A    I was going to say out of Deputy Spencer's
8  to -- I don't know who it was after that.
9      Q    And your sworn testimony is that if she
10 didn't leave, it's because it's her fault for not
11 asking?
12     A    I think more so if that question presented
13 itself that we would look at it in a different way as
14 to what was going on and, like I said, talk to
15 supervision and then get that reasoning as to why or
16 what we're going to do through legal counsel, in the
17 sense of the district attorney, and get that guidance
18 through them. I think --
19     Q    Is it your --
20     A    Go ahead.
21     Q    Were you done?
22     A    Yeah. Go ahead.
23     Q    Is it your training that if -- that you
24 can hold somebody indefinitely until they ask to
25 leave?

Page 208

1      A    No. If it's a detainment, you're going to
2  hold the people for a reasonable amount of time until
3  an investigation is completed.
4      Q    And it's not incumbent on the person to
5  ask to leave. You're legally required to release
6  them once there's been adequate time to interrogate
7  them and determine whether or not there's reasonable
8  cause to believe they've engaged in any crime, right?
9      A    Well, once we interview them and we
10 dictate it becomes unreasonable or you don't have the
11 evidentiary value there to move forward with
12 something else. But, like I said, this was prior to
13 any questioning that even took place, in a sense.
14     Q    You can't just hold somebody until they
15 ask to leave, right?
16     A    Not necessarily. Because, I mean, once it
17 becomes unreasonable, that's when you're going to
18 have to release. Like I said, this -- the
19 questioning of Ms. Ward Stamp and Mr. Brown hasn't
20 even begun yet. They're just getting there to do
21 that.
22     Q    In light of the fact that the decision had
23 been made not to question Ms. Ward Stamp at all
24 before this, during this moment at -- your body
25 camera shows at 58 minutes and 26 seconds, was she

*AB Litigation Services*

Page 209

1  free to leave?
2      A      At that time, no, due to the unknowing of
3  what took place.
4      Q      All right.  We're going to go back to --
5  if I can find it.  Hold on a minute.  All right.  I'm
6  going to show you your report already.  Can you see
7  on the screen your report?
8      A      Yes.  It's small, but yes, ma'am.
9            MR. O'DONNELL:  If it's easier, why don't
10  you look on that one.
11           THE DEPONENT:  Yeah.
12      Q     (BY MS. NEWMAN)  Can you read it?
13      A      Yes, ma'am.
14      Q      All right.  And you recognize this as your
15  report?  I can give you a hand.  Right here at the
16  first part it says, I, Nicholas Berumen, responded.
17      A      Can you go to the bottom, just to make
18  sure I signed it.
19      Q      Sure.
20      A      Yep, that's me.
21      Q      So you recognize this as your report?
22  It's Bates Number Ward 54 and 55.
23      A      Yes, ma'am.
24      Q      All right.  This will be Exhibit --
25           MR. O'DONNELL:  It will be 66.

Page 210

1            MS. NEWMAN:  Thank you.  I'm not doing a
2  great job keeping track of the numbers as I'm going.
3            (Exhibit Number 66 was marked.)
4      Q      (BY MS. NEWMAN)  All right.  Exhibit 66 is
5  your report.
6            So when did you write this report?
7      A      I would imagine it would have been the day
8  of.
9      Q      Does it help to look on the second page
10  at the bottom that it was Wednesday, February 23rd at
11  16:58?
12      A      Yes.
13      Q      Is that the time that you did this report?
14      A      Yeah.  That would have been at least the
15  time I finished it.  I would imagine I sent it off
16  for approval.
17      Q      Where were you when you wrote this report?
18      A      I couldn't tell you, in all honesty.  I
19  would have no idea.
20      Q      Was it your practice -- or what was your
21  practice at the time?
22      A      Just, I mean, this was the time that I was
23  actually able to be a cop, in a sense, and I could
24  work -- I could go look for warrants, or what have
25  you, do interviews at the jail or what's going on.

Page 211

1  So I'm not really sure where I would have been at
2  this time.  I could have been at the annex or what
3  have you.  I really don't know.
4      Q      Was your practice to write your report by
5  yourself or in a room with other people?
6      A      No.  I would write it by myself.  I mean,
7  it just depends what happened.  I know we used to
8  have a lieutenant that would make sure we all sat
9  down and got it done, and that was just to make sure
10  it just got done on time.
11           But, then again, like at this time
12  period -- like I said, I'm assuming I would have been
13  by myself.  I'm guessing, I'm thinking I would have
14  been by myself.
15      Q      Was it your practice to talk with the
16  other involved officers before doing your report to
17  make sure you all sort of remembered things the same?
18      A      No, because in a report you're telling
19  your side and your statements of events.  So in a
20  sense, it wouldn't be necessarily what everyone's
21  actions were.
22           I mean, if I was doing a main narrative,
23  then, yeah, I possibly could put in -- everyone
24  else's interactions into the report itself.  But
25  being this was a supplemental, it would have been my

Page 212

1  point of view, I guess, in a sense.
2      Q      All right.  And I read through this
3  report, and the entirety of your report describes
4  your interaction and engagement with Mr. Brown, but
5  what I don't see mentioned anywhere in it is any of
6  your interactions with Ms. Ward Stamp.
7            Why is it you didn't put anything about
8  your interactions with her in your report?
9      A      I don't recall as to why I wouldn't.
10      Q      Wouldn't it have been appropriate for you
11  to include that you -- among other things, that you
12  cuffed Ms. Ward Stamp?
13      A      Yes, ma'am.
14      Q      Wouldn't it have been appropriate for you
15  to put in your report that you made the decision to
16  detain Ms. Ward Stamp?
17      A      Yes, ma'am.
18      Q      And wouldn't it have been appropriate for
19  you to include in your report the legal basis for
20  your decision to detain Ms. Ward Stamp?
21      A      Yeah.  In reference to that, it just
22  depends on -- I mean, there would be some sort of
23  indicator somewhere as to why we did certain things
24  or why I did that certain act.
25      Q      Well, and you know that you're required to

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp, and
KRISTY WARD STAMP,

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity
PUEBLO COUNTY BOARD OF COUNTY COMMISSIONERS
DEPUTY CHARLES MCWHORTER, in his individual and official capacity;
DEPUTY CASSANDRA GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official capacity;
DEPUTY CHRISTINE SPENCER, in her individual and official capacity;
DEPUTY NICOLAS BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and official capacity,
SERGEANT JOSH RAGAN, in his individual and official capacity, and
CAPTAIN SHELLEY BRYANT, in her individual and official capacity,

      Defendants.

---

**BODY -WORN CAMERA VIDEO OF DEFENDANT CHRISTINE SPENCER
(CONVENTIONALLY SUBMITTED)**

---

      The electronic **Body-Worn Camera Video of Defendant Christine Spencer**, which has been disclosed to all Parties with the name and Bates number, "Ward (149) - PCSO - BWC - Suspicious_Pers (29)," is being conventionally filed with the Court on a flash drive pursuant to Section 4.8(f) of this Court's Electronic Case Filing Procedures.  A copy of these materials is being delivered via Dropbox to all counsel, as stated in the Certificate of Service for Plaintiffs' Motion for Partial Summary Judgment.

*AB Litigation Services*

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT COURT OF COLORADO
Civil Action No. 23-CV-00473-CNS-MDB
--------------------------------------------------
VIDEOCONFERENCE DEPOSITION OF
CHRISTINE DANCE SPENCER
NOVEMBER 27, 2023
--------------------------------------------------
ESTATE OF RICHARD WARD, by and through its personal
representative Kristy Ward Stamp, and
KRISTY WARD STAMP,
    Plaintiffs,
v.
PUEBLO, COLORADO; DEPUTY CHARLES McWHORTER, in his
individual and official capacity; DEPUTY CASSANDRA
GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official
capacity; DEPUTY CHRISTINE SPENCER, in her individual
and official capacity; DEPUTY NICOLAS BERUMEN, in his
individual and official capacity; DEPUTY ROBERT
QUINTANA, in his individual and official capacity;
and SERGEANT JOSH RAGAN, in his individual and
official capacity,
    Defendants.
--------------------------------------------------

APPEARANCES:
    KILLMER LANE LLP
      By Darold W. Killmer, Esq.
        Mari Newman, Esq.
        Andrew McNulty, Esq.
        Reid Allison, Esq.
        1543 Champa Street, Suite 400
        Denver, Colorado 80202
          Appearing remotely for Plaintiffs
```

**Page 2**

```
1   APPEARANCES (continued):
2       THE LANE LAW FIRM, P.C.
          By William O'Donnell, Esq.
3         5105 DTC Parkway
          First National Bank Building, Suite 475
4         Greenwood Village, Colorado 80111-2764
            Appearing remotely for Defendants
5
6       Also Present Remotely:  Cassandra Gonzales
                                Kristy Ward Stamp
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1          Pursuant to Notice and the Federal
2    Rules of Civil Procedure, the videoconference
3    deposition of CHRISTINE DANCE SPENCER, called by
4    Plaintiffs, was taken on Monday, November 27, 2023,
5    commencing at 1:08 p.m. before Kathy L. Davis,
6    Registered Professional Reporter, Certified Realtime
7    Reporter, and Registered Merit Reporter within and
8    for the State of Colorado.
9
10
11                    I N D E X
12   VIDEOCONFERENCE DEPOSITION OF CHRISTINE DANCE SPENCER
13   EXAMINATION                               PAGE
14       By Ms. Newman                          5
15   EXHIBITS                        INITIAL REFERENCE
16   Exhibit 12  Background report of Christina  9
                 Dance Emilio
17
     Exhibit 13  Pueblo County Law Enforcement   58
18               Bureau Policy Number 1.5,
                 Subject:  Arrests and
19               Detentions
20   Exhibit 14  Pueblo County Sheriffs Office,  81
                 Policy Number:  1.4, Search and
21               Seizure
22   Exhibit 15  Document titled                 99
                 Officer-Involved Incident
23               Protocol Of The Tenth Judicial
                 District
24
     Exhibit 16  Photographs of Gonzales' arms  104
25               taken at the hospital
```

**Page 4**

```
1    EXHIBITS (continued)        INITIAL REFERENCE
2    Exhibit 17  Photographs of Gonzales' legs  105
                 taken at the hospital
3
     Exhibit 18  August 2023 citizen complaint  134
4                (not included as an exhibit
                 herein until the unredacted
5                version is received)
6    Exhibit 19  9/9/2020 Memo from Guadagnoli  136
                 to Steve Bryant, Re:  20C-015
7
8
9    REQUESTED INFORMATION                      PAGE
10               Citizen complaint              129
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*AB Litigation Services*

Page 49

1    A    Correct.
2    Q    So you put her in the back of your police
3  cruiser, right?
4    A    Yes.
5    Q    And you locked the door?
6    A    No, I didn't lock it.
7    Q    Was she free to leave?
8    A    No, not at the time.
9    Q    Was she free to leave at any point while
10  law enforcement was there at the scene?
11   A    During my contact with her she was not.
12   Q    And why was she not free to leave?
13   A    She was detained at the time.
14   Q    What was the justification for not
15  allowing her to leave, the legal justification?
16   A    The -- I'm sorry.  What was the last
17  part?
18   Q    What was your legal justification for not
19  allowing her to leave?
20   A    At the time the -- she was part of the
21  investigation.  We don't know if she's a suspect, if
22  she is a witness.  Right then we're trying to piece
23  all of the pieces of the puzzle together to figure
24  out exactly what her role is.
25   Q    And why wasn't she given the same

Page 50

1  opportunity as -- as the other fellow that you spoke
2  with to go -- to leave and come back?
3    A    The -- Mr. Valencia, who I spoke with
4  initially, he was a separate witness to the incident,
5  wasn't directly involved.  I was told when she was
6  walked to me that she was in the vehicle with Mr. --
7  Mr. Ward, so she has a more direct role in that
8  situation so there's a possibility that she could be
9  a suspect involved in the investigation.
10   Q    Did you ever advise her of her legal
11  rights?
12   A    No.
13   Q    Why not?
14   A    She was not under arrest at that time.
15   Q    Well, you wouldn't let her leave even if
16  she wanted to, right?
17   A    She was detained for a period of time
18  until the investigation can go forward.
19   Q    You're -- you were clear that she wanted
20  to leave because she told you she did, right?
21   A    I don't remember her telling me that.
22   Q    Do you recall her telling you that she
23  actually had a child that she was there to pick up?
24   A    Yes, and I wrote the -- the child's name
25  down.

Page 51

1    Q    Right.  And she wanted to pick up her
2  child.  You understood that?
3    A    Oh, I would assume that's why -- yes.
4    Q    I'm -- obviously that's why she was
5  there, is to pick up her child, correct?
6    A    I know that now.
7    Q    Well, and you knew that at the time
8  because she told you?
9    A    Well, I didn't know that prior to the
10  situation, but I knew -- she said, My child's in
11  eighth grade inside.
12   Q    And she --
13   A    I would assume --
14   Q    Sorry.
15   A    I would assume that she was trying to
16  pick up her child at that time.
17   Q    She in fact told you that she wanted to
18  pick up her child and she was concerned about him?
19   A    I don't remember the specific
20  conversation.  I just remember writing down the name.
21  That way we could make sure that he is safe and --
22  and okay and that he's not left by himself.
23   Q    Did you take any further action to make
24  sure that her child was in fact taken care of?
25   A    I provided the name to Deputy Mahan when

Page 52

1  I was instructed to leave the scene.
2    Q    What is the policy regarding what
3  witnesses are allowed to stay and what witnesses -- I
4  mean, sorry, what -- let me ask you this question
5  from the beginning again.
6        What is the Pueblo County Sheriff's
7  Department's policy regarding what witnesses to an
8  event are allowed to leave and which are detained and
9  required to stay?
10   A    I don't believe there's a specific policy
11  depicting that.
12   Q    So it's just a subjective decision that
13  the officer can make according to their whim at that
14  moment?
15   A    I would assume if they are directly
16  involved and possibly a suspect, then of course a
17  possible suspect cannot leave.
18   Q    Well, let's talk about this concept of a
19  possible suspect.  What -- what was Kristy Ward Stamp
20  suspected of?
21   A    At the time all I knew prior to arriving
22  was that it was a suspicious person call, somebody
23  trying door handles to -- to people's cars.  Don't
24  know if that is involving more than one person or
25  anything or what the purpose of trying to open those

*AB Litigation Services*

Page 53

1  door handles is.
2      Q    You understood it was a male who was
3  doing that?
4      A    Honestly, I didn't hear prior. I just
5  heard it was a person.
6      Q    Well, did you have -- did you have some
7  reason to believe that Ms. Ward Stamp was suspected
8  of trying to open people's doors?
9      A    At the time I didn't have the information
10 to -- to have that knowledge. All I knew is that it
11 was a suspicious person call, and I was responding to
12 it after the shots were fired.
13     Q    And who makes the determination of
14 whether a witness is taken to the station or
15 interviewed on the scene?
16     A    I would say it would be the invest- --
17 like whether -- well, in this particular situation,
18 with the CIT team, that would -- depending on the --
19 how much information that can provide to the
20 investigation, I would say it's whoever's in charge
21 at that time, whether it be CIT or just the
22 supervisor there on scene.
23     Q    Who was in charge at that time?
24     A    While I was there it was Sergeant Ragan
25 at the time, but I don't know when that was

Page 54

1  relinquished to somebody else.
2      Q    During the entirety of the time that
3  Ms. Ward Stamp was there was Sergeant Ragan in
4  charge?
5      A    I don't know because I left prior to
6  Sergeant Ragan.
7      Q    During the entire time you were there
8  Sergeant Ragan was in charge?
9      A    Yes. While I was there Sergeant Ragan
10 was who I believed to be in charge.
11     Q    And if a witness is required for some
12 reason to go to the station, is there any reason why
13 they can't transport themselves?
14     A    If that witness is possibly a suspect,
15 then they can't transport themselves.
16     Q    And how does one determine whether a
17 witness is a witness or a possible suspect?
18     A    It just depends on the situation at hand.
19 With this particular one, we didn't have that
20 knowledge yet until further questions were -- were
21 asked.
22     Q    And what questions did you ask to get to
23 the bottom of that?
24     A    I -- I didn't have part in questioning
25 Ms. -- Ms. Ward Stamp.

Page 55

1      Q    So you just took this person who was
2  handcuffed and put her in the back of your cruiser,
3  no questions asked?
4      A    I was asked -- she was already handcuffed
5  when she was brought to me. I was asked to place her
6  in the back of my vehicle, which I did, and then I
7  was told to transport -- or transfer her to another
8  deputy's vehicle. And she was in handcuffs then, and
9  I transferred her to the other deputy's vehicle.
10     Q    Don't you have a legal responsibility to
11 make sure that you've got a legal justification to
12 hold somebody?
13          MR. O'DONNELL: Objection. Form.
14     A    I would say that the person was already
15 handcuffed so my fellow officer had a reason to
16 handcuff her.
17     Q    (BY MS. NEWMAN) Have you been trained on
18 the arrest and detention policy of the Pueblo County
19 Sheriff's Office?
20     A    Yes.
21     Q    Tell me, what is your understanding of
22 the legal requirements to arrest or detain somebody?
23     A    Well, with an arrest you need probable
24 cause, and with detaining it's either reasonable
25 suspicion or something similar until further

Page 56

1  information is learned.
2      Q    What does that mean?
3      A    Just until further information is
4  learned. If you have a reasonable suspicion to
5  believe that this person has been involved in some
6  kind of incident, you can detain them until you find
7  out further. And then if you find out that they are
8  not involved then you can release them.
9      Q    So let's start with the first. Would you
10 agree with me that there was no legitimate legal
11 reason to arrest Ms. Ward Stamp?
12     A    She was not arrested.
13     Q    Would you agree with me that there was no
14 legal basis to arrest Ms. Ward Stamp?
15          MR. O'DONNELL: Objection. Form.
16     A    Well, she wasn't arrested, so there
17 was -- she . . . There was no reason to arrest her.
18     Q    (BY MS. NEWMAN) Based on all of your
19 training and experience as a Pueblo County Sheriff's
20 officer, was there any legal justification to arrest
21 Ms. Ward Stamp?
22     A    There was legal justification to detain
23 her, yes, but there was not a reason to arrest her at
24 that time.
25     Q    Was there a reason -- a legal

*AB Litigation Services*

Page 57

1  justification to arrest her at any time?
2      A    Based on the results of the
3  investigation, no.  She was released.
4      Q    And you would agree with me there was
5  never probable cause that would justify arresting
6  Ms. Ward Stamp, correct?
7      A    As far as I know with the results of the
8  investigation there was no probable cause for her
9  arrest.
10     Q    Well, you don't get to just wait till the
11 results of the investigation.  You know, you can't
12 arrest somebody while you're trying to come up with
13 probable cause, correct?
14     A    Correct.
15     Q    You can only arrest them either because
16 there's a warrant or probable cause, right?
17     A    Yes.
18     Q    And neither of those existed with regard
19 to Ms. Ward Stamp at any time, correct?
20     A    I don't know the details of the
21 investigation in -- in and of itself, but I would say
22 that there was no probable cause learned for her
23 arrest.
24     Q    And so -- here, let's take a peek
25 together at the arrest and detention policy.  I'll go

Page 58

1  ahead and share my screen.  This will be Exhibit
2  Number 12?
3              MR. O'DONNELL:  It will be 13.
4              MS. NEWMAN:  13.  Thank you.
5              (Deposition Exhibit 13 was marked.)
6      Q    (BY MS. NEWMAN)  Can you see my screen
7  now?
8      A    Yes.
9      Q    Okay.
10             MR. O'DONNELL:  Hold on.  I'm going to
11 have to blow up -- I just have a small laptop.  So is
12 there any way you can blow this up?
13             MS. NEWMAN:  Let me try.  Not that.
14             MR. O'DONNELL:  Maybe I can do it on my
15 end.
16             THE DEPONENT:  Yeah.
17             MR. O'DONNELL:  Okay.  Here --
18             MS. NEWMAN:  Were you able to?
19             MR. O'DONNELL:  Yeah.  I had to put mine
20 up at a hundred.  All right.
21     Q    (BY MS. NEWMAN)  Okay.  Can you read
22 this?
23     A    Yes, ma'am.
24     Q    Do you recognize this as a Pueblo County
25 Sheriff's Office policy regarding Arrests and

Page 59

1  Detentions?
2      A    Yes, ma'am.
3      Q    And you've been trained on this policy?
4      A    Yes, ma'am.
5      Q    So we'll start here just under this
6  paragraph that says Policy.  "It is the policy of the
7  Pueblo County Sheriff's Office to restrict the
8  freedom of citizens by arrest only when lawful, and
9  to detain persons pursuant to statutes and/or with
10 regard to their" -- "to their welfare.  Arrestees
11 shall be treated with dignity and with a minimum of
12 embarrassment."  Do you see that?
13     A    Yes.
14     Q    All right.  So you've already conceded
15 there was no just- -- there was no legal
16 justification to arrest Ms. Ward Stamp, right?
17 You've already agreed with me on that?
18     A    Yes.
19     Q    So then what you've said is that she was
20 detained --
21     A    Yes.
22     Q    -- correct?  And here, according to the
23 policy, the policy is "to detain persons pursuant to
24 statutes and/or with regard to their welfare."  So
25 let's break it down.  What statute justified the

Page 60

1  detention of Ms. Ward Stamp, if any?
2      A    Well, I would say with the investigation
3  at hand, to determine what crime was committed or was
4  trying to be committed, that it would -- whether it
5  be auto theft, theft from auto.  There could be a
6  multitude of statutes that it would apply to.
7      Q    But you didn't have probable cause or
8  reasonable suspicion to believe that she had been
9  engaged in any of those crimes, did you?
10     A    At the time she was handed to me and -- I
11 didn't have any knowledge as to the events prior to
12 that.
13     Q    Right.  So you didn't have reasonable
14 suspicion to believe she had committed any crime,
15 correct?
16     A    I did not know.
17     Q    You had zero information that would give
18 you reasonable suspicion to believe she had engaged
19 in any kind of crime, correct?
20     A    Yes.  I had zero information as to what
21 her role in the situation was.
22     Q    And you continued to detain her even
23 though you had no reasonable suspicion, correct?
24     A    Just because I may not have the
25 reasonable suspicion, somebody else may.  So at the

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp, and
KRISTY WARD STAMP,

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity
PUEBLO COUNTY BOARD OF COUNTY COMMISSIONERS
DEPUTY CHARLES MCWHORTER, in his individual and official capacity;
DEPUTY CASSANDRA GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official capacity;
DEPUTY CHRISTINE SPENCER, in her individual and official capacity;
DEPUTY NICOLAS BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and official capacity,
SERGEANT JOSH RAGAN, in his individual and official capacity, and
CAPTAIN SHELLEY BRYANT, in her individual and official capacity,

      Defendants.

---

**BODY -WORN CAMERA VIDEO OF DEFENDANT ROBERT QUINTANA
(CONVENTIONALLY SUBMITTED)**

---

      The electronic **Body-Worn Camera Video of Defendant Robert Quintana**, which has

been disclosed to all Parties with the name and Bates number, "Ward (138) - PCSO - BWC -

Suspicious_Pers (18)," is being conventionally filed with the Court on a flash drive pursuant to

Section 4.8(f) of this Court's Electronic Case Filing Procedures.  A copy of these materials is

being delivered via Dropbox to all counsel, as stated in the Certificate of Service for Plaintiffs'

Motion for Partial Summary Judgment.

*AB Litigation Services*

**Page 1**

```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT COURT OF COLORADO
Civil Action No. 23-CV-00473-CNS-MDB
-------------------------------------------------
VIDEOCONFERENCE DEPOSITION OF JOSHUA WESLEY RAGAN
NOVEMBER 28, 2023
-------------------------------------------------
ESTATE OF RICHARD WARD, by and through its personal
representative Kristy Ward Stamp, and
KRISTY WARD STAMP,
     Plaintiffs,
v.
PUEBLO, COLORADO; DEPUTY CHARLES McWHORTER, in his
individual and official capacity; DEPUTY CASSANDRA
GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official
capacity; DEPUTY CHRISTINE SPENCER, in her individual
and official capacity; DEPUTY NICOLAS BERUMEN, in his
individual and official capacity; DEPUTY ROBERT
QUINTANA, in his individual and official capacity;
and SERGEANT JOSH RAGAN, in his individual and
official capacity,
     Defendants.
-------------------------------------------------
APPEARANCES:
    NEWMAN McNULTY LLC
      By Mari Newman, Esq.
        Andrew McNulty, Esq.
        1490 North Lafayette Street, Suite 304
        Denver, Colorado 80218
          Appearing remotely for Plaintiffs
```

**Page 2**

```
1  APPEARANCES (continued):
2     THE LANE LAW FIRM, P.C.
         By William O'Donnell, Esq.
3         5105 DTC Parkway
          First National Bank Building, Suite 475
4         Greenwood Village, Colorado 80111-2764
            Appearing remotely for Defendants
5
6     Also Present:  Kristy Ward Stamp
                     Cassandra Gonzales
7
8
...
25
```

**Page 3**

```
1          Pursuant to Notice and the Federal
2   Rules of Civil Procedure, the videoconference
3   deposition of JOSHUA WESLEY RAGAN, called by
4   Plaintiffs, was taken on Tuesday, November 28, 2023,
5   commencing at 1:02 p.m., before Kathy L. Davis,
6   Registered Professional Reporter, Certified Realtime
7   Reporter, and Registered Merit Reporter within and
8   for the State of Colorado.
9
10
11           I N D E X
12  VIDEOCONFERENCE DEPOSITION OF JOSHUA WESLEY RAGAN
13  EXAMINATION                              PAGE
14       By Ms. Newman                          5
15  EXHIBITS                    INITIAL REFERENCE
16   Exhibit 24  4/19/2022 memo from Romo to    20
                 Hall, Re:  21C-059 Meeting With
17               Sgt. Joshua Ragan
18   Exhibit 25  Defendant Ragan's Responses To 22
                 Plaintiffs' Discovery Requests
19               To The Individual Defendants
20   Exhibit 26  11-5-09 Memo from DeSalvo to   24
                 Ragan, Re:  Use of Force 09
21               D2317
22   Exhibit 27  Disciplinary Action Sign-Off   25
                 for Ragan regarding a parolee
23               release
24   Exhibit 28  Joshua Ragan Response to       139
                 Resistance Report dated
25               2/22/2022
```

**Page 4**

```
1  EXHIBITS (continued)         INITIAL REFERENCE
2   Exhibit 29  Defendant Ragan's Responses To  174
                Plaintiffs' Requests For
3               Admission To All Defendants
4
5
6  EXHIBITS PREVIOUSLY MARKED    INITIAL REFERENCE
7   Exhibit 10  Pueblo County Sheriff's Office   72
                Office Of Professional
8               Standards & Internal Affairs
                IA-2203, Deputy Charles
9               McWhorter, Inspector John Romo
10  Exhibit 15  Document titled                  48
                Officer-Involved Incident
11              Protocol Of The Tenth Judicial
                District
12
13
14  REQUESTED INFORMATION               PAGE
15      Sergeant Ragan's body-worn       18
        camera footage
16
        Signed verification page for    175
17      Defendant Ragan's Responses To
        Plaintiffs' Requests For
18      Admission To All Defendants
19
...
25
```

*AB Litigation Services*

Page 89

1  involvement was, at least in the same vein as you did
2  with every single other person you talked to?
3      A    Because they were directly involved in
4  the scene.  And that's going to be CIT's direction.
5  They need -- they need to make that initial contact
6  with them to determine one way or the other.  My
7  initial contact with Deputy McWhorter was to secure
8  the scene and make sure the community was safe.  All
9  the people outside was just to deem if they were any
10 type of witness whatsoever or how their involvement
11 was as far as what they observed.
12         The people inside the vehicle were
13 involved directly or indirectly as a witness or -- or
14 potentially even more.  We weren't sure at the time.
15 So that's why they were held -- or not held, but
16 that's why they were detained pending CIT's
17 involvement.
18     Q    Did you ask Deputy McWhorter what Kristy
19 Ward Stamp's involvement was?
20     A    Honestly I don't remember, ma'am.
21     Q    Well, when you showed up at the scene and
22 you saw that Kristy Ward Stamp and Tommy Brown were
23 sitting in the -- well, let me ask it this way, since
24 I guess you're saying that that isn't what happened,
25 although the -- Berumen's body cam seems to suggest

Page 90

1  it.  One thing you knew was that McWhorter and
2  Gonzales had not taken Kristy Ward Stamp into
3  custody, correct?
4      A    I'm sorry, ma'am.  Could you repeat that
5  one?  It was kind of broken up.
6      Q    Yeah.  You knew that Kristy Ward Stamp
7  had not been taken into custody by McWhorter and
8  Gonzales, right?
9      A    Correct.
10     Q    And if she had actually been involved
11 somehow in the event, you would expect that they
12 would have arrested her as part of -- as part of the
13 initial part of the scene, right?
14     A    Initially I don't think it even got that
15 far, it happened so fast, ma'am, as far as they were
16 on scene.  Even if hypothetically they were directly
17 involved, I don't think -- the way that
18 Deputy McWhorter and Deputy Gonzales talked to
19 Mr. Ward and how fast that all happened prior to the
20 shoot, I don't think the investigation even got close
21 to determining that one way or the other.  And the
22 officers arriving on scene didn't know one way or the
23 other as well.
24     Q    But after they had shot Mr. Ward they
25 were in charge of making sure that the scene was

Page 91

1  secure until backup arrived, right?
2      A    That's correct.
3      Q    And if Ms. Ward Stamp had been involved
4  in any sort of criminal or threatening activity, they
5  would have arrested her, too, correct?
6      A    I -- I can't speak to them.  I know that
7  their immediate focus was on the shooting, and I know
8  that they did give commands -- and this is all prior
9  to watching body cam.  They did commands to them to
10 stay where they are, I believe.  But their initial
11 after the shooting is directly on the shooting and
12 that security there.  I don't know that they would
13 be -- their first priority would be looking into the
14 suspicious person at that point.
15     Q    At some point you say that you were
16 instructed by Captain Bryant to have both parties who
17 were inside the vehicle transported to the PCS
18 investigation annex to meet with detectives.  Is
19 that --
20     A    That's --
21     Q    -- accurate?
22     A    Yes.
23     Q    Describe to me who Captain Bryant was and
24 what his role was.
25     A    Captain Bryant -- it's actually Captain

Page 92

1  Shelley Bryant.  We have a couple.  We have a -- we
2  have Steve Bryant, who is the undersheriff, and his
3  wife, Shelley Bryant, is the investigations
4  supervisor.  She is the captain.
5         So it was Shelley Bryant, Captain Shelley
6  Bryant, who is the investigations captain and she was
7  at the time.  She is also one of the ones that heads
8  up our side of the critical incident team.
9      Q    So was she the person who made the
10 decision to have Kristy Ward Stamp and Tommy Brown
11 taken to the scene -- I mean, to the annex rather
12 than questioned at the scene?
13     A    Yes, ma'am.
14     Q    When did she arrive?
15     A    I -- I would have to look at radio logs,
16 ma'am, and to tell you, I would just be guessing.
17 Everything was -- it was so chaotic, and everything
18 happened fast and slow at the same time.  I couldn't
19 tell you.  I know that I went over and contacted a
20 group of our command staff, and she was there.  I
21 don't know how fast it was -- it happened.  Sorry.
22     Q    So earlier you were describing to me that
23 it would have been inappropriate for you to do even
24 an initial questioning of Kristy Ward Stamp because
25 she was directly involved in the scene and you needed

*AB Litigation Services*

Page 93

1  to save that for somebody who was involved in the CIT
2  team, right?
3      A    Not necessarily.  It was -- it's not my
4  job to investigate.  It was my job to secure the
5  scene and -- and try to identify potential witnesses
6  or people that were identified.  And they were on the
7  scene, so it's reason to believe that they were at
8  least a critical witness if not possibly involved in
9  it some way.
10     Q    So Captain Bryant, though, is that CIT
11 person that you were waiting for?  Is that accurate?
12     A    Yes.  She is the one that's in charge of
13 Pueblo County Sheriff's Office side of the CIT, but
14 she is not the -- because this was Pueblo Police
15 Department, she is not their -- she handles our side
16 of it.
17     Q    So Captain Bryant could have made the
18 decision to interview Ms. Ward Stamp right there on
19 the scene, correct?
20     A    She would have been the one that would be
21 able to, but I don't know what her thinking was or
22 what she was -- what was going on with that.  But she
23 is one of the ones that could have potentially
24 thought about that, yes.
25     Q    And she is the person who could have

Page 94

1  directed that Ms. Ward Stamp be uncuffed?
2      A    I can't speak to that, ma'am.  And the
3  only reason I say I can't speak to that is it's not
4  that she doesn't have the authority -- I guess she
5  really doesn't have the authority in this because our
6  agency isn't the -- the primary investigating agency.
7  I think she has the authority to do that type of
8  stuff, but this would be one of those things where
9  she would need to at least speak with, in this case,
10 Pueblo Police Department's supervision to make sure
11 that happens so we don't have any compromise to the
12 investigation or anything there.
13     Q    What information did you provide to
14 Captain Bryant?
15     A    Um, to my recollection, ma'am, it was a
16 quick -- a quick -- and I apologize.  I don't
17 remember if I told her or if Dante told her
18 specifically a brief overview of what happened with
19 CT, the actual incident, just a quick overview.  But
20 I was the one that went and talked to her and told
21 her that the two people that were in the car are in
22 patrol vehicles.
23     Q    Did you tell her anything else about them
24 other than the fact that they were just in patrol
25 vehicles?

Page 95

1      A    I don't recall, ma'am.  I don't.  I know
2  that I told her that two people from the vehicle that
3  was on scene are in the -- in patrol vehicles.  I
4  don't recall what else as far as they were concerned.
5      Q    Is she the person who made the decision
6  to confiscate the vehicle?
7      A    I don't know.  That was -- that was past
8  my involvement once CIT took over.  I don't know.
9      Q    You have no idea who made the decision to
10 confiscate --
11     A    I don't.
12     Q    -- Ms. Ward Stamp's car?
13     A    No, ma'am.
14     Q    Do you know who made the decision to
15 confiscate Ms. Ward Stamp's purse?
16     A    No, ma'am.
17     Q    I gather your answer's going to be the
18 same, but do you have any idea who made the decision
19 to confiscate Ms. Ward Stamp's cell phone?
20     A    No.  After the initial investigation once
21 CIT took over my -- my knowledge on it's actually
22 pretty limited.
23     Q    Have you told me everything you recall in
24 your communications with Sergeant -- I'm sorry, with
25 Captain Bryant?

Page 96

1      A    That I recall, ma'am, yes.  Like I said,
2  it was -- it was pretty chaotic, and I talked to her
3  and a couple other of the command staff, so I don't
4  know specifically what I said to her and what I
5  didn't.
6      Q    Did Captain Bryant ask you what Kristy
7  Ward Stamp's involvement was in the -- in the
8  incident?
9      A    I don't believe so.
10     Q    So you told her the two people that were
11 in the -- in the car are now in patrol cars and that
12 was the entirety of what information you
13 communicated?
14     A    As far as Mr. -- I'm sorry, is Mr. Brown
15 Tommy? -- and Ms. Ward Stamp, I believe so, ma'am.
16 But without viewing the cameras, I wouldn't be able
17 to tell you a hundred percent.
18     Q    Did you let her know that they had
19 actually been in the back of those cruisers
20 handcuffed for quite some time by that point?
21     A    I don't believe so.
22     Q    Did you give her any information
23 regarding what reasonable suspicion existed to
24 continue to detain Ms. Ward Stamp or Tommy Brown?
25     A    No.  I didn't tell her anything like

*AB Litigation Services*

1 rephrasing -- or not rephrasing. Do you mind --
2      Q      Yeah. No, I can rephrase it actually.
3             Can you think of any other instance where
4 you were involved in an investigation where a witness
5 to a shooting was handcuffed?
6      A      I can.
7      Q      Can?
8      A      I can, yes.
9      Q      Tell me about it.
10     A      So we had a -- and I don't -- I
11 apologize. I don't remember the dates. I was -- I
12 believe I was on afternoon crew as the supervisor.
13 We had what was deemed later to be a suicide where a
14 juvenile had shot himself in the head. One of the
15 juveniles, we didn't find out till later, had taken
16 the firearm and hid it in the closet.
17            We detained everybody that was in that
18 house until we determined -- like I said earlier,
19 we -- even on suicides we investigate it as a
20 homicide until we can prove otherwise. So we
21 detained everybody in that house until we could
22 determine who was what and who was where. And
23 those -- those parties were actually transported for
24 interview as well.
25     Q      They were all handcuffed?

1      A      Yes.
2      Q      What is the policy that you rely on in
3 determining whether a witness should be interviewed
4 on the scene or taken to the station?
5      A      I don't know if there is a policy, ma'am.
6 It's -- it's just a common practice to see if they're
7 involved. Especially with something like -- as big
8 as the Liberty Point International, we potentially
9 had hundreds of witnesses, potentially. So we need
10 to kind of help out and figure out who was actually a
11 witness and who wasn't there and who didn't see
12 anything. We've got to help out investigations a
13 little bit with that just so they know who to talk
14 to.
15     Q      Do the witnesses have any choice in
16 whether or not they get interviewed on the scene or
17 interviewed at the station?
18     A      The ones that are not directly involved
19 in the crime scene, the ones that are outside
20 witnesses, I couldn't speak to CIT. I know that we
21 speak to them initially and get their contact
22 information, but it's going to be up to Pueblo PD to
23 determine whether they stay on scene or are allowed
24 to leave for -- for their interview.
25     Q      Was there ever probable cause that would

1 justify arresting Ms. Ward Stamp at any point during
2 the entirety of this event?
3      A      Just from my initial contact in securing
4 the scene and getting ready for CIT, I did not have
5 any probable cause.
6      Q      And did you ever have reasonable
7 suspicion to believe that Ms. Ward Stamp had engaged
8 in any kind of crime?
9      A      I believe there was some reasonable
10 suspicion with the report that came in and with what
11 was reported that he was possibly under the influence
12 of something. It's not uncommon for these type of
13 calls to come in and -- be it a theft from auto or a
14 carjacking. And if that's the case, they always have
15 other people in the car to help them get away or be
16 co-conspirators in it. So I do think we had
17 reasonable suspicion until we could rule out what the
18 actual call was and what was going on with -- with
19 the initial one.
20     Q      Let's dig into that a little bit. What
21 reasonable suspicion specifically did you have that
22 Ms. Ward Stamp had anything to do with -- with any of
23 what Mr. Ward was doing?
24     A      It's -- I mean, and this is just me
25 speaking. I can't speak to other deputies. But it's

1 reasonable for me to believe that somebody who is in
2 the back seat going car to car, whether he's
3 committing a crime or not -- at the time the call
4 came in we weren't sure and we were going to
5 investigate it -- that the drivers and the other
6 passenger vehicles would at least have knowledge of
7 what was going on at the time. That just seems
8 reasonable to me.
9      Q      Well, is having knowledge of what's going
10 on the same as reasonable suspicion that she was
11 engaged in criminal activity herself?
12     A      We wouldn't know until we further
13 investigated. That's one of the reasons she was
14 detained.
15     Q      Right. But you -- you didn't have
16 reasonable suspicion because you didn't ask her what
17 she knew or didn't know, correct?
18     A      We didn't because of the homicide that
19 occurred afterwards, and the CIT team was going to
20 take over.
21     Q      So the -- but the question I'm asking you
22 is really a specific one. I'm trying to get to the
23 bottom of whether you ever had reasonable suspicion
24 specifically. And so what specified reasonable
25 suspicion did you ever have, if any, that Ms. Ward

*AB Litigation Services*

Page 129

1    conflict of interest.
2        Q    So instead you just went ahead and had
3    her detained for several hours in handcuffs, correct?
4        A    No.  My involvement wasn't several hours
5    with her.  My involvement was the short time on scene
6    where they were detained and placed in patrol cars.
7    After that the CIT -- I can't speak to what they did
8    or how they did it.  I don't know, ma'am.  I'm sorry.
9        Q    So you know how long you had her
10   detained?
11       A    Just a rough estimate, like I told you.
12   It's just me kind of ballparking it.  Everything was
13   so -- so chaotic.
14       Q    Did you ever advise Ms. Ward Stamp of her
15   legal rights?
16       A    I did not.  I don't believe I spoke to
17   Ms. Ward Stamp at all.
18       Q    Did you ever instruct any other Pueblo
19   County sheriff's officer to advise Ms. Ward Stamp of
20   her legal rights?
21       A    No, I don't believe so.  I know that just
22   watching body cam, I believe that Mahan and Berumen
23   did tell them that they were being detained and not
24   arrested.  But as far as me directing them to
25   specifically say something, no.

Page 130

1        Q    Well, and telling somebody that they are
2    being detained isn't advising them of their legal
3    rights, is it?
4        A    No.
5        Q    Do you believe it would be appropriate to
6    advise -- to have advised Ms. Ward Stamp of her legal
7    rights?
8        A    As far as the investigation goes, that
9    would be for the -- the official interviewer, because
10   they are the ones that are going to have to be
11   questioning her.  The main time that we, as you know,
12   read people their Miranda rights or their legal
13   rights is before they're questioned.  And my guys are
14   not questioning them on -- or at least they're not
15   supposed to be questioning them on the actual
16   investigation.
17       Q    Would you agree with me that Ms. Ward
18   Stamp was not free to leave?
19       A    Initially when we were figuring it out
20   then, yes, I would say she was being detained and not
21   free to leave until we could figure out what was
22   going on.
23       Q    Was there any point on the -- at the
24   scene where Ms. Ward Stamp was free to leave?
25       A    To my knowledge, no.

Page 131

1        Q    What would have happened if Ms. Ward
2    Stamp had tried to leave the scene?
3        A    I can't even speculate on that, ma'am,
4    especially with her in -- in the back of a patrol
5    car.  It would have been kind of hard to leave.  If
6    she would have tried to leave, I would -- and this is
7    just speculation, a hypothetical, I think that we
8    would have gone and tried to get ahold of either
9    Captain Bryant or part of the CIT team right away and
10   say, Listen, this is what's going on.  She's trying
11   to leave.  But she is currently being detained --
12   sorry -- detained while we're trying to figure this
13   out.
14       Q    And you agree with me it would have been
15   virtually impossible for her to leave?  She was, as
16   you say, locked in the back of a patrol car?
17       A    Right.  Once you're in the back of the
18   patrol car, you have to be released from the -- from
19   the outside.
20       Q    So there's no way she could have left, no
21   matter how much she wanted to?
22       A    Not at that point, I don't believe.
23       Q    Well, and not at -- not at any point?
24       A    To my knowledge, yes.
25       Q    Was Captain Bryant the head of the CIT

Page 132

1    team?
2        A    She was the head of the Pueblo County
3    Sheriff's side.  She usually is.  I -- and again,
4    ma'am, I'm assuming.  She usually is, and she was on
5    scene, so I'm assuming she was at this point as well.
6    But she wasn't the head of the actual CIT because it
7    was another agency handling it.  She was assisting
8    that other agency.
9        Q    The Pueblo Police Department?
10       A    Correct.
11       Q    Do you know who the head of the CIT team
12   was from that department?
13       A    I don't, ma'am.
14       Q    Do you -- I apologize if I asked this
15   earlier.  Do you know who would have made the
16   decision to both confiscate and retain Ms. Ward
17   Stamp's vehicle?
18       A    And again, just speculation because of
19   the way of the CIT thing, it would have been either a
20   command staff or a detective with the Pueblo Police
21   Department that would have ultimately made that
22   decision.
23       Q    And you have no idea in this instance who
24   that would have been?
25       A    I don't.  After my -- after CIT took over

*AB Litigation Services*

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 23-cv-00473-CNS-MDB

_____

DEPOSITION OF SHELLEY BRYANT
April 10, 2024

_____

ESTATE OF RICHARD WARD, by and through its personal
representative Kristy Ward Stamp, and KRISTY WARD
STAMP,

Plaintiff,

vs.

PUEBLO COUNTY, COLORADO; DEPUTY CHARLES McWHORTER, in
his individual and official capacity; DEPUTY
CASSANDRA GONZALES, in her individual and official
capacity; DEPUTY JACOB MAHAN, in his individual and
official capacity; DEPUTY CHRISTINE SPENCER, in her
individual and official capacity; DEPUTY NICOLAS
BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and
official capacity; and SERGEANT JOSH RAGAN, in his
individual and official capacity,

Defendants.

_____

APPEARANCES:
   KILLMER LANE, LLP
      By Darold W. Killmer, Esq.
         Reid Allison, Esq.
         1543 Champa Street
         Suite 400
         Denver, Colorado 80202
         303.571.1000
         dkillmer@killmerlane.com
         rallison@killmerlane.com
            Appearing on behalf of Plaintiffs

## Page 2

```
 1   APPEARANCES CONTINUED:
 2
 3   NEWMAN McNULTY, LLC
         By Mari Newman, Esq.
 4          Andy McNulty, Esq.
            1490 N. Lafayette Street
 5          Suite 304
            Denver, Colorado 80218
 6          720.850.5770
            mari@newman-mcnulty.com
 7          andy@newman-mcnulty.com
               Appearing on behalf of Plaintiffs
 8
 9   THE LANE LAW FIRM, PC
         By William O'Donnell, Esq.
10          3131 S. Vaughn Way
            Suite 220
11          Aurora, Colorado 80014
            303.830.0500
12          wodonnell@lanelawpc.com
               Appearing on behalf of Defendants
13
14   ALSO PRESENT:  Cassandra Gonzales
                    Nicolas Berumen
15                  Kristy Ward
                    Sam Weiner
16                  Josh Ragan
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            Pursuant to Notice and the Federal Rules of
 2   Civil Procedure, the deposition of SHELLEY BRYANT,
 3   called by Plaintiffs, was taken on Wednesday, April
 4   10, 2024, commencing at 1:04 p.m., via remote
 5   videoconference, before Barbara J. Davalos,
 6   Registered Merit Reporter and Certified Realtime
 7   Reporter within and for the State of Colorado.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              I N D E X
 2
     EXAMINATION                               PAGE
 3
     BY MS. NEWMAN                                5
 4   BY MR. O'DONNELL                           137
 5
 6
     EXHIBIT      DESCRIPTION        INITIAL  REFERENCE
 7
 8   Exhibit 56   Pueblo County Sheriff's          9
                  Department Personnel
 9                Information Sheet for Shelley
                  Bryant
10
     Exhibit 57   Pueblo County Sheriff's         19
11                Office Completed Training
                  Summary Report for Shelley
12                Bryant
13   Exhibit 58   Basic Exam for Shelley Bryant   25
14   Exhibit 59   Pueblo County Sheriff's        132
                  Office Call Detail Report,
15                3/1/22
16
17   PREVIOUSLY MARKED EXHIBITS
18
     None
19
20
21
22
23
24
25
```

*AB Litigation Services*

1  what level or above?
2      A    It would be a sergeant and above.
3      Q    Okay.  And is there any distinction
4  between, like, where somebody is being transported?
5      A    No.  No.  It's more determined like the
6  incident itself and what's occurring at the incident.
7  So say that --
8      Q    I don't understand that exactly.
9      A    Say that it was a courtesy transport or a
10 different type of transport.  Then there could be a
11 possible determination made at that time.  But the
12 majority of the time it would not be approved, not in
13 our units.
14          We've had too many incidents, like
15 dangerous incidents happen.  So they're very leery
16 about like not putting somebody in cuffs.
17     Q    So let me understand this a little bit
18 better.  So are you saying in a courtesy transport
19 somebody might not need to be cuffed?
20     A    Correct.  It would be up to the
21 determining factors of that incident, and the
22 supervisor would make the call.
23     Q    And what's an example of a courtesy
24 transport?  Where somebody asks specifically, Can you
25 please give me a ride?

1      A    Yeah.  It would be more that type of
2  incident, like a car accident and you're trying to
3  get somebody to a different location that can't get a
4  ride, or there's something that's in play at that
5  time where they're not being looked at for anything
6  suspicious at the time.
7      Q    Okay.  So essentially your policy is that
8  if somebody is being looked at for something
9  suspicious as in you've got reasonable cause, then
10 they should be handcuffed?
11     A    Well, that would make sense that that
12 would -- but there's a lot of factors that come in.
13 Every situation is different.  And so, you know,
14 supervisors make different calls on what they're
15 observing and what information they have at the time.
16 So I'm not going to lock it into a certain thing.
17          Everybody makes a call as to what they're
18 seeing at the time, whether it would be appropriate
19 or not appropriate.
20     Q    So is it a policy where the officer has
21 discretion whether or not they choose to handcuff
22 somebody who is being transported?
23     A    No, not really.  It's like I said.  If --
24 they would have to -- it would be -- they would have
25 to get permission to not handcuff somebody, and they

1  would have to explain to the supervisor why they
2  would not handcuff -- would not want to handcuff
3  somebody.
4          There, again, it could be if that person
5  is extremely handicapped.  You know, different things
6  come into play on that.
7      Q    Where is this policy found?
8      A    I can look it up for you.
9      Q    That would be fantastic.  If you could
10 please, during a break, look up the policy where this
11 is, because I haven't actually seen a written policy
12 of this nature.
13          I'm making a little list of things that
14 you're going to take a look for.  So thank you for
15 that.
16          I want to go back to something you just
17 said, though.  Did you say that you would handcuff
18 somebody if you're transporting them because there's
19 some -- because you're investigating them for
20 something?
21     A    No.  I said you're going to handcuff
22 anybody that you're transporting or putting in that
23 marked unit for officer safety.  Like, that's what
24 you're going to do.
25     Q    And what are the circumstances under which

1  you can appropriately put somebody into a locked
2  patrol car?
3      A    Well, there's a lot of reasons why we
4  would put somebody in a patrol unit.  If it's -- it
5  would be weather circumstances.  It would be to get
6  them out of a scene and move them into a nice, safe
7  place to be.  It would be because there's no other
8  safe place to put the person.  It would be to detain
9  a person.
10          I mean, there's a lot of reasons why you
11 would do that.
12     Q    Well, the first two that you described, if
13 the weather is bad or to remove them and to get them
14 someplace safe, are those both at the request of the
15 person?
16     A    No, not necessarily.  I mean, there again,
17 there's so many different things that happen in
18 patrol all the time.  You're constantly trying to
19 make the right decisions and get -- especially if you
20 need to move somebody out of a scene.  You've got to
21 try to preserve things.  There's many different
22 reasons as to why you might do that.  So . . .
23     Q    When have you received training on when
24 it's appropriate to put somebody into a locked car,
25 locked patrol car?

*AB Litigation Services*

Page 77

1    mean, how do you determine who is and who isn't under
2    your supervision?
3        A    Who is on scene?
4        Q    Sure.  I'll tell you some of the people
5    who were on scene and you can tell me.
6        A    Okay.
7        Q    For example, one of the people who
8    describes conversations with you is Sergeant Ragan.
9    Do you have a recollection of speaking with him on
10   scene?
11       A    I do not.  In his body cam he comes and
12   stands before me for a few seconds and turns and
13   talks to his captain.  I don't recall talking to him,
14   nor does it look like I'm talking to him.  I'm
15   talking to Dante Guadagnoli at the time that he turns
16   and his body cam faces me for a few seconds and then
17   he turns and is speaking to his captain.
18       Q    So are you saying that you did not speak
19   to --
20       A    I don't recall.
21       Q    -- Sergeant Ragan?
22       A    I don't recall speaking to him.
23       Q    If he testifies -- if he has already
24   testified under oath that you spoke with him, would
25   that be untrue?

Page 78

1        A    No.  It would be I don't recall speaking
2    to him on the scene.  I don't recall.
3        Q    So you think it may have happened; you
4    just don't remember?
5        A    Correct.
6        Q    Okay.  Was Sergeant Ragan under your
7    supervision?
8        A    No.
9        Q    What about Mahan?  Was he under your
10   supervision?
11       A    No.
12       Q    Berumen?
13       A    No.
14       Q    Talton?
15       A    Yes.
16       Q    So what was Sergeant Guadagnoli's
17   responsibilities?
18       A    He just went out there to cover and to
19   help contain the scene until the CIRT team was
20   activated.
21       Q    And what about Detective Talton, similar?
22       A    So Guadagnoli would have been his
23   sergeant.  So he was directing him to whatever needed
24   to be done out there, I'm sure.
25       Q    Sergeant Ragan identified you as the head

Page 79

1    of the CIT team on the Pueblo County Sheriff's Office
2    side.  Was he accurate in that?
3        A    Yes.
4        Q    Who was the head of the CIT team from the
5    police department side?
6        A    Captain Dan Anderson.
7        Q    Sergeant Ragan testified that you
8    instructed him -- well, do you know who Kristy Ward
9    Stamp is?
10       A    No.
11       Q    Even sitting here right this minute, do
12   you know who she is?
13       A    I know who she is now now that I looked at
14   the case.
15       Q    Okay.  So one of the things that Sergeant
16   Ragan described is that he told you that there were
17   two people who were handcuffed in the patrol car.  Do
18   you recall that?
19       A    I would have to look at the body cam
20   footage.  I don't know if they were still in the car
21   when I arrived.  I'd have to look at the body cam
22   footage.
23       Q    Okay.  Well, what Sergeant Ragan testified
24   was that he was the one that went and talked to you
25   and told her that the two people who were in the car

Page 80

1    were now in patrol vehicles.  Do you have any reason
2    to disbelieve his testimony?
3        A    No.  I just don't recall the conversation.
4        Q    Okay.  But you don't have any reason to
5    believe he's just making that up?
6        A    No.
7        Q    And when he says, The two people who were
8    in the car, you understand he means the two people
9    who were in the white Lexus that Mr. Ward had gotten
10   into?
11       A    Correct.
12       Q    He also said -- I asked him this question,
13   whether or not Captain Bryant had asked what Kristy
14   Ward Stamp's involvement in the incident was.  And he
15   said he believed you did not ask him that.  Is that
16   consistent with your memory as well?
17       A    Correct.
18       Q    So his recollection was that you didn't
19   ask him any questions about what Ms. Ward Stamp's
20   involvement in the incident was.  Is that also what
21   you believe?
22       A    Correct.
23       Q    And you understood that she was then
24   cuffed in the back of a patrol car, correct?
25       A    Like I said, I don't recall my

*AB Litigation Services*

1  conversation with him at the time.

2      Q    **What Sergeant Ragan testified was that you**
3  **instructed him to have Kristy Ward Stamp and Tommy**
4  **Brown taken to the annex rather than questioned at**
5  **the scene.  Do you have any reason to doubt the truth**
6  **of his testimony?**

7      A    No, I don't.

8      Q    Do you know who Tommy Brown is?

9      A    I do now that he -- I looked at the body
10  cam footage.

11     Q    So your understanding -- did you know that
12  Kristy Ward Stamp -- at the time did you know that
13  that was Mr. Ward's mother?

14     A    I don't recall that, no.

15     Q    **Do you have any understanding of when you**
16  **learned that?**

17     A    So what I knew at the time was I knew that
18  you had a suspicious person at the school possibly
19  trying to break into cars.  I know that he eventually
20  got back into the white Lexus.  At that point in time
21  he's connected to two other people.  There's probable
22  criminal activity, crime being committed on school
23  grounds.

24         There's children that are about ready to
25  be let out.  That leads you to believe that there's a

1  possibility that he's in a car with a possible
2  get-away driver and lookout or another person related
3  to that.  We run into that a lot.  We have a lot of
4  car break-ins and a lot of things that happen.

5         So at that point in time you don't know
6  what the circumstances are of the people that are in
7  the car.

8      Q    **So tell me, what steps did you take to**
9  **learn what the circumstances were of the people who**
10  **were in the car?**

11     A    When I went to get briefed to find out
12  what was happening at the school grounds, that's when
13  I got the information as to what was occurring on the
14  school grounds.  Calls coming in.  Obviously people
15  didn't feel that it was safe.  So obviously there's a
16  problem on the school grounds, right.  So we're also
17  trying to determine, like, what's happening on the
18  school grounds.

19     Q    So tell me -- you were saying that it was
20  -- well, I guess let me ask this a different way.

21         Why did you -- why did you make the
22  decision to have Kristy Ward Stamp and Tommy Brown
23  taken to the Pueblo County Sheriff's Office annex?

24     A    So like I said, I don't recall saying it,
25  but probably because of at that time they're all

1  three together and there's criminal activity that is
2  occurring on the school grounds, and one of them is
3  actively involved in it.

4         You don't know what the involvement of the
5  other two people in the car are.  You don't know if
6  they're supposed to be at the school.  You don't know
7  if they have a child that's at the school.  You don't
8  know why anybody is there.  And you don't know all
9  the facts at that time as to what is occurring on
10  those school grounds.

11         So obviously we're going to have to look
12  into that to see what is happening and who is
13  involved in that.  Okay.  It doesn't look good that
14  he just gets back in that car after he's running
15  around doing the things that he's doing.

16         The other thing is that everybody says
17  that he's possibly under the influence of drugs,
18  right.  So you also don't know what's occurring in
19  that car at that time.

20     Q    **All right.  So all of the information that**
21  **you based your decision on with regard to Kristy Ward**
22  **Stamp and Tommy Brown when you decided to take them**
23  **to the sheriff's annex to interrogate them, was that**
24  **they were in the car together with Mr. Ward and that**
25  **there was some thought that maybe he was on drugs.**

1  So you didn't know what was happening in the car; is
2  that correct?

3      A    No.  I'm telling you there's criminal
4  activity that's happening outside of the vehicle.  So
5  that leads to you believe that the people he's with
6  are also involved with him in the criminal activity
7  that's occurring, right.

8         You have the possible get-away driver.
9  You have a possible lookout.  You don't know if
10  there's another car or anybody else involved.  So you
11  have to look into it to see what is occurring at the
12  school, why are they there, what's occurring at the
13  school with this criminal activity that's happening
14  right when school and kids are supposed to be let out
15  of school.

16     Q    **And so with regard to -- well, so you made**
17  **the decision to have Kristy Ward Stamp and Tommy**
18  **Brown taken to the annex.  Did you make the decision**
19  **to have any other witnesses taken to the annex for**
20  **interrogation?**

21     A    So other people were at the annex in
22  interviews.  And it's not interrogation.  There's
23  interviews that are being conducted at the Pueblo
24  Police and at my investigations annex.

25         At that time PD had taken that over.  We

*AB Litigation Services*

Page 129

1   reasonable, right, what's reasonable.
2        Q     And that's something that you've been
3   trained on, isn't it?
4        A     I'm sure that it's come up in training,
5   correct.
6        Q     But not just you.  But you have been
7   trained, as an officer of the Pueblo County Sheriff's
8   Office, that at some point when an investigation
9   becomes -- an investigatory detention takes too long
10  it becomes an arrest, right?
11       A     And that's when I told you that we always
12  confer with the district attorney.  We explain to
13  them our cases, what we have going on.  They are
14  usually present or they're on the phone with us, and
15  we're asking their advice on what we're doing and the
16  actions that we're taking.
17       Q     Do you know if the district attorney was
18  advised or was counsel -- let me ask it this way.
19             Do you know if -- this is very easy.  Did
20  you receive any counsel from the district attorney's
21  office before making the determination to take Ms.
22  Ward Stamp and Mr. Brown to the annex for
23  questioning?
24       A     Not that I recall.
25       Q     Was the district attorney at the scene

Page 130

1   ever?
2        A     I told you I don't remember if they were
3   at the scene.  There could have been some
4   investigators there from the DA's office, but I told
5   you the district attorney was in the office with the
6   Pueblo Police sergeant during that time.  So he was
7   present during that time with the sergeant that was
8   running the case.
9        Q     And you said you believe you had run
10  somebody's name through the system for them.  Do you
11  believe it was Mr. Brown?
12       A     I don't recall.
13       Q     Well, do you have a guess?
14             MR. O'DONNELL:  Objection, form.
15       A     I don't have a guess.  I'm not going to
16  guess.  I don't know.  I would have to look at the
17  body cam footage.  I truly don't know.
18       Q     (BY MS. NEWMAN)  Was it somebody related
19  to this case?
20       A     I have no idea.  I'd have to go back and
21  look at the body cam footage and see if I can listen
22  to the name or listen to what they were requesting
23  that I help them with, but I don't recall.  I
24  honestly don't.
25       Q     Would you agree that there was never

Page 131

1   probable cause to arrest Ms. Ward Stamp?
2        A     There was not probable cause to arrest
3   her?  I agree with that.
4        Q     Based on everything that you know as
5   you're sitting here now, would you do anything
6   differently than you did?
7        A     Based on everything that I've looked at,
8   no.
9        Q     Everything you've heard, everything you've
10  looked at.  Is there anything at all -- you know,
11  hindsight is 20/20.  So with all of the benefits of
12  hindsight, is there anything that you would do
13  differently with everything you know now?
14       A     Why -- there's nothing that -- there
15  again, I didn't go through the entire case.  I went
16  through parts of the case.  But at this time no, I
17  would not have done anything differently than what
18  was done.
19       Q     And a minute ago you told me that you
20  agree that there was never probable cause to arrest
21  Ms. Ward Stamp, right?
22       A     Well, they obviously didn't get to the
23  point of probable cause.  So from what I saw, no.
24       Q     I'm going to show you another document for
25  us to just kind of briefly go through.  All right.

Page 132

1             MS. NEWMAN:  So this one will be
2   Exhibit 59?
3             THE REPORTER:  Yes.
4             (Exhibit Number 59 was marked.)
5        Q     (BY MS. NEWMAN)  This is the CAD reports
6   from that day, all right.  Do you recognize this?
7        A     I looked at it.
8        Q     Your car is identified at U9, correct?
9        A     Correct.
10       Q     So we've highlighted the parts that we
11  believe are yours.  And if you believe I've missed
12  some, then let me know.  If you think there's
13  something from your review, let me know.  Okay?
14       A     Correct.
15       Q     So this is the first one that I believe
16  was you.  So this is indicating that at 3:47 p.m. you
17  had been advised and you were en route?
18       A     Yeah, I'm en route to the call.
19       Q     Is there anything else that we can tell
20  from that from this entry?
21       A     No.  I'm just driving to the call.
22       Q     Right.  The next one I believe is this one
23  at 16:00, so 4 o'clock.
24       A     Correct.
25       Q     And this indicates that you had arrived,

*AB Litigation Services*

<table>
<tr><td>

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT COURT OF COLORADO
Civil Action No. 23-CV-00473-CNS-MDB
--------------------------------------------------
VIDEOCONFERENCE DEPOSITION OF ROBERT QUINTANA
NOVEMBER 28, 2023
--------------------------------------------------
ESTATE OF RICHARD WARD, by and through its personal
representative Kristy Ward Stamp, and
KRISTY WARD STAMP,
    Plaintiffs,
v.
PUEBLO, COLORADO; DEPUTY CHARLES McWHORTER, in his
individual and official capacity; DEPUTY CASSANDRA
GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official
capacity; DEPUTY CHRISTINE SPENCER, in her individual
and official capacity; DEPUTY NICOLAS BERUMEN, in his
individual and official capacity; DEPUTY ROBERT
QUINTANA, in his individual and official capacity;
and SERGEANT JOSH RAGAN, in his individual and
official capacity,
    Defendants.
--------------------------------------------------
APPEARANCES:
    KILLMER LANE LLP
      By Darold W. Killmer, Esq.
        Reid Allison, Esq.
        1543 Champa Street, Suite 400
        Denver, Colorado 80202
          Appearing remotely for Plaintiffs
```
</td><td>

Page 2

```
 1   APPEARANCES (continued):
 2     THE LANE LAW FIRM, P.C.
         By William O'Donnell, Esq.
 3         5105 DTC Parkway
           First National Bank Building, Suite 475
 4         Greenwood Village, Colorado 80111-2764
             Appearing remotely for Defendants
 5
 6
 7     Also Present:  Kristy Ward Stamp
                      Cassandra Gonzales
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
</td></tr>
<tr><td>

Page 3

```
 1          Pursuant to Notice and the Federal
 2   Rules of Civil Procedure, the videoconference
 3   deposition of ROBERT QUINTANA, called by Plaintiffs,
 4   was taken on Tuesday, November 28, 2023, commencing
 5   at 9:01 a.m., before Kathy L. Davis, Registered
 6   Professional Reporter, Certified Realtime Reporter,
 7   and Registered Merit Reporter within and for the
 8   State of Colorado.
 9
10
11              I N D E X
12   VIDEOCONFERENCE DEPOSITION OF ROBERT QUINTANA
13   EXAMINATION                              PAGE
14       By Mr. Killmer                        5
15
16   EXHIBITS                    INITIAL REFERENCE
17   Exhibit 20  6/3/2022 resignation letter of   26
                 Quintana
18
     Exhibit 21  Supplemental report of Quintana   55
19
     Exhibit 22  Preemployment Psychological      109
20               Evaluation for Quintana
21   Exhibit 23  Defendant Quintana's Responses   113
                 to Plaintiffs' Discovery
22               Requests To The Individual
                 Defendants
23
24
25
```
</td><td>

Page 4

```
 1   PREVIOUSLY MARKED EXHIBITS        INITIAL REFERENCE
 2   Exhibit 13  Pueblo County Law Enforcement      84
                 Bureau Policy Number 1.5,
 3               Subject:  Arrests and
                 Detentions
 4
     Exhibit 14  Pueblo County Sheriffs Office,     91
 5               Policy Number:  1.4, Search and
                 Seizure
 6
 7
 8   REQUESTED INFORMATION                       PAGE
 9        Unredacted portion of Bates           112
          Stamp PCSO 3458
10
          Corrected or amended answers to       115
11        plaintiffs' discovery requests
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
</td></tr>
</table>

*AB Litigation Services*

Page 73

1  look at some notes?  Did you watch your body cam?
2  What did you do?
3       A    Oh, body cam footage most likely.
4       Q    Yours or yours plus others'?
5       A    Mine.  Mine only.
6       Q    Well, did you have access to the other
7  officers' body cams?
8       A    I don't believe so.
9       Q    Did you ever decide for yourself whether
10  there was a legal basis to detain and make a
11  custodial transportation of Ms. Ward to the annex?
12       A    Did I ever decide myself if there was a
13  legal basis to transport her?
14       Q    In custody, yeah.
15       A    Anytime -- anytime we transport anybody
16  they're placed in restraints in our vehicle.  That is
17  a policy that's just for safety.  So as -- as -- if I
18  remember correctly, as she asked me where I was
19  going, I was being honest with her and said, I don't
20  know.  I'm just going to transport you to the annex
21  to be questioned.
22       Q    Well, I don't want to seem like I'm
23  trying to trick you.  I'm reading case law, 10th
24  Circuit Court of Appeals and United States Supreme
25  Court cases that have been decided that existed at

Page 74

1  the time you transported her in custody.  And one
2  case is called McInerney versus King in the
3  10th Circuit.  And it instructs that an officer has
4  to decide for himself whether there's a basis or
5  whether this violates the Fourth Amendment.
6            And so you've described to me that
7  Berumen said, Do this, and Berumen had information
8  that he didn't necessarily tell you what it was but
9  that you relied on him saying, Take her down there.
10  And I'm wondering whether you ever decided for
11  yourself that there is a factual basis to make this
12  custodial transfer down to the annex or whether --
13  or, on the other hand, you just relied on Deputy
14  Berumen.
15       A    Well, and at the time I -- she wasn't
16  under arrest by my means.  It was just for the
17  transportation.  So that's the only thing I focused
18  on was placing her in the back of my patrol unit to
19  transport her to the annex.
20       Q    Well, you say she wasn't under arrest,
21  but what -- what's your definition of an arrest?
22       A    Well, probable cause to believe that they
23  had committed a crime and that they were being
24  arrested or restrained because they are going to
25  receive, you know, further investigation towards

Page 75

1  criminal charges or other.
2       Q    Right.  And you've already said you don't
3  believe that you had probable cause to believe she
4  committed a crime, right?
5       A    Yes, but that -- I did not arrest her
6  thinking that she had committed a crime.
7       Q    My question is, when I say, What do you
8  think an arrest is? what -- what do you think
9  constitutes an arrest?  Here you've got a woman
10  that's in handcuffs.  You've searched her by patting
11  her down.  You've put her into the vehicle, and you
12  take her, not because she requested it, but because
13  your -- your colleague requested you to do so, down
14  to the annex, and then she does get interrogated.  So
15  her freedom of movement is restrained for at least
16  two, three, four hours, right?
17       A    Well, at the time, like, I didn't think
18  she was going to be -- to be interrogated.  My
19  specific was that she was going to be questioned
20  there.
21       Q    Okay.  You don't think --
22       A    I wasn't aware -- right.  But that, you
23  know, I wasn't aware if she was, you know, going to
24  be questioned as a part of -- because it was a
25  critical incident or if she had had a direct part in

Page 76

1  that, which is why I made it very clear that I wasn't
2  going to ask her questions and I did not want to give
3  her information.
4       Q    Okay.  And I'm not asking about whether
5  you asked her questions or gave her information.  I'm
6  asking about from her perspective she was not free to
7  leave because you were directing her to get into the
8  car rather than to just go about her business that
9  day, correct?
10       A    From -- I couldn't tell you what her
11  perspective was.
12       Q    Well, aren't you trained that you -- you
13  have to consider the totality of the circumstances as
14  to whether a suspect would feel free to leave under
15  the totality of the circumstances?
16       A    Yes.
17       Q    All right.  That's what I'm asking you to
18  do.  The objective circumstances presented to you
19  was, Here's a woman surrounded by police, one of
20  who's just shot and killed her son, and now they've
21  put her in handcuffs and they're putting her in the
22  police car and taking her down to the station.  Don't
23  you believe those objective circumstances would lead
24  a person in Kristy Ward Stamp's shoes to believe
25  she's not free to leave?

*AB Litigation Services*

Page 89

1  criminal, is it?
2      A    No.  But being there with them, that kind
3  of raises for further speaking to those individuals.
4      Q    Well, you agree with me that mere
5  presence at the scene of a potential crime is not
6  itself a crime?
7      A    Not itself, no.
8      Q    And she had done nothing else which would
9  augment her presence there to make you think she's
10 involved in some criminal activity, right?
11     A    Not that I was aware of.
12     Q    Ever, up to today, correct?
13     A    Correct.
14     Q    This policy in about the middle of the
15 page has a Probable Cause section.  And it says,
16 "Probable Cause arises only where the facts and
17 circumstances within the deputy's knowledge suffice
18 to warrant a reasonably prudent person in the belief
19 that the person to be arrested committed or is
20 committing a criminal offense."
21          And you agree that there was no probable
22 cause to believe that Ms. Ward Stamp had committed
23 any or was committing a criminal offense, right?
24     A    Yes, I agree.
25     Q    I'm interested in this answer you gave a

Page 90

1  little bit ago that you don't think she was under
2  arrest.  If somebody is detained, in custody, and put
3  into a police cruiser and brought down to the annex
4  and is not free to leave, that constitutes an arrest,
5  doesn't it?
6      A    If they're not free to leave, yes.
7      Q    Did you ever tell her that she was free
8  to leave?
9      A    No.
10     Q    Are you aware of any law enforcement
11 officer that communicated to Ms. Ward Stamp that she
12 was free to leave?
13     A    Not that I'm aware of.
14     Q    You are equipped with consent forms that
15 can -- that demonstrate the concept of somebody to be
16 searched or detained, right?
17     A    Yes.  I believe, yeah, there are forms.
18     Q    And those forms, you have them right
19 there in your -- in your vehicle, right?
20     A    Yes.
21     Q    Did you ever ask her to sign a consent
22 form to show that she was consenting to this
23 intrusion into her personal liberty?
24     A    No, just the verbal when I had told her
25 that I was going to pat search her and to check her

Page 91

1  pocket.
2      Q    And she didn't say, I hereby consent to
3  that.  She -- she had no choice.  She was cuffed and
4  standing there and so she merely didn't object,
5  right?
6      A    She didn't use that exact verbiage, but
7  she said, Yeah, that's fine.
8      Q    Well, she didn't use that verbiage.  I
9  mean, I want to -- it's on the -- it's on the body
10 cam, right?
11     A    Yeah.  She said, Yes, you can check my
12 pocket.
13     Q    You're not trained that a failure to
14 object to a search constitutes consent under the law,
15 are you?
16     A    No.
17     Q    Did you ever inform her that the search
18 of her is voluntary and that she had the right to
19 refuse the request to search?
20     A    No.
21     Q    Let me show you another policy, which is
22 the Search and Seizure policy.  Is that on your
23 screen now?
24     A    That is.
25     Q    That was previously marked as Deposition

Page 92

1  Exhibit 14 in the Spencer deposition, and this is
2  another sheriff's office policy that governs your
3  conduct as an officer, correct?
4      A    Yes.
5      Q    The second page of this, it has a section
6  on Consent Searches.  Do you see that?
7      A    Yes.
8      Q    And it says in the second paragraph,
9  "Consent is invalid" -- "invalid if it is obtained by
10 coercion or under duress."  Do you see that?
11     A    I do.
12     Q    Did it occur to you that the
13 circumstances that she was confronting, namely, being
14 there right after the police had killed her son,
15 shot -- shot her son and -- and killed him, and now
16 she's cuffed and now there's a bunch of officers
17 themselves that are armed, constituted some sort of
18 coercion or under duress under this policy?
19     A    Am I -- it did not occur to me, no.
20     Q    But now upon reflection you can
21 understand why that might feel coercive or under
22 duress?
23     A    I wouldn't say I agree, but I could see
24 how she would have been stressed out.
25     Q    Well, not just stressed out, but not free

*AB Litigation Services*

1  to say, you know, Take a hike, you know, where she
2  would just have to agree with whatever you said.  I
3  mean, after all, the Pueblo County sheriffs had just
4  killed her son.
5      A    Well, she could -- I mean, I just advised
6  her that I was going to just do a pat search for
7  weapons and then asked her specifically if I could --
8  she said that she had something in her pocket.  I
9  asked her if I could check her pocket, and she said
10 yes.
11     Q    Well, the next paragraph puts more meat
12 on the bones.  It says, "Prior to conducting a
13 consensual search of a person who is not under
14 arrest, the person's effects, or a vehicle, a peace
15 officer shall" -- "shall inform the person that the
16 search is voluntary, and the person has the right to
17 refuse the request to search."  Do you see that?
18     A    Yes.
19     Q    And "shall" is mandatory language.  You
20 must do this, correct?
21     A    Yes.
22     Q    But you did not tell her that this was a
23 voluntary search and that she had the right to refuse
24 it, did you?
25     A    Well, not specifically.  I asked her if I

1  can, and she said yes.  She could have said no at
2  that time.
3      Q    Well, except you didn't tell her that she
4  could say no.  And that's what this policy says you
5  have to do.  "A peace officer shall inform the person
6  that the search is voluntary, and the person has the
7  right to refuse the request to search."  You didn't
8  tell her that, did you?
9      A    Well, no.  I guess in my opinion asking
10 someone for permission is opening the pretense that
11 they can deny me permission.
12     Q    Well, you agree, though, don't you, that
13 you violated this mandatory policy that prior to
14 conducting what you considered a consensual search,
15 you didn't inform her that it's voluntary and that
16 she was free to refuse it, correct?
17          MR. O'DONNELL:  Objection.  Form.
18     A    I also -- I don't agree.
19     Q    (BY MR. KILLMER)  You don't agree that
20 you violated that?
21     A    No.
22     Q    Did you read her her rights?
23     A    No.
24     Q    Why not?
25     A    Because I wasn't questioning or -- or

1  arresting her.
2      Q    So you believe you have to read her her
3  rights if you're going to engage in a custodial
4  interrogation?
5      A    Do I believe I'd have to read her her
6  rights?
7      Q    Yeah.
8      A    I don't --
9      Q    If you're going to engage in a custodial
10 interrogation.
11     A    I was not going to engage in a custodial
12 interrogation.
13     Q    Right, which is why you didn't read her
14 her rights, correct?
15     A    Yes.  Yes.
16     Q    But if you were going to engage in a
17 custodial interrogation you would have been required
18 to read her her rights?
19     A    Yes.
20     Q    That's the basic mandate of Miranda,
21 correct?
22     A    Yes.
23     Q    But since you made it a point to not ask
24 her any questions, you felt you didn't need to read
25 her her rights?

1      A    Yes.
2      Q    But under the circumstances on the --
3  ever since you met her she was in cuffs, and all the
4  way down to when you dropped her off in that room at
5  the annex, you agree she was in custody?
6      A    She was.
7      Q    Now, this consent form at the top of
8  it -- it's Exhibit 14 -- says there's three "Types of
9  Searches:  Search incident to arrest, Search by
10 consent, and Search by warrant and stop and frisk."
11 What would you consider your search of her to be?
12     A    For her pocket it would be search by
13 consent.
14     Q    Is that it?
15     A    Yes.
16     Q    You didn't have a search warrant, did
17 you?
18     A    No.
19     Q    Did you ever or anybody to your knowledge
20 ever seek to get a search warrant?
21          MR. O'DONNELL:  Objection.  Form.
22     A    Not that I'm aware of.
23     Q    (BY MR. KILLMER)  The policy on this
24 Exhibit 14 Search and Seizure policy is in the middle
25 of the page, the lower middle, and it says, among

*AB Litigation Services*

1     A     Yeah.

2     Q     Correct?

3     A     Correct.

4     Q     Do you know if other witnesses were also

5 invited to voluntarily come down to the station?

6     A     I'm not sure.  I only know of that one

7 because he was there when I had arrived.

8     Q     Right.  Do you know if any witnesses were

9 interviewed at the scene?

10     A     I am not aware of any.

11     Q     Can you think of any legitimate reason --

12 I'm sorry.

13     A     I'm sorry.  I don't know.

14     Q     Can you think of any legitimate reason

15 that Ms. Ward Stamp couldn't be interviewed at the

16 scene?

17     A     Maybe just because she was, like I said,

18 involved more so than these others and also weather

19 conditions.  Also, they probably wanted her to be

20 interviewed by the detectives that were responding

21 for that incident rather than a patrol officer, just

22 to limit the amount of people that are interviewing

23 them instead of just having the detectives do the

24 interviews.

25     Q     I want to re- -- I want to visit this

1 Exhibit 13, the Arrest and Detention policy, again

2 just for a minute.

3     On the second page of that exhibit there

4 is a big paragraph that has five numbers called

5 Probable cause to arrest and stuff.  Do you see where

6 I'm at?

7     A     Yes.

8     Q     And the first sentence of that section

9 says, "Probable cause to arrest shall be supported by

10 facts.  Vague hunches or suspicions are not enough."

11 And is that consistent with your training that vague

12 hunches or suspicions are not enough to constitute

13 probable cause?

14     A     Yes.

15     Q     Had you ever previously responded to an

16 officer-involved shooting scene?

17     A     No, I don't -- I don't believe so.

18     Q     What -- where is this policy found that

19 you've referred to several times -- I think

20 Deputy Gonzales said this too -- that it's the policy

21 that people have to be in handcuffs if they're going

22 to be driven down to the station?  I've scoured the

23 policies and I don't see that, but I might have

24 missed it.  There's a lot of them.  Where is this

25 policy?

1     A     That is from my training with my patrol

2 training officer and through supervisors.  That is

3 how I've always been told when transporting anybody.

4     Q     Well --

5     A     So to answer the question, I don't know

6 where the policy is located.

7     Q     Well, I can show you something that comes

8 close.  On page 4 there's something called Arrest

9 Searches.  Do you see where I'm at?

10     A     Yes.

11     Q     And it says, "Maximum safety while

12 searching prisoners is achieved by isolating each

13 subject when searching that person.  Regardless of

14 the offense use of restraints on prisoners is

15 required.  Body cavity searches shall not be

16 conducted without the proper court warrant."  So

17 regardless of the offense, use of restraints on

18 prisoners is required.  Is that the policy you're

19 referring to?

20     A     No, I don't believe so.

21     Q     Because I -- I may have missed it, but

22 that's the closest I've been able to find that

23 requires use of restraints, but that is specifically

24 on prisoners.

25     A     Hmm.

1     Q     You don't think she -- you're testifying

2 today under oath that you don't think she was a

3 prisoner, right?

4     A     Yeah.  I was -- I was unaware if she was

5 a prisoner.

6     Q     And you're -- so you're -- so you're

7 saying this policy wouldn't require you to handcuff

8 Ms. Ward Stamp because it doesn't apply to her,

9 right?

10     A     Yeah.

11     Q     And you're referring rather to a

12 witness -- a potential witness to a crime being

13 transported also has to be cuffed, correct?

14     A     Yes.  Anybody who is being transported,

15 from our training, has to be placed into restraints

16 before going into the patrol unit.

17     Q     Whether they're a witness or an arrestee

18 or a person you're just giving a ride home --

19     A     Yes.

20     Q     -- or -- it doesn't matter?  Everybody

21 has to be in handcuffs?

22     A     Yes.

23     Q     And you're saying you're not aware of any

24 written policy.  This is just something that was kind

25 of in the air that you were told and you heard or

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp, and
KRISTY WARD STAMP,

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity
PUEBLO COUNTY BOARD OF COUNTY COMMISSIONERS
DEPUTY CHARLES MCWHORTER, in his individual and official capacity;
DEPUTY CASSANDRA GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official capacity;
DEPUTY CHRISTINE SPENCER, in her individual and official capacity;
DEPUTY NICOLAS BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and official capacity,
SERGEANT JOSH RAGAN, in his individual and official capacity, and
CAPTAIN SHELLEY BRYANT, in her individual and official capacity,

      Defendants.

---

**INTERVIEW WITH PLAINTIFF KRISTY WARD STAMP**
**(CONVENTIONALLY FILED)**

---

The electronic video recording of Pueblo Police Department's **Interview with Plaintiff Kristy Ward Stamp**, which has been disclosed to all Parties with the name and Bates number, "Ward (3095) - PPD - Interview - Kristy Ward Stamp (Video)" is being conventionally filed with the Court on a flash drive pursuant to Section 4.8(f) of this Court's Electronic Case Filing Procedures.  A copy of these materials is being delivered via Dropbox to all counsel, as stated in the Certificate of Service for Plaintiffs' Motion for Partial Summary Judgment.

```
1
2
3
4
5
6
7                    INTERVIEW WITH KRISTY WARD STAMP
8                         Q=Det. Carly Gustin
9                         Q1=Det. Amy Lile
10                        Q2=Dispatch
11                        A=Kristy Ward Stamp
12                        A1=(Tommy)
13
14
15   Q:              Hello. I'm Detective Gustin. I'm from the Pueblo Police Department, okay?
16
17   A:              Mm-hm.
18
19   Q1:             My name's Detective Lile, I work for the Sheriff's Office. Now, what is your
20                   name?
21
22   A:              Kristy Ward Stamp.
23
24   Q1:             And how do you spell your first name?
25
26   A:              K-R-I-S-T-Y.
27
28   Q1:             Ward Stamp?
29
30   A:              Yeah. As in Montgomery Ward and the postage stamp.
31
32   Q1:             Hyphenated?
33
34   A:              Yes. Well, no, it's not. It's just spaced.
35
36   Q1:             Okay. All right. And then what is your birthday, Kristy?
37
38   A:              ████████
39
40   Q1:             Okay. How about a good phone number for you?
41
42   A:              ███████████
43
44   Q1:             Mm-hm.
45
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp,
and
KRISTY WARD STAMP,

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity
PUEBLO COUNTY BOARD OF COUNTY COMMISSIONERS
DEPUTY CHARLES MCWHORTER, in his individual and official capacity;
DEPUTY CASSANDRA GONZALES, in her individual and official capacity;
DEPUTY JACOB MAHAN, in his individual and official capacity;
DEPUTY CHRISTINE SPENCER, in her individual and official capacity;
DEPUTY NICOLAS BERUMEN, in his individual and official capacity;
DEPUTY ROBERT QUINTANA, in his individual and official capacity,
SERGEANT JOSH RAGAN, in his individual and official capacity, and
CAPTAIN SHELLEY BRYANT, in her individual and official capacity,

      Defendants.

---

**BODY -WORN CAMERA VIDEO TWO OF DEFENDANT NICOLAS BERUMAN
(CONVENTIONALLY SUBMITTED)**

---

      The electronic **Body-Worn Camera Video Two of Defendant Nicolas Berumen**, which

has been disclosed to all Parties with the name and Bates number, "Ward (129) - PCSO - BWC -

Suspicious_Pers (6)," is being conventionally filed with the Court on a flash drive pursuant to

Section 4.8(f) of this Court's Electronic Case Filing Procedures.  A copy of these materials is

being delivered via Dropbox to all counsel, as stated in the Certificate of Service for Plaintiffs'

Motion for Partial Summary Judgment.

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
 2
     Case No. 23-CV-00473-MDB
 3   _____
 4   DEPOSITION OF KRISTY WARD STAMP INDIVIDUALLY AND AS
     PERSONAL REPRESENTATIVE OF THE ESTATE OF RICHARD WARD
 5   VOLUME I
     June 25, 2024
 6   _____
 7   ESTATE OF RICHARD WARD by and through its personal
     representative Kristy Ward Stamp and KRISTY WARD STAMP,
 8
     Plaintiffs,
 9
     v.
10
     PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official
11   capacity;
     PUEBLO COUNTY BOARD OF COUNTY COMMISSIONERS;
12   DEPUTY CHARLES McWHORTER, in his individual and official
     capacity;
13   DEPUTY CASSANDRA GONZALES, in her individual and official
     capacity;
14   DEPUTY JACOB MAHAN, in his individual and official
     capacity;
15   DEPUTY CHRISTINE SPENCER, in her individual and official
     capacity;
16   DEPUTY NICHOLAS BERUMEN, in his individual and official
     capacity;
17   DEPUTY ROBERT QUINTANA, in his individual and official
     capacity;
18   SERGEANT JOSH RAGAN, in his individual and official
     capacity;
19   CAPTAIN BRYANT, in her individual and official capacity,
20   Defendants.
     _____
21
                    A P P E A R A N C E S
22
     For the Plaintiffs:      DAROLD KILLMER, ESQ.
23                            Killmer Lane, LLP
                              1543 Champa Street
24                            Suite 400
                              Denver, Colorado  80202
25
```

177

1    Q   Okay.  Have -- have -- you have experienced in
2    your past with Richard before he died times when he had
3    mental health issues that were causing him problems.
4        Is that fair to say?
5    A   Yes.
6    Q   Okay.  The behavior that he was exhibiting
7    when he was in the backseat of the vehicle, did -- did
8    you think that he was having some kind of a mental health
9    episode?
10   A   I -- I didn't know.  I didn't know for sure.
11   I -- I didn't know.
12   Q   What kind of behavior would you see him
13   exhibit when he was having a mental health episode?
14   A   Well, he's just disoriented and forgetful, you
15   know, like short attention span.
16   Q   Based on your history, do you think that
17   Richard's mental health issues could have contributed to
18   his resisting and fighting?
19       MR. KILLMER:  Object to form, calls for
20   speculation.
21       THE WITNESS:  No.  I don't know any of that.
22   Q   (By Mr. Lane)  Okay.  After you spoke with the
23   two detectives, what -- what was the next thing that you
24   recall?
25       MR. KILLMER:  You're talking about down at the

178

1    station?
2        MR. LANE:  Yes.  The two detectives we've been
3    discussing, the two females detectives she --
4        THE WITNESS:  Maybe -- maybe Tommy came in the
5    room of the -- I don't know.
6    Q   (By Mr. Lane)  So Tommy came in the interview
7    room?
8    A   Yeah, he got -- I think they finished with him
9    and then I believe Tommy came in the room after that and
10   that's all I remember.  And then the other -- I don't
11   know who the other lead detective or something was.  I
12   don't know his name.
13   Q   Do you recall speaking with another detective
14   after that?
15   A   No.
16   Q   Okay.  So you say in Interrogatory Number
17   12 -- okay.
18       MR. KILLMER:  The -- the -- yes, we'll get
19   there.  There's your answers.
20       MR. LANE:  Okay.
21   Q   (By Mr. Lane)  And again, this is the second
22   page of that answer.  This will be --
23       MR. KILLMER:  These are -- in bold is your
24   answer.  That's the question.
25       THE WITNESS:  Oh, okay.

179

1        MR. LANE:  Yeah.
2    Q   (By Mr. Lane)  So this will be the second
3    page, which your attorney is indicating, and this will be
4    the third paragraph.  You say, All of our personal
5    belongings including our car were confiscated.
6    A   Yes.
7    Q   Okay?  And you say they didn't return your
8    cell phone, ID, and wallet, which I need for everyday
9    life until days later.
10       What did they return to you days later?
11   A   Well, we were -- we tried to get -- call there
12   and get -- get these things returned to us.
13   Q   When you say we, who was it?
14   A   Oh, my family.  Myself, and my family.
15   Q   Okay.  Who else called other than you?
16   A   Possibly my father.  I don't know.  Maybe
17   Tommy.  I don't really know.
18   Q   So you -- you called, though.  You remember
19   making those calls?
20   A   I don't remember specifically.
21   Q   Okay.
22   A   I just know we -- we were trying to get our
23   stuff back and then eventually we talked to our attorneys
24   and then they had -- they talked to the -- station to
25   get our things back.  And then we were able -- we were

180

1    able to go down at a certain time and pick those things
2    up.
3    Q   Okay.  And in terms of you -- you got those
4    days later; is that correct?
5    A   Yes.
6    Q   Okay.  You were going to California for
7    Richard's end of life celebration?
8    A   Yes.
9    Q   Why were you doing Richard's end of life
10   celebration in California?
11   A   Because all of our family's there.  And my mom
12   had passed away recently, so we were having hers out
13   there as well statement at the same time.
14   Q   So Patricia was your mother?
15   A   Yes.
16   Q   So you were having Patricia and Richard's end
17   of life ceremony in California?
18   A   Correct.
19   Q   What other family did you have in California?
20   Your father lived here, correct?
21   A   Yes.
22   Q   Who lived in California?
23   A   My brother, my sister, my nephews, my nieces,
24   cousins, aunts, uncles.
25   Q   Where in California did you do the end of life

205

1    (Exhibit Number 93 was marked for
2  identification.)
3    MS. NEWMAN: I'm sorry. Can you tell me what
4  the new exhibit number is for this?
5    MR. LANE: This -- this new exhibit --
6    MR. O'DONNELL: Should be 93.
7    MR. LANE: -- will be Exhibit 93.
8    MS. NEWMAN: Thanks.
9    MR. LANE: Thank you for helping clarify that
10  change of Bates numbers. Okay.
11    Q   (By Mr. Lane) So I'm looking at Exhibit 93
12  and it starts out with a bill from a funeral home.
13    Is that the bill for the cremation?
14    A   Yes.
15    Q   Okay. Has this bill been paid?
16    A   Yes.
17    Q   Did you pay for this -- did you personally pay
18  for this? Did anyone else pay for it?
19    A   I paid for it.
20    Q   Okay. And did you pay for it with credit card
21  or was it paid for by cash or check?
22    A   Probab-- I don't know. I couldn't tell you
23  for sure, but I believe it was a -- it was a debit card.
24  That's what I always use.
25    Q   So a debit card draws directly out of your

206

1  account?
2    A   Yes.
3    Q   That's page 5281 down at the bottom.
4    A   Yeah.
5    Q   Okay. And I do think that I see that it was a
6  debit card purchase, and that's on 5282. Oh, I'm sorry.
7  That's the tow.
8    MR. KILLMER: That may be a different --
9    MR. LANE: That's different, yeah.
10    Q   (By Mr. Lane) So tell me about that. That's
11  a debit card purchase Discount Towing for 200 -- help me
12  understand that. There's -- there's two bills here.
13  Looks like it was $280.
14    What was that for?
15    A   Am I on the right --
16    Q   This on page 5282.
17    MR. KILLMER: Right there. 280 --
18    THE WITNESS: That was to -- to get the -- get
19  the Lexus out of the impound.
20    Q   (By Mr. Lane) So it was $280 to have it towed
21  from the impound lot?
22    A   It was a charge --
23    Q   Was that -- that was the charge for getting it
24  out of the impound?
25    A   Yes.

207

1    Q   Okay. Understood.
2    And do you know when that was? I think it
3  shows here October 5th, 2022; is that correct? And this
4  is just in kind of the upper corner underneath that
5  redacted black block.
6    A   Oh, okay. It must be. I don't -- I couldn't
7  say for sure, but it's -- yeah, I believe it might have
8  been that.
9    Q   And I can -- I will tell you that this was
10  given to us is our understanding. So I'm --
11    A   Sure.
12    Q   -- trying to figure out -- so that would have
13  been -- would that have been the date that you actually
14  picked up the vehicle?
15    A   Yes.
16    Q   Okay. And it was being held by Discount
17  Towing; is that correct?
18    A   Yes.
19    Q   Okay. And then the next page is 5283, same
20  exhibit. This is Enterprise Rent-A-Car. Tell me what
21  this was for.
22    A   This was to have a transportation to drive out
23  to California.
24    Q   Okay. And it looks like this was invoiced on
25  April 1st of 2022? And I'm looking at the top of the

208

1  document.
2    A   Yes.
3    Q   Okay. It looks like you checked out the
4  vehicle on March 18th and checked it back in on
5  April 1st.
6    Can you tell me, when you went to California
7  for this ceremony for Richard and for your mother, how
8  long did it take you to get there?
9    A   I believe two days it took us to get there --
10  there and then two days on the way back.
11    Q   Okay. And so -- and it looks like then you
12  would have spent nine days approximately in California?
13    A   Yes, I believe that's what it is.
14    Q   Okay. Can you tell me what you did in
15  California? I know you went to a ceremony, but, I mean,
16  can you tell me about the ceremony? Where it was held
17  and how long did it take?
18    A   My mom's was at a -- my -- my sister had
19  rented a -- I don't believe -- I -- it's a -- it was a --
20  how would you -- like a banquet room or something. I
21  don't really know. It was -- my sister arranged it all
22  so I couldn't tell you --
23    Q   For your mother?
24    A   For my mother.
25    Q   And -- and when did your mother -- you said

*Estate of Richard Ward and Kristy Ward Stamp*

*v.*

*Pueblo County Colorado*

---

Charles Thomas McWhorter, III

December 04, 2023

---



216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

*AB Litigation Services*

Page 277

```
1       Q    Do you know that Captain Shelley Bryant
2   was one of the supervisors who responded to the scene
3   after you shot Mr. Ward?
4       A    I did not know that.  I wasn't there.
5   But she is the captain of investigations, so I would
6   assume she would.
7       Q    And you know that the lawsuit definitely
8   includes claims against you and Deputy Gonzales for
9   the death of Mr. Ward, but it also includes claims
10  against the other responding officers who saw fit to
11  arrest Kristy and Tommy.  You knew that the lawsuit
12  includes that?
13      A    I knew it included other deputies, yes.
14      Q    And the supervisor on the scene presiding
15  over those arrests or those detentions and bringing
16  them down to the sheriff's office for interrogation
17  and so forth, the supervisor on the scene would have
18  been Captain Shelley Bryant, right?
19           MR. LANE:  Objection to form.
20      A    I'm uncer- -- unsure about that.  I know
21  she's the captain of investigations.  There is a big
22  difference between detentions and arrests.
23      Q    (BY MR. KILLMER)  Why do you think that?
24      A    You -- you said that they were arrested
25  and then you said, Well, they were detained.  Being
```

Page 278

```
1   detained is -- is different than -- than the arrest.
2       Q    Well, what -- what do you think the
3   difference is?
4       A    Arrested, you're -- you are -- for us
5   whenever I arrest somebody I -- I place them in
6   handcuffs and I take them to the jail to book them
7   in.  When I detain 'em, sometimes I may place them in
8   handcuffs.  I may move them to another location if
9   it's unsafe or due to weather.  And -- and then
10  determining based off of the investigation, then I'll
11  release them if they are not to be arrested.
12      Q    Well, in the meantime, though, they're
13  not free to leave, correct?
14      A    Correct.  It's a -- you're detaining
15  them.  They're not free to go --
16      Q    Well --
17      A    -- whether they're a witness or a suspect
18  or whatever the case may be.
19      Q    Are you trained to put witnesses in
20  handcuffs in taking them down to the station?
21      A    It depends on -- on the circumstances.
22  But if we're transporting, we do place them in
23  handcuffs to do transport.
24      Q    Well, don't you believe that if somebody
25  is detained and put into handcuffs and then
```

Page 279

```
1   involuntarily taken to the sheriff's facility that
2   that can turn a detention into an arrest under the
3   law?
4       A    It --
5           MR. LANE:  Objection to form.
6       A    It could depending on the -- the extent
7   of the time frame, but if -- if it's just the
8   transport and the questioning, maybe it was to -- to
9   be in a better environment.  I know that it was -- it
10  was very cold that day.  And to have them out there
11  is -- is inhumane, frankly, to speak with them out in
12  the cold.
13      Q    (BY MR. KILLMER)  Well, you're not under
14  the impression that they are the ones who wanted to
15  be handcuffed and taken in to the sheriff's office,
16  are you?
17      A    Well, I'm sure nobody really wants to be
18  handcuffed.  But if -- if we were -- if they're being
19  transported to the sheriff's office, it -- it could
20  be in -- in the best interests for them.  We also
21  like to use video and audio at the annex, I know, for
22  interviews to better help with the investigation.
23      Q    Are you trained that a detention if it
24  lasts long enough can turn into an arrest under the
25  rules of law?
```

Page 280

```
1       A    It can, absolutely.
2       Q    And how long must a detention go in order
3   to evolve from a temporary Terry stop type detention
4   into what the law considers an arrest?
5       A    I would have to review that.  I'm
6   uncertain at this time the length of time it would
7   be.  I'm sure you would probably know.
8       Q    I do, but I'm asking if you do, because
9   you're the officer, you know, on the spot now.
10      A    Yes, sir.
11      Q    Are you --
12      A    I --
13      Q    Are you trained in what is known as a
14  Terry stop?
15      A    They -- they have gone over lots of
16  trainings for us.  A lot of the times we don't pay
17  attention to the names of -- of the different things.
18      Q    Okay.  Well, you are trained in the
19  contours of a brief investigative stop where you can,
20  for example, temporarily handcuff somebody and pat
21  them down for officer safety, right?
22      A    Absolutely --
23      Q    And --
24      A    -- which is what we were attempting to
25  do.
```

*AB Litigation Services*

Page 281

1    Q    Which is what?
2    A    What we were attempting to do.
3    Q    But once you find out that officer's safety
4  is not at risk, you've done the pat-down, there's no
5  weapons, for example, no attempt to flee, then the --
6  then you have to take the cuffs off or else it will
7  transition into an arrest under the rules of law,
8  correct?
9    A    And how --
10        MR. LANE:  Objection to form.
11   A    And how many hours would that be?
12   Q    (BY MR. KILLMER)  Well, let's just say,
13  for example, if it's more than two.
14   A    Okay.  And I --
15        MR. LANE:  Objection to form again.
16        But go ahead.
17   A    I wasn't part of that, so I -- I have no
18  idea how long they were at the annex, how long they
19  were handcuffed.
20   Q    (BY MR. KILLMER)  Right, but I'm not -- I
21  know.  I know you weren't.  But you brought it up
22  that -- you know, you wanted to make clear to me that
23  there's a difference between a detention and an
24  arrest.  So since you brought it up I thought I would
25  learn some stuff from you about what these things

Page 282

1  mean within the world of the Pueblo County Sheriff's
2  Office.  And they were handcuffed, they were
3  involuntarily taken to the sheriff's annex, and it
4  lasted well more than two hours that they were --
5  from the time that they were not free to leave to the
6  time they were released later that night after they
7  were interrogated it was well more than two hours.
8  So --
9    A    Were they hand- --
10   Q    -- it was --
11   A    Okay.
12   Q    Yeah, they were handcuffed on the way
13  down there.  Then they unhandcuffed them in the
14  interrogation room.
15   A    Correct.  So they -- they weren't still
16  handcuffed --
17   Q    But they weren't free to leave either.
18   A    -- being questioned.
19   Q    Isn't that something you're taught is a
20  relevant consideration as to whether this detention
21  is legal or not, is if the witness feels free to
22  leave?
23   A    Yeah.  They -- we definitely need to keep
24  them there for as long the -- we need to interview
25  them to determine what is happening.

Page 283

1    Q    Well, don't they have the right to say,
2  you know, Get out of here.  I don't want to talk to
3  you?
4    A    Absolutely.  They could -- they could
5  tell us that they'd like to speak to an attorney or
6  whatever, if they felt like they were being
7  questioned in that manner.  And -- and like I said, I
8  don't have any knowledge of what occurred with them.
9    Q    Well, I'm not talking about a criminal
10  suspect here.  You don't think that Ms. Ward Stamp
11  and Mr. Brown were sus- -- criminal suspects, do you?
12   A    I don't know what the investigation
13  entailed.
14   Q    Well, you were there all the time you
15  were there.  Did you see either one of them do
16  anything that you believe constituted a crime?
17   A    I did not have enough contact with them
18  during this investigation.  I -- if, say, Mr. Ward
19  was committing a crime, they could have been
20  accomplices.  And I did not have that knowledge, but
21  further investigation might have given that
22  information.
23   Q    Well, based on everything that you've
24  learned since then do you think that they were
25  accomplices to some criminal activity of Mr. Ward's?

Page 284

1    A    I'm uncertain of that information.  I
2  don't know.
3    Q    Do you still suspect that they might have
4  been part of a criminal enterprise?
5    A    I -- I don't have their background
6  information so I'm not sure.
7    Q    I -- so what you're saying is you have no
8  evidence of it.  And most people would say,
9  Therefore, I have no evidence that they were involved
10  in any criminal activity.  You seem to be reluctant
11  to draw that conclusion even though you're admitting
12  you have no evidence of them being involved in
13  criminal activity.
14   A    I'm saying that --
15        MR. LANE:  Objection to form.
16   A    -- I have no evidence -- I have -- I
17  don't know what that investigation had continued on
18  with because I wasn't part of it.
19   Q    (BY MR. KILLMER)  I understand that.  But
20  you were there as long as you were.  So I'm not
21  asking you what happened after you stopped attending
22  to it, but you were there during the key parts, which
23  is up -- leading up to the shooting and killing of
24  Richard Ward.
25        Based on everything you knew and you

*AB Litigation Services*

1  observed -- you were an eyewitness on the scene -- do
2  you believe they did anything that constituted a
3  criminal -- a crime?
4          MR. LANE:  Objection to form.
5      A    And as I stated, I'm uncertain because I
6  did not have enough time to -- to speak with them to
7  determine whether or not there was a crime being
8  committed and if they were involved.
9          MR. KILLMER:  This Purple Heart exhibit
10 is Number -- did you say, 51, Kathy?
11         THE REPORTER:  53.
12         MR. KILLMER.  53.  Thank you.
13     Q    (BY MR. KILLMER)  You Received a Medal
14 of -- what was it called? -- a Medal of Valor for
15 your role in the killing of Mr. Flowers?
16     A    With my actions, yes.
17     Q    Was that -- did I get it right, the Medal
18 of Valor?
19     A    Yes, sir.
20     Q    What is that based upon?
21     A    Our actions during an incident.
22     Q    I assumed so, but whereas the Purple
23 Heart is based upon receiving an injury in the line
24 of duty, the Medal -- you didn't receive an injury in
25 the Dennis Flowers killing, did you?

1      A    I did not, no.
2      Q    So that wouldn't be Purple-Heart-worthy,
3  but you got a Medal of Valor.  Do you know what
4  that's based on?
5      A    It's -- I know it's our acts and -- and
6  what we -- putting ourself in a situation to -- to
7  help others.
8      Q    Do you know if Deputy Roldan, likewise,
9  received a Medal of Valor for his role in the killing
10 of Dennis Flowers?
11     A    He did receive a Medal of Valor with me,
12 yes.
13     Q    So both of the officer-involved shootings
14 which resulted in deaths of citizens of Pueblo ended
15 up causing you to be more highly decorated?
16         MR. LANE:  Objection to form.
17     A    I would say that they were recognizing my
18 actions and my performance.
19     Q    (BY MR. KILLMER)  Okay.  I'm going to
20 introduce two sets of medical records into the record
21 and not talk about them a lot, but these have to do
22 with the various injuries we've talked about.  So
23 Deposition --
24         (Deposition Exhibit 54 was marked.)
25         MR. LANE:  Counsel, are these the

1  injuries received by former Deputy McWhorter?
2          MR. KILLMER:  These are all -- these are
3  all McWhorter's medical records, yes.
4          MR. LANE:  I was just -- I was unsure if
5  this was injuries received by Mr. Ward.  So thank
6  you.
7          MR. KILLMER:  Oh, no, no, no, not
8  Mr. Ward.  Mr. -- Deputy McWhorter.
9          MR. LANE:  Thank you.
10     Q    (BY MR. KILLMER)  So the first one I have
11 marked as Deposition Exhibit 54.  And these were
12 recently produced to us by your counsel.  And just
13 for the record, let me say these have -- bear a Bates
14 number of PCSO 4018 through 4124, so it's about
15 116 pages' worth of medical records.  We're
16 definitely not going to go through them all or even
17 very many of them.
18         But these are medical records from CMC
19 South Academy.  Are you familiar with what that
20 facility is?
21     A    I don't -- I would have -- you would have
22 to explain more.  I'm not sure.
23     Q    Okay.  I thought it might ring a bell.
24 There's a whole bunch of records from -- in this --
25 I'm pretty sure this is a worker's comp file that

1  we're looking at.  And I'll just page through it so
2  you can see.  Have you seen your medical records?
3      A    No, I don't believe I've looked at them.
4      Q    Okay.  Well, the -- another problem is,
5  is they're not chronologically organized or, as far
6  as I can tell, organized at all.  But they go from
7  2018, I think, through -- through 2023.
8          And I'll turn to what's Bates numbered
9  PCSO 4058.  Let me scroll to that.  Almost got it on
10 the nose.  4058 is a medical record.  The Service
11 Date was October 21st, 2021, so late of the year
12 2021, roughly four months before the Richard Ward
13 incident.  And this is a treating clinician, Dr. Lisa
14 Baron -- do you know her?
15     A    I do not.
16     Q    Okay -- diagnosing you with cervical disk
17 disorder, left shoulder strain, trapezius strain, and
18 history of cervical spinal surgery.  Those diagnoses
19 all sound familiar to you, I take it?
20     A    Yes, I believe so.
21     Q    This left shoulder strain, is that
22 something that you -- you know, you're wearing the
23 sling today after your shoulder surgery.  Is that
24 related to the left shoulder strain that you
25 report- -- that were reported in your medical

*Estate of Richard Ward and Kristy Ward Stamp*

*v.*

*Pueblo County Colorado*

_____

Cassandra M. Gonzales

October 26, 2023

_____



216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

*AB Litigation Services*

Page 217

1            MR. LANE:  Same objection.
2       A    Yes.
3       Q    (BY MR. KILLMER)  All right.  We're at
4  2:04 and I'm going to run it for a minute.
5            (Video played.)
6       Q    (BY MR. KILLMER)  Okay.  I've stopped it
7  at 2:26.  And I don't know if you can see it or not,
8  but McWhorter has again come into the outside part of
9  the right-hand screen, and he's putting on rubber
10  gloves.  Do you recall that being -- happening?
11      A    In the time of the incident, no.
12  Obviously, now that I've seen the video, yes, I can
13  see it.
14      Q    Okay.  What's the point of putting on
15  rubber gloves in circumstances such as this?
16      A    To render aid.
17      Q    Do you know why he put rubber gloves on
18  and nevertheless did not render aid?
19      A    I mean, you put gloves on before you
20  render aid because you don't know what somebody has.
21      Q    Right.  I can understand that, putting
22  gloves on before you render aid if you're going to
23  render aid.  But he didn't.  Do you know why he
24  didn't?
25      A    No.

Page 218

1       Q    At this point it's been over a minute,
2  probably about a minute and a half since shots were
3  fired, and the people in the front seat had not
4  misbehaved at all, had they?
5            MR. LANE:  Objection to form.
6       A    No.
7       Q    (BY MR. KILLMER)  They had some
8  understandable anguish, and the mother of the fella
9  who was shot is crying, but that's to be expected,
10  isn't it?
11           MR. LANE:  Objection to form.
12      A    Yes.
13      Q    (BY MR. KILLMER)  You didn't consider
14  that inappropriate or noncompliant for either her or
15  Mr. Brown to be -- having done the things that
16  they've done on this body cam, right?
17      A    No.
18           MR. LANE:  Same objection.
19      Q    (BY MR. KILLMER)  Do you think that they
20  had done anything to provide probable cause to arrest
21  them?
22           MR. LANE:  Objection to form.
23      A    I don't -- I don't know why you're asking
24  me that.  I don't understand.
25      Q    (BY MR. KILLMER)  I'm asking, based upon

Page 219

1  all the conduct that you're aware of -- you saw it
2  that day.  You've reviewed it on body cams, not just
3  yours, but McWhorter's too.  Do you believe they did
4  anything that would provide probable cause for their
5  arrest?
6            MR. LANE:  Same objection.
7       A    I didn't know they were arrested so I
8  don't know.
9       Q    (BY MR. KILLMER)  I didn't ask you if
10  they were arrested.  I'm asking you if their conduct
11  in your judgment and experience constituted probable
12  cause to believe they committed some sort of offense
13  for which they could be arrested.
14           MR. LANE:  Same objection.
15      A    And at that point we didn't know what
16  their involvement was, so I can't -- not say that.
17      Q    (BY MR. KILLMER)  Well, I don't -- you've
18  got a bunch of negatives in there, "I can't not say
19  that."  I don't understand that.  But you've seen
20  what they did.  And you later reviewed that on body
21  cams.  So based on everything you know, do you think
22  they did anything that would constitute probable
23  cause to arrest them?
24           MR. LANE:  Same objection.
25      A    So in the beginning they were still just

Page 220

1  unknowns, okay?  Now moving forward past -- we've
2  gone through everything, no.  But in the beginning, I
3  have no idea what their involvement was, so that's
4  why I said that.
5       Q    (BY MR. KILLMER)  So I'm giving you the
6  opportunity to evaluate everything they did from the
7  moment you laid eyes on them to the time you were
8  done for the day.  They didn't do anything that gave
9  you in your judgment -- gave the law enforcement
10  probable cause to believe they should be arrested?
11      A    So are you --
12           MR. LANE:  Objection to form.
13      A    Are you asking me what I knew at that
14  time or what I know now two years later?
15      Q    (BY MR. KILLMER)  Let's say now.  I mean,
16  you know more now, so I'm giving you the maximum
17  benefit of the doubt.  Did they -- everything you
18  know, including what you know today, did they do
19  anything that you believe constituted probable cause
20  to justify an arrest?
21      A    No.
22      Q    Okay.  We're at 2:26 and I'm going to run
23  some more part of this body cam.
24           (Video played.)
25      Q    (BY MR. KILLMER)  Okay.  At 2:43, right

*AB Litigation Services*

**Page 317**

1  taken down to the station for interrogation? *AB Litigation Services*
2         MR. LANE:  Objection to form.
3     A    After the fact, yes.
4     Q    (BY MR. KILLMER)  Yeah.  All of this was
5  after the fact.  I mean, you didn't -- you weren't
6  there before the fact.  So do you know what legal
7  basis there was to handcuff Kristy Ward Stamp under
8  these circumstances?
9     A    Can I ask a question?
10    Q    Sure.
11    A    Were they -- did they go in their own
12  personal vehicle?
13    Q    No.  They were taken down by law
14  enforcement officers to the sheriff's station in
15  handcuffs.
16    A    Okay.  So our policy is that anybody that
17  rides in the back of the patrol car has to remain in
18  cuffs.
19    Q    Well, can you think of a legal basis to
20  in a nonvoluntary way be cuffed, put into the patrol
21  car, and taken down to the sheriff's office -- which
22  is where the jail is, isn't it?
23    A    No.
24         MR. LANE:  Objection to form.
25    A    It's not where the jail is.

**Page 318**

1     Q    (BY MR. KILLMER)  Okay.  Taken to the
2  sheriff's office for interrogation.  Can you think of
3  a legal basis to do that nonconsensual detention upon
4  Ms. Ward Stamp?
5         MR. LANE:  Same objection.
6     A    I guess I don't understand.  If you're
7  riding in the back of a patrol car, you have --
8  that's what you have to do.
9     Q    (BY MR. KILLMER)  But my question is,
10  what gives you the right -- "you," being law
11  enforcement -- the right to put her in cuffs and put
12  her in your patrol vehicle?  That's an arrest, isn't
13  it?
14         MR. LANE:  Object to form.
15    A    No, it's not an arrest.  Just because you
16  put handcuffs on somebody doesn't mean you're
17  arresting them.
18    Q    (BY MR. KILLMER)  Do you think she was
19  free to leave?
20    A    Well, I don't know.  I wasn't there.
21    Q    Well, you were there, but I mean, you may
22  not have been attending to that detail.  But they put
23  her in handcuffs.  That's an indication, isn't it,
24  that law enforcement says you're not free to leave?
25    A    Well, it's --

**Page 319**

1         MR. LANE:  Objection to form.
2     A    If she's riding in the back of the patrol
3  car, you have to get handcuffed.  I don't know what
4  you're trying to get at.
5     Q    (BY MR. KILLMER)  I'm trying to get at
6  some conceivable legal basis for law enforcement to
7  handcuff the mother of her son who just was shot to
8  death by an officer right point blank in the chest
9  when he was unarmed and hadn't justified it in her
10  eyes.  She's grieving and screaming and crying, and
11  they decide to cuff her and put her into a car and
12  bring her down to the sheriff's station.  What
13  conceivable legal basis is there for that, Deputy, if
14  you can think of one?
15    A    I can.
16         MR. LANE:  Object to form.
17    A    Actually, I can think of one, but --
18    Q    (BY MR. KILLMER)  Tell me.
19    A    Well, I'm trying to.  So one, at that
20  moment, we still don't know -- just because she's
21  allegedly the mom, we don't know if that's a factual
22  thing.  And she's still in the vehicle, right?  She
23  still could be a suspect.  It -- that's -- I'm just
24  telling you.  You wanted to know it, so I'm telling
25  you.

**Page 320**

1     Q    Yeah.  I --
2     A    She still could possibly be a suspect,
3  right?  We don't know --
4     Q    A suspect of what?
5     A    We don't know.  We don't know --
6     Q    A suspect of something?  Maybe she's
7  growing marijuana illegally in her basement?  A
8  suspect of having shoplifted when she was 18 years
9  old?  A suspect of what?
10    A    Well, you're not letting me finish.
11  So --
12    Q    What did you think she was a suspect of?
13    A    We still don't know at that moment if
14  that was her vehicle, right?  I did not know that,
15  what I'm telling you.
16    Q    Did you ask her?
17    A    So if we don't know, we don't know,
18  right?  I'm not the one that handcuffed her, so I
19  don't know.  Ask those people.  But what I'm telling
20  you that I know is we still don't know what her
21  involvement was, right?  Regardless of the situation,
22  if you're standing there, you're involved in that
23  crime scene.
24         So they transported her.  They still have
25  to transport her in handcuffs.  Regardless if she's

*AB Litigation Services*

AB Litigation Services

1  the mom, if she's the president, whoever she is,
2  she's still getting handcuffed.
3      Q    That's just standard operating procedure
4  at Pueblo County Sheriff's?
5      A    That's our -- that's what we're supposed
6  to do. That's our policy.
7      Q    Just because she's at the scene there, if
8  they are going to take her down to the sheriff's
9  office, they're going to cuff her if it's going to be
10  in their car?
11     A    Yep. We are supposed to, yes.
12     Q    So that's fully consistent with Pueblo
13  County's customs, policies, and practices?
14         MR. LANE: Objection. Form.
15     A    I don't know what -- I don't know what
16  you're saying.
17     Q    (BY MR. KILLMER) Well, I'm just
18  summarizing your testimony that to cuff her and to
19  put her into the car and to take her down to the
20  sheriff's office, as far as you've been trained,
21  that's fully consistent with PCSO's standard
22  operating procedures?
23     A    Yes.
24         MR. LANE: Same objection.
25     A    Yes.

1      Q    (BY MR. KILLMER) Can you articulate some
2  crime that you suspected she might be guilty of? Did
3  you think she was in a stolen car?
4      A    We don't know that.
5      Q    Well, I'll tell you what. When McWhorter
6  shows up at the scene, he calls in -- even before he
7  talks to Richard, calls in the license plate and
8  receives information that it's registered to Larry
9  Ward, which is Kristy Ward Stamp's father.
10     A    So --
11     Q    Did you ever learn anything about that?
12     A    -- what does that have to do with
13  anything? People get their car stolen all the time.
14     Q    Do dads get their cars stolen from their
15  daughters?
16     A    That has nothing to do with it. Yes,
17  families are always stealing other vehicles. We're
18  going to those all the time.
19     Q    So you thought maybe she had stolen her
20  father's vehicle and she furtively went to a middle
21  school to pick up somebody she alleges was her son.
22  Why didn't you arrest her son also because he could
23  be a criminal too, right?
24     A    Now you're just splitting hairs.
25  That's -- that's like --

1      Q    I'm not splitting hairs.
2      A    Yes, you are.
3      Q    I'm trying to figure out the logic of
4  your answers.
5      A    That's splitting hairs, sir. No. She's
6  a part of that area. She's still considered in that
7  spectrum where we don't know what her involvement is.
8      Q    Is she --
9      A    So it doesn't matter who she is, who
10  she's still. She's still --
11     Q    Did you think she was somehow helping him
12  try to get into other people's cars? Do you have any
13  objective evidence on that?
14     A    We don't have objective evidence, but
15  there's always -- when people go out and case
16  vehicles, they don't just go by themselves all
17  willy-nilly. They're going in in groups, several of
18  them, three or four people.
19     Q    So you think you had probable cause to
20  believe that Kristy Ward Stamp was casing vehicles
21  while waiting in line to pick up her middle-aged son
22  from school?
23         MR. LANE: Objection to form.
24     A    Sir, people go take their children to go
25  steal from Walmart. I don't -- I'm not surprised by

1  anything anymore, so, yes.
2      Q    (BY MR. KILLMER) So you sort of thought
3  that might be going on here?
4      A    I didn't know what her involvement was,
5  so I'm standing by that, yes, sir.
6      Q    Okay. And you didn't ask her whether her
7  involvement included that, did you?
8      A    In that little interaction, that was --
9  no, I did not.
10     Q    One of the ways police officers or
11  sheriff's deputies find out whether a car belongs to
12  somebody is to say things like, Let me see your
13  license and registration, right?
14     A    And -- and when exactly would have --
15  that have been a good time that you think we should
16  have done that, sir? Because there was no time for
17  that right now.
18     Q    It seems like you could have done it
19  right when you walked up. Why couldn't you have that?
20     A    Because we were engaged in one -- you
21  don't just start talking over people and doing all of
22  this. We were engaged with him. He was our main
23  focus at that moment, like I said --
24     Q    And once -- once you had dispatched with
25  him, though, did any of you or your colleagues ask

**MOV'T APPX 52**

*Estate of Richard Ward and Kristy Ward Stamp*

*v.*

*Pueblo County Colorado*

---

30(b)(6) Pueblo County Sherrif's Office David Lucero

June 03, 2024

---



**AB Litigation**
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

**AB Litigation Services**

Page 61

1    discussion point on how our responses -- or how we
2    respond with lights and sirens and initiate
3    pursuits, et cetera, was -- fell under that policy.
4        Q    I take it the nature of the change was to
5    try to reduce the need for high-speed chases?
6        A    Well, to -- I think there was a couple
7    aspects of it.  One was did the warrant -- did the
8    response to an alarm call warrant an emergent
9    response.  Did we need to run lights and sirens to
10   go to an alarm call.
11            And, ultimately, it was changed that,
12   look, if this is just an alarm call, with just that
13   being the only factor of an alarm, then it may not
14   warrant lights and sirens.
15       Q    Were there any policy changes or training
16   changes or changes in Pueblo County Sheriff's Office
17   practice as a result of the Richard Ward case?
18       A    No.  Not that I'm aware of.
19       Q    Did you conclude -- you being the, you
20   know, Pueblo County Sheriff's Office -- conclude
21   that everything that happened in the Richard Ward
22   case happened pursuant to Pueblo County official
23   policy and training?
24       A    Yes.
25       Q    This third case is called Wodiuk v.

Page 62

1    Graziano.  Do you know anything about that case?
2        A    I do remember some of the details on that
3    case.  This was a case involving Heidi Wodiuk.  She
4    was experiencing some mental illness and was taken
5    in custody -- taken into custody by, I believe,
6    Deputy Bryant and Deputy Graziano.  It was a use of
7    force.  And she had filed a lawsuit on that case
8    against Deputy Graziano.  And it doesn't look like
9    Deputy Bryant's listed as a defendant on that one.
10   But -- so Deputy Graziano.
11       Q    Well, no.  Sometimes the title uses the
12   first name sometimes, so it might have been or might
13   not have been.
14       A    Okay.
15       Q    Which Bryant are you talking about?
16       A    Shelley Bryant.  Captain Shelley -- she's
17   now a captain with our sheriff's office.
18       Q    Yeah.  There's a man and a woman named
19   Bryant there, right?
20       A    Yes, sir.
21       Q    Okay.  You're talking about the woman,
22   Shelley Bryant?
23       A    Yes, sir.
24       Q    Do you know -- I'll just say, who won?  I
25   mean, was that case thrown out of court because of

Page 63

1    lack of merit, or was it settled?
2        A    It was thrown out, lack of merit.
3        Q    All right.  The fourth case is McBeth v.
4    Cisneros, and that says allegations of excessive
5    force and stipulated settlement.  So that gives us a
6    little bit of a clue on that.
7            Are you familiar with that case?
8        A    I am not.
9        Q    Did you make any effort to familiarize
10   yourself with the -- any of the facts of these cases
11   that you don't know about?
12       A    No.  I didn't look up these cases.
13       Q    I mean, one of the -- one of the problems
14   in a 30(b)(6) is nobody can know everything, but the
15   rule requires the deponent to do diligence in
16   determining the substance of the answers that are
17   given on behalf of the County.
18            And so I'm asking you if you did anything
19   to determine the substance of these first -- well,
20   of these first 4 cases, or, actually all 12.
21            The ones that you didn't already know
22   about, did you try to learn about them?
23       MR. LANE:  And, Counsel, we would object
24   based on the 30(b)(6) deposition notice.  There is a
25   question regarding policies, procedures, and customs

Page 64

1    related to use of force.  Prior uses of force I
2    don't believe are actually within the 30(b)(6)
3    notice.
4            Now, we understand that he did sign on
5    behalf of the sheriff's department, and that's why
6    there's been no objection from me to date.
7            But I don't think there is anything in
8    the 30(b)(6) notice about these prior uses of force.
9    Supervision of.
10       Q    (BY MR. KILLMER)  Well, and you've been a
11   supervisor in the Pueblo County Sheriff's Office
12   ever since you were a bureau chief at least, right?
13       A    Captain level.
14       Q    So that's a --
15       A    Well -- I'm sorry.  Go ahead.
16       Q    You were a captain and then you were a
17   bureau chief?
18       A    Correct.
19       Q    So you've been a supervisor ever since
20   you were -- became a captain, right?
21       A    Well, actually since a sergeant.  When I
22   got promoted to sergeant, we have general
23   supervision authority over our line level deputies.
24       Q    Fair enough.  So that's since what year
25   that you became a sergeant?

*AB Litigation Services*

Page 89

1  transportation for her as well?
2          MR. LANE:  Objection to form.
3      A    It has happened.  We have allowed people
4  to transport themselves.  Again, there's other
5  factors that you're looking at.  Are they a
6  potential suspect, are they involved in the crime
7  scene, or are they just the witness that's right
8  there on scene that's ancillary to this.  I think
9  those are all factors that would determine how we
10 would transport.
11     Q    (BY MR. KILLMER)  Is it your opinion that
12 everything involved with cuffing and detaining
13 Ms. Ward Stamp for some period of time in the car --
14 they then actually changed the car, two different
15 sheriff's vehicles, with associated searches of her
16 each time, so she was searched two or three
17 different times, and then the delivery of her down
18 to the sheriff's station; all of those were fully
19 consistent with the training and policies of the
20 Pueblo County Sheriff's Office?
21         MR. LANE:  Objection to form.
22     A    I would say yes.
23     Q    (BY MR. KILLMER)  You agree that it is
24 clearly established that an officer has to have a
25 probable cause to detain an individual for more than

Page 90

1  a brief period of time?
2          MR. LANE:  Objection to form.
3      A    I think it has to be reasonable suspicion
4  to detain somebody.
5      Q    (BY MR. KILLMER)  Well, reasonable
6  suspicion for a brief investigatory detention, but
7  for -- once it becomes an extended period of time,
8  say, an hour or more, you need to have a probable
9  cause to believe that they violated some law?
10         MR. LANE:  Objection to form.
11     A    No, I would disagree.
12     Q    (BY MR. KILLMER)  Do you think that
13 reasonable suspicion is good -- is good to go for as
14 long as the officers need the person?
15         MR. LANE:  Objection to form.
16     A    No.  Again, this goes back to those
17 factors.  What crimes are being investigated?
18 What's, you know, the reasonableness and the length
19 of detention?  What are some of the other factors
20 and circumstances that present themselves?  Do they
21 have a location that they can conduct an interview?
22 Or does it make sense to take them to a sheriff's
23 office where we have -- or the police department,
24 where we have recording equipment so that we can get
25 that statement.

Page 91

1      Q    (BY MR. KILLMER)  She was not only seized,
2  but her cell phone and her car was also seized and
3  kept in property inventory.  The seizure of that was
4  done by the Pueblo County Sheriff's Office deputies,
5  correct?
6      A    I -- no.  The Pueblo Police Department
7  would have been the primary agency on that.
8      Q    Yeah.  You said that before, but I'm not
9  asking you who the primary agency.  The actual
10 person who took her cell phone from her was Pueblo
11 County Sheriff's Office.  They might have delivered
12 it to the police department, right?
13         MR. LANE:  Objection to form.
14     A    I don't remember who actually seized her
15 phone.  And I'm sorry, there's something on my
16 screen.  You have a section that's -- there we go.
17     Q    (BY MR. KILLMER)  When you search and cuff
18 somebody, do you at that point seize their property,
19 like their car keys and their cell phone?
20     A    Not as a general practice, no.
21     Q    Well, it happened in this case.  I mean,
22 they seized her cell phone.
23         Do you know why that was?
24     A    I don't.
25     Q    Can you think of any law enforcement

Page 92

1  justification for taking her cell phone during her
2  detention or seizure?
3      A    To see if she's potentially involved in
4  this case, because she's at the crime scene, or the
5  vehicle itself.  That could be a reason.
6      Q    Wait, my question was to seize her cell
7  phone.  Why --
8      A    Because there could be potential evidence
9  on there that could be destroyed.  It doesn't mean
10 we could get into the phone.  Depending on the
11 investigation and what details are learned, we may
12 have to apply for a search warrant to get into that
13 cell phone if we wanted to look at it.  That could
14 be a reason.
15     Q    Why does one need a search warrant to
16 look in a cell phone?
17     A    Again, if probable cause existed that
18 warrant us that to link -- if we believe that she
19 may have been involved in this case at all, we may
20 have applied for a search warrant to a get a
21 phone -- or to get into the phone to see --
22 corroborate details.  Sometimes we use it for GPS to
23 confirm their locations.
24         I'm sorry, did I answer your question,
25 sir?

Page 181

1  with Richard Ward to now the post shooting
2  interaction with Kristy Ward Stamp.  So I'm going to
3  have you focus your attention on that.
4        You're aware that during the events at
5  issue -- leading up to the shooting, Ms. Ward Stamp
6  was always in the front passenger seat of the car?
7    A    Yes.
8    Q    And you're aware that her boyfriend at
9  the time, Tommy Brown, was in the driver's seat of
10 the car, correct?
11   A    Yes.
12   Q    Are you aware of any conduct either of
13 them engaged in which was inappropriate?
14   A    No.
15   Q    Are you aware of anything that they did
16 at any time before the shooting, immediately after
17 the shooting, or well after the shooting that was
18 threatening to any officer or third person?
19        MR. LANE:  Objection to form.
20   A    Yeah.  I saw some potential threats with
21 the opening of the car door, trying to get out.
22        So yes.
23   Q    (BY MR. KILLMER)  Do you mean the opening
24 of the passenger door after Richard had been shot
25 when she said, Did you just shoot my son?

Page 182

1    A    Yes.
2    Q    You thought that was wrong somehow?
3        MR. LANE:  Objection to form.
4    A    We don't know her involvement in this, if
5  they're involved.
6    Q    (BY MR. KILLMER)  Well, one thing that you
7  know is your officer had just shot and killed her
8  son, and she opened the door to ask if that was, in
9  fact, the status, and you're blaming her for
10 misbehavior?
11        MR. LANE:  Same objection.
12   A    I'm just saying that's suspicious
13 movement.
14   Q    (BY MR. KILLMER)  That's suspicious of
15 what?
16   A    Well, we don't know the extent of
17 involvement.  Now we've just been involved in an
18 officer-involved shooting.  You got to assess for
19 potential other threats that could be coming at you.
20        Again, are there other people involved?
21 What is the extent of the involvement?  Do you have
22 a crime scene you have to consider now?
23        You still have the factor of those kids
24 that are going to be getting out of school.
25   Q    So is this how you --

Page 183

1    A    By that time, they were already out of
2  school because I remember seeing some of the kids
3  walking by.
4    Q    Yeah.  No.  After Officer -- after Deputy
5  McWhorter shot Mr. Ward three times and killed him,
6  this is right when the kids were coming out, right,
7  that sort of the maximum time of danger for shooting
8  a gun, do you agree?
9        MR. LANE:  Objection to form.
10   A    Yeah.  I'm not sure exactly what time
11 kids were released.  I did see some walking around.
12 I don't know if that's when the bell rang or when
13 all kids came out.  I don't know that.
14   Q    (BY MR. KILLMER)  Well, you're the one who
15 brought up that you were able to see in the video
16 that there were kids now that were filing past the
17 car with Richard Ward on the ground having been shot
18 by your deputy, correct?
19        MR. LANE:  Objection to form.
20   A    Correct.  I could see kids walking by,
21 yes.
22   Q    (BY MR. KILLMER)  And you say you're
23 suspicious of Ms. Ward Stamp because she opened the
24 door and said, did you just shoot my son, right?
25        MR. LANE:  Objection to form.

Page 184

1    A    Yes.
2    Q    (BY MR. KILLMER)  And that makes you
3  suspicious of her somehow, right?
4    A    Potentially, yes.
5    Q    Well, in actuality, she didn't commit any
6  crime, did she?
7    A    Not that we knew at the time.
8    Q    Or ever.
9        Sitting here today, she didn't commit any
10 crime, did she?
11   A    No.
12   Q    In fact, she never did anything that gave
13 you probable cause to believe she had committed a
14 crime, correct?
15   A    Correct.
16   Q    She didn't do anything to give you
17 reasonable suspicion to believe that criminal
18 activity was afoot on her behalf, right?
19        MR. LANE:  Objection to form.
20   A    Correct.
21   Q    (BY MR. KILLMER)  So when she opened the
22 door, she was instructed to close the door, and she
23 did so immediately, right?
24   A    Yes.
25   Q    Other than opening the door to inquire

**office policy to not find out that information, right?**

MR. LANE: Objection to form.

A We have a protocol for the officer-involved shooting.

**Q (BY MR. KILLMER) Right. But the protocol -- and you're saying the protocol, which is completely department made, or maybe task force made between the participating agencies, is not a product of a legal requirement, it's just an organizational structure that you adopted, correct?**

MR. LANE: Objection to form.

A Yes.

**Q (BY MR. KILLMER) So the consequence was you had to take Kristy Ward Stamp in handcuffs, detain her at the scene for a fair period of time, then take her down to the station and do a custodial interrogation as opposed to an interrogation like you did other witnesses out at the scene, right?**

MR. LANE: Objection to form.

A She was part of the crime scene and was transported to be interviewed again, and I said there was -- weather was a factor as well.

**Q (BY MR. KILLMER) Yeah. But other witnesses were in the weather, too, and they were**

**interviewed at the scene, right?**

A Yeah. But their vehicles weren't part of the crime scene.

**Q By the way, it wasn't that cold, it was just barely starting to snow, correct? It was, like, 30 degrees that day.**

MR. LANE: Same objection.

A It was cold. I remember because of my earmuffs, since you refreshed my memory with that news clip.

**Q (BY MR. KILLMER) Well, you showed up later. But you were out the there talking. So if you're tough enough to do it, then you think the mother of the guy that was killed might be tough enough to do it, right?**

MR. LANE: Same objection.

**Q (BY MR. KILLMER) I mean, if it would have been a snowstorm blizzard, you wouldn't have been standing out there either. You would have invited them into your office to give an interview.**

**So it was not so bad as to stop you from standing in the elements and answering the questions of the press, even though you answered them inaccurately, right?**

MR. LANE: Objection to form.

A Yes.

**Q (BY MR. KILLMER) So did you ask -- you meaning any of your law enforcement officers -- ask Ms. Ward Stamp with -- whether she preferred to go into the warmth down at the station or answer questions out at the scene?**

A I don't know the answer to that question.

**Q You're pretty sure that nobody asked and she wasn't given the choice, correct?**

MR. LANE: Objection to form.

A I don't know the answer to that question.

**Q (BY MR. KILLMER) When she was in the handcuffs being taken to the station, she wasn't free to leave, was she?**

MR. LANE: Objection to form.

A She was -- I guess you could argue she was in handcuffs, so as our policy. So she was being transported per policy. She wouldn't have been free to leave.

**Q (BY MR. KILLMER) When she got to the station and brought to the interrogation room, that's when the cuffs were taken off, correct?**

A I believe so.

**Q But even then she wasn't free to leave because she hadn't been interrogated yet, correct?**

MR. LANE: Objection to form.

A They were still trying to determine her, if any, involvement with the earlier incident at the school.

**Q (BY MR. KILLMER) They were still trying to find out what her involvement was without asking her a single question, though, right?**

MR. LANE: Objection to form.

A Until they got to the recorded interview room.

**Q (BY MR. KILLMER) Correct. But right before that recorded interview, I'm talking about the moment before, she wasn't free to leave, was she? She still had to give her statement.**

MR. LANE: Same objection.

A Yeah. We still needed to find out facts and her extent of her involvement.

**Q (BY MR. KILLMER) But it wasn't a voluntary statement, was it?**

MR. LANE: Same objection.

A You know, I'm not sure if they advised her of Miranda or not. I don't remember.

**Q (BY MR. KILLMER) What would the training have been in that regard?**

**Should they have?**