AB Litigation Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-00473-CNS-MDB

---

DEPOSITION OF SHELLEY BRYANT
April 10, 2024

---

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp, and KRISTY WARD STAMP,

Plaintiff,

vs.

PUEBLO COUNTY, COLORADO; DEPUTY CHARLES McWHORTER, in his individual and official capacity; DEPUTY CASSANDRA GONZALES, in her individual and official capacity; DEPUTY JACOB MAHAN, in his individual and official capacity; DEPUTY CHRISTINE SPENCER, in her individual and official capacity; DEPUTY NICOLAS BERUMEN, in his individual and official capacity; DEPUTY ROBERT QUINTANA, in his individual and official capacity; and SERGEANT JOSH RAGAN, in his individual and official capacity,

Defendants.

---

APPEARANCES:

    KILLMER LANE, LLP
        By Darold W. Killmer, Esq.
           Reid Allison, Esq.
           1543 Champa Street
           Suite 400
           Denver, Colorado 80202
           303.571.1000
           dkillmer@killmerlane.com
           rallison@killmerlane.com
            Appearing on behalf of Plaintiffs

```
 1    APPEARANCES CONTINUED:

 2
      NEWMAN McNULTY, LLC
 3         By Mari Newman, Esq.
              Andy McNulty, Esq.
 4            1490 N. Lafayette Street
              Suite 304
 5            Denver, Colorado 80218
              720.850.5770
 6            mari@newman-mcnulty.com
              andy@newman-mcnulty.com
 7              Appearing on behalf of Plaintiffs

 8
      THE LANE LAW FIRM, PC
 9         By William O'Donnell, Esq.
              3131 S. Vaughn Way
10            Suite 220
              Aurora, Colorado 80014
11            303.830.0500
              wodonnell@lanelawpc.com
12              Appearing on behalf of Defendants

13
      ALSO PRESENT:  Cassandra Gonzales
14                   Nicolas Berumen
                     Kristy Ward
15                   Sam Weiner
                     Josh Ragan
16

17

18

19

20

21

22

23

24

25
```

AB Litigation Services

1          Pursuant to Notice and the Federal Rules of
2    Civil Procedure, the deposition of SHELLEY BRYANT,
3    called by Plaintiffs, was taken on Wednesday, April
4    10, 2024, commencing at 1:04 p.m., via remote
5    videoconference, before Barbara J. Davalos,
6    Registered Merit Reporter and Certified Realtime
7    Reporter within and for the State of Colorado.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  point in time the district attorney, CBI, state
2  patrol, Pueblo Police, everybody jumps onboard, and
3  then it is decided at that point in time who the lead
4  agency will be.
5     Q     And do you have an idea in this case when
6  that happened?
7     A     It happened, like, as far as I know,
8  immediately once the sheriff was alerted that one of
9  our officers had fired a gun.
10    Q     Did you have any interaction at all with
11  the DA before getting to the annex?
12    A     I don't recall having any action -- so all
13  -- I probably had a little interaction.  I went out
14  to the scene for less than two minutes.  I spoke to
15  one detective out there.  I got an update of how big
16  the screen was, how many people were involved, I got
17  a look at the area, and I took off back to the annex
18  to facilitate turning the incident over to who was
19  determined to be the lead agency.
20          At that time it was Pueblo Police that was
21  determined to be the lead agency.  So at that point
22  in time I facilitate that, give the update of what --
23  the information I have at that time, which is very
24  little, and then they take over the incident, and I
25  have to step aside as the captain of investigations

1   at this agency.
2       Q   All right.  And we'll get back to that
3   because I'm going to want to hear quite a bit more
4   about that.  But I want to kind of round out this
5   whole line of questioning about the training that
6   we've been talking about first.
7       A   Okay.
8       Q   But I appreciate your -- I appreciate you
9   telling me that.
10          Before I do that, though, one quick
11  question.  You said you think you might have had some
12  interaction with the DA before --
13      A   Yes.
14      Q   Go ahead.
15      A   That would be during the brief.  So
16  there's a brief with all agencies involved.  They're
17  determining who's going to be the lead agency.
18  Everybody is making decisions at that time.
19          Pueblo Police was named as the lead
20  agency.  So they start facilitating.  They can use my
21  detectives.  They start facilitating who's being
22  teamed up with who, who's assigned to what.
23          So at that time the district attorney is
24  going to be there.  So I could have possibly talked
25  to them.  I don't recall talking to them because I am

1   facilitating the meeting.  And then I'm stepping out
2   because it is -- I have to.  I let the captain from
3   Pueblo police run the investigation and I have to
4   step aside.
5        Q    And so we're going to talk more about
6   this.  But you were on the actual scene for about two
7   minutes, you said?
8        A    I see myself on body cam footage for less
9   than two minutes.  I went out there to talk to one of
10  my detectives that happened to be on scene just to
11  get enough information to pass it on in the meeting
12  as to what I was seeing -- what I was being told, and
13  that's it.
14            I didn't cross the crime scene tape.  I
15  didn't go into the scene.  I stayed out of the scene.
16  I was there for -- it was less than two minutes.  You
17  can see me on body cam footage, and then I left.
18       Q    And who was it that you spoke with?
19       A    I spoke with Inspector Guadagnoli.  He was
20  one of my detectives.  He was a special
21  investigations detective at that time.  So he was one
22  of -- assigned to me at the time.  So I spoke to him.
23  He responded to the incident.  And he gave me a quick
24  brief and I left.
25       Q    Is Inspector Guadagnoli the only person

AB Litigation Services

1   break now.

2              MS. NEWMAN:  I was going to shift topics,

3   and so that's why I was asking the question actually.

4              MR. O'DONNELL:  Okay.  We can shift.

5              THE REPORTER:  I would like a break,

6   please.

7              MS. NEWMAN:  Okay.  Fair.  We're going to

8   take five.

9              (Recess from 2:23 p.m. to 2:33 p.m.)

10       Q    (BY MS. NEWMAN)  Still under oath.  You

11  gave me a very quick rundown, but I want to do this a

12  little bit more deliberately now.  Can you please

13  just tell me everything you recall about the Ward

14  incident from beginning to end of your role in it and

15  describe sort of what your -- as you go what your

16  role was, and I'll ask you some questions as we're

17  going.

18       A    Okay.  I believe that I arrived and it was

19  -- I was thinking it was closer to 30 minutes or plus

20  after the incident.  I got out of my car, talked to a

21  detective outside of the crime scene less than two

22  minutes, asked him basically who was involved, how

23  many people are involved, how big is the scene, just

24  your basic stuff that I would normally ask.

25              And then I came back to the office and

1   gave a briefing on what information I had at the time
2   from my detective.  And at that time it was
3   determined that Pueblo Police -- because it would
4   usually be CBI or Pueblo Police that would take the
5   lead.  At that point in time Pueblo Police was
6   determined to be the lead agency.
7           And at that point in time I no longer was
8   involved in the case.  They can utilize my
9   detectives, make assignments, and they run the case.
10  So they usually team up my detectives with their
11  detectives, but they take lead on everything.  So
12  basically my personnel answer to them and assist them
13  in any way that they need, whether it be crime scene,
14  interviews, whatever they need.
15          They assign them and they help out with
16  what's needed, but they're teamed up with either a
17  Pueblo police officer or a CBI agent.  It would be --
18  whoever is teamed up to assign, whoever responds at
19  that time, so -- but I as the captain step aside.
20      Q   Okay.  Have you told me the entirety of
21  your role then?
22      A   Yeah.  The only other thing that I found
23  on body cam footage, like I told you, is when the
24  sergeant from PD and the District Attorney Marzavas
25  is in the hallway, they ask me about a name -- or ask

1    me to look up a name to assist them.  And I went in
2    my office.  And I probably did whatever they needed.
3             The only other thing that I saw is on
4    video footage, it looks like I possibly led the
5    coroner into my building because my building is
6    secured.  Other than that, I had no involvement in
7    the case.
8        Q    All right.  I've got some follow-ups, you
9    won't be surprised to do hear.
10       A    Okay.
11       Q    So the first thing you described is that
12   you got out of the car and talked to a detective.
13   Tell me about that conversation.  Tell me everything
14   that you learned.
15       A    Like I said, it would have been a quick
16   brief of information that I passed on at the time of
17   the debrief for the critical incident team that
18   arrived.
19       Q    Do you keep a notepad?
20       A    I do not.
21       Q    While you're having that conversation, is
22   everything committed to memory or do you jot it down
23   somewhere?
24       A    I was not writing anything down when I was
25   talking to him -- so I don't --

1        Q      And what did you determine as to how many
2    witnesses there were?
3        A      I don't recall. I know they told me --
4    everything was still pretty chaotic out there. They
5    told me that there was a lot -- there were several
6    witnesses. I think they were still trying to figure
7    out the kids at the school at that time. So they
8    just told me that there were several people.
9               So I told them I would try to get some
10   people -- some help out there as soon as possible to
11   get everything started. There again, it got passed
12   on to the next agency.
13       Q      And when you said that you were going to
14   get several people out there to get some things
15   started, is that you were going to get officers out
16   there to interview the witnesses?
17       A      No. That's that the CIT protocol is going
18   to get started and people will be coming out to take
19   over and assist. So not at my direction but at the
20   direction of whoever is taking over. You know, I
21   will let them know that we need to get some people
22   started out there.
23       Q      You were saying that you were trying to
24   determine how many officers to send out. So what are
25   the factors that help you determine how many officers

AB Litigation Services

1  to send out?
2       A    How big the scene is.  And, there again,
3  that would be just me talking to the other captain or
4  whoever is taking over the scene, right.
5       Q    And so here was the number of witnesses
6  that needed to be interviewed part of how you figured
7  out how many people to send out?
8       A    Well, we had to get -- so what you need is
9  you've got to have your crime scene.  You also have
10 to have people to obtain video footage from the
11 school.  You've got to have teams.  So they do it in
12 teams of two.  Everywhere they team people up.
13           So I just -- there's got to be people that
14 go and look at surrounding areas to see if there's
15 anybody on footage, who videotaped it off of their
16 cell phones, like -- so you just team it up as to,
17 like, what is out there and how many people that you
18 think that -- you know, what's going on.
19           But the other captain is the one that
20 makes the decision as to how he's going to run his
21 investigation because it's no longer mine at that
22 time.
23      Q    You said you talked to the detective about
24 how many people were involved.  You learned that
25 there were several witnesses, right?

Shelley Bryant - 04/10/2024                             68

AB Litigation Services

1    mean, how do you determine who is and who isn't under
2    your supervision?
3         A    Who is on scene?
4         Q    Sure.  I'll tell you some of the people
5    who were on scene and you can tell me.
6         A    Okay.
7         Q    For example, one of the people who
8    describes conversations with you is Sergeant Ragan.
9    Do you have a recollection of speaking with him on
10   scene?
11        A    I do not.  In his body cam he comes and
12   stands before me for a few seconds and turns and
13   talks to his captain.  I don't recall talking to him,
14   nor does it look like I'm talking to him.  I'm
15   talking to Dante Guadagnoli at the time that he turns
16   and his body cam faces me for a few seconds and then
17   he turns and is speaking to his captain.
18        Q    So are you saying that you did not speak
19   to --
20        A    I don't recall.
21        Q    -- Sergeant Ragan?
22        A    I don't recall speaking to him.
23        Q    If he testifies -- if he has already
24   testified under oath that you spoke with him, would
25   that be untrue?

```
 1   So you didn't know what was happening in the car; is
 2   that correct?
 3         A    No.  I'm telling you there's criminal
 4   activity that's happening outside of the vehicle.  So
 5   that leads to you believe that the people he's with
 6   are also involved with him in the criminal activity
 7   that's occurring, right.
 8              You have the possible get-away driver.
 9   You have a possible lookout.  You don't know if
10   there's another car or anybody else involved.  So you
11   have to look into it to see what is occurring at the
12   school, why are they there, what's occurring at the
13   school with this criminal activity that's happening
14   right when school and kids are supposed to be let out
15   of school.
16         Q    And so with regard to -- well, so you made
17   the decision to have Kristy Ward Stamp and Tommy
18   Brown taken to the annex.  Did you make the decision
19   to have any other witnesses taken to the annex for
20   interrogation?
21         A    So other people were at the annex in
22   interviews.  And it's not interrogation.  There's
23   interviews that are being conducted at the Pueblo
24   Police and at my investigations annex.
25              At that time PD had taken that over.  We
```