**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, by and through its personal representative Kristy Ward Stamp, and KRISTY WARD STAMP,

    Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity, et al.,

    Defendants.

---

**REPLY TO DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

### 1. INTRODUCTION

On February 22, 2022, PCSO Defendants shot and killed Richard Ward in the parking lot of his younger brother's middle school. Immediately thereafter, other PCSO Defendants handcuffed Ward's mother Kristy Ward Stamp, locked her in the back of multiple police cruisers, drove her to the police station, and questioned her—holding her against her will (while she still needed to pick up her younger child) for over three hours. These Defendants now claim that these actions did not constitute an arrest, and besides, someone else told them to do it. In the process, they drag Richard Ward's name through the mud, wildly speculating with no evidence whatsoever that he was leading a carjacking ring with his mother in a middle school pickup line or *that he was holding his mother hostage. See* [Doc. 136] at 17, 19. This Court must strongly reject these arguments and grant Plaintiff's Motion for Partial Summary Judgment.

**2. RESPONSE TO DEFENDANTS' ADDITIONAL STATEMENT OF DISPUTED FACTS**

1-3.   Admit.[1] The ownership of the vehicle has no bearing on Kristy Ward Stamp's claims related to her arrest upon which Plaintiff moves for summary judgment and neither does the weather that day.

4.   Plaintiff admits that Mr. Ward opened the door of Plaintiff's vehicle as Defendant McWhorter approached him. The opening of the door has no bearing on the claims concerning Kristy Ward Stamp's arrest.

5.   Plaintiff's attire—a hooded winter jacket and sunglasses on a bright, cold afternoon—has no bearing on anything, let alone the present motion.

*6.*   **Deny**. Richard Ward did remember his little brother's name and said it was "Chase". *See* **Mov't Appx. 1**, McWhorter BWC, 00:30-00:48. Mr. Ward's memory of his brother's name has no bearing on this motion.

7.   **Deny.** Video is inconclusive regarding whether Mr. Ward's foot was inside or outside of the vehicle. *See* **Mov't Appx. 1**, 00:45-00:53. Regardless, neither the location of Mr. Ward's feet nor Defendant McWhorter's self-interested speculations have any bearing on the present claims, pertaining to the arrest of Richard's mother after Defendant McWhorter killed Richard.

8.   **Deny** that Mr. Ward's motions were "indicative of reaching for a

---

[1] The vehicle was registered to Plaintiff's father, Larry Ward, and she was using it with his permission. Throughout Plaintiff's Motion for Summary judgment, the possessive is used simply to indicate which vehicle is being discussed rather than to ascribe ownership of the vehicle to any party, much as Plaintiff references the Defendants' vehicles (e.g., "Defendant Gonzales arrived in her marked PCSO SUV") without ascribing *ownership* to the individual Defendants. Defendants use similar language (*see, e.g.,* Defendants reply to Plaintiffs' Statement of Undisputed Fact #33 – "he briefly spoke with Defendant Berumen who advised him to move Plaintiff to Deputy Quintana's vehicle").

2

weapon." Plaintiff admits that Ward swallowed a prescribed anti-anxiety pill and that he was looking for his identification, as requested by Defendant McWhorter. *See* **Mov't Appx. 1**, 2:09-2:25; **Ex. 1**, CBI Lab Report, WARD 003154.

    9-10.   Admit.

    11.   **<u>Deny</u>**. Defendant Berumen detained Plaintiff on his own authority, at the direction of Defendant Mahan. Upon Mahan's arrival at the scene approximately three minutes after the shooting, McWhorter directed him to prevent Plaintiff from leaving her car. **Mov't Appx. 1**, 6:18-6:23. Mahan then summoned Defendant Berumen to assist in removing Plaintiff from the car. Berumen then handcuffed Plaintiff and escorted her to Defendant Spencer's SUV. *See* **Mov't Appx. 3,** Mahan BWC, 3:07-13:50; **Mov't Appx. 8,** Berumen BWC, 6:21-11:10; **Mov't Appx. 2,** Gonzales BWC, 1:00-4:00. Neither Defendant Mahan nor Defendant Berumen make any mention in their reports or their deposition testimony that they had received any directive from CIT to detain Plaintiff. *See* **Ex. 2,** Berumen Report; **Ex. 3**, Mahan Report.

    12, 13.   **<u>Deny</u>**. Defendant Ragan testified that Defendant Bryant gave him the order to transport Plaintiff to the station, and Bryant testified that she could not remember whether she gave the order but had no reason to disbelieve Ragan. *See* **Mov't Appx. 25,** 91:15-92:13; **Mov't Appx. 31,** 79:23-81:7.[2]

---

[2] Defendant Ragan has testified that Defendant Bryant issued this order. Defendants have offered no evidence of any kind that any member of the PPD-led CIT team directed Defendant Bryant to give the order to transport Plaintiff to the Annex, even if the CIT team did have authority to do so. Notably, the PPD executive summary of the CIT investigation – over 15 pp. long - makes no reference to the decision to transport Plaintiff to the Annex. *See* **Ex. 4,** CIT Executive Summary. Closer examination of *all* of the PPD reports submitted regarding the CIT OIS investigation reveals only two mentions of Plaintiff's

3

### 3. RESPONSE TO DEFENDANTS' ADMISSIONS AND DENIALS OF PLAINTIFFS' STATEMENTS OF UNDISPUTED MATERIAL FACT

12.     Defendants deny because "Plaintiff's statement of material fact mischaracterizes Deputy McWhorter's alleged statement." Defendant McWhorter tells Defendant Mahan, "They don't get out" regarding Plaintiff and her boyfriend, and Defendant Mahan confirms McWhorter's meaning: "Leave 'em in there?" **Mov't Appx. 3***,* 3:45-4:00; **Mov't Appx. 1***,* 6:10-6:25. Mahan holds Plaintiff in the car for approximately eight minutes, before summoning Defendant Berumen to assist in detaining Plaintiff. *See* **Mov't Appx. 3**, 3:55-13:40.

13.     Defendants falsely deny that Plaintiff complied with Defendant Mahan's orders to "Keep your hands where I can see them." As body-worn camera footage demonstrates, Plaintiff not only kept her hands visible, but actually raised them and presented them to Defendant Mahan each time that he issued orders to keep her hands visible. *See* **Mov't Appx. 3**, 3:54-13:40.

15.     Defendants deny because "Plaintiff's statement of material fact mischaracterizes Deputy Mahan's alleged statement." In the cited bodycam clip, Defendant Mahan calls Defendant Berumen, and Berumen walks over to join Mahan. Defendant Mahan says, "Hey, these two right here, let's just get 'em out

---

transportation to the Annex—both of them indicating that the reporting parties, PPD Sergeant Christopher Flores and PPD Detective Jose Medina, were informed of the transportation *after* it had already begun, i.e., after the decision to transport Plaintiff had been made. *See* **Ex. 5**, PPD Reports; **Ex. 5** Flores Report at WARD 189; **Ex. 5,** Medina Report at WARD 496. Detective Medina, who was the lead investigator for the PPD on the CIT OIS investigation, reported that he learned of Plaintiff's transportation to the Annex from a PCSO source: "Undersheriff Hall said the vehicle the suspect was contacted in had two other occupants, stating the two occupants were being transported to the Sheriff's Office Annex." *See* **Ex. 5,** Medina Report at WARD 496.

4

and put 'em somewhere." Defendant Mahan and Defendant Berumen then work together to order Plaintiff out of her car, handcuff her, and walk her to a PCSO SUV. *See* **Mov't Appx. 3**, 11:50-12:10; **Appx. 9**, Berumen BWC, 7:10-11:05.

19.     Defendants deny because Berumen testified that he "did not *believe* Plaintiff was free to leave". As the person who ordered Plaintiff out of her vehicle, handcuffed her, and physically controlled her, Berumen's belief as to Plaintiff's freedom was functionally identical to her actual freedom. **Mov't Appx. 9**, Berumen BWC, 8:55-11:55; **Mov't Appx. 11-12,** Berumen Dep., 133:9-22.

23.     Defendants claim that Spencer did not order Plaintiff to sit in her SUV. This is demonstrably false. Spencer told Plaintiff, "Go ahead and take a seat in," and indicated her vehicle's open rear door. Plaintiff, still handcuffed, got into the SUV; Spencer weren't  wasclosed the door. *See* **Mov't Appx. 18,** Spencer BWC*,* 15:30-16:30. Spencer testified that she "put" Plaintiff in her SUV, and that Plaintiff was not free to leave. **Mov't Appx. 20**, Spencer Dep., 49:2-13.

26.     Defendants deny that Sergeant Ragan ordered Deputies Spencer, Mahan, and Berumen to transfer Plaintiff from Deputy Spencer's SUV to Defendant Mahan's SUV. This is yet another clear falsehood. Defendant Ragan testified that he told the deputies to transfer Plaintiff between the SUVs. *See* **Ex. 6,** Ragan Deposition, 97:5-12. The order itself and the deputies' compliance are captured on body worn camera video. Defendant Ragan asks where Mahan's car is; Defendant Mahan points to it. Ragan says, "Can you pull it around and get the one she's got in your car?" Mahan says, "Yeah." Ragan confirms that Mahan doesn't yet have any other person in his car, then states, "Yeah, do that for me."

5

*See* **Mov't Appx. 3,** 19:00-19:17. Defendant Mahan then pulls his vehicle around and works with Spencer to transfer Plaintiff into his vehicle. *Id.*, 19:20-22:20; **Mov't Appx. 18**, 17:30-21:20.

33. Defendants deny that Defendant Berumen made the decision to drive Plaintiff to the PCSO Annex. Plaintiff did not allege that Berumen made this decision. Defendant Ragan testified that he directed Defendant Berumen to transport Plaintiff to the Annex. *See* **Ex. 7,** Berumen Depo Transcript, 101:5-13. Berumen is captured on body worn camera footage directing Defendant Quintana to drive Plaintiff to the Annex. **Mov't Appx. 23***,* Quintana BWC, 00:42-1:01.

37. Defendants do not deny that Defendant Bryant instructed Defendant Ragan to have Plaintiff transported to the Annex, but claim that the order originated from the CIT. None of the materials cited in response state that Defendant Bryant did not give the order. Defendant Ragan testified that Defendant Bryant did give the order, and Defendant Bryant testified that she didn't remember but had no reason to doubt Defendant Ragan. *See* **Mov't Appx. 25,** 91:15-92:13; **Mov't Appx. 31,** Bryant Dep. Transcript, 79:23-81:7.

45. On the cited video, Plaintiff states, "I'm like my son's CNA, so I need to let them know if I'm going to be back to do his cares. Like I do 'em from 4 to 5. What time is it right now? 4:30? Yeah. I gotta call my dad and find out – 'cause he's autistic and—." *See* **Mov't Appx. 23,** Quintana BWC, 11:30-11:44; **Ex. 8**, Quintana SUV Interior Footage, 7:50-8:10.

58. In admitting that they never had probable cause to arrest Ms. Ward

6

Stamp, Defendants add that any determinations as to whether there was probable cause to arrest Plaintiff were made by the CIT. Defendants cite their Exhibit U, which is PPD's executive summary of the CIT investigation. Exhibit U makes no reference of any kind to any determination of whether or not there was probable cause to arrest Plaintiff. In fact, Plaintiff's time on the scene and her transportation to the Annex goes entirely unmentioned in the executive summary.

### 4. ARGUMENT

**A. Defendants misapply the fellow officer rule; that rule offers no mitigation of Defendants' clearly unlawful arrest of Ms. Ward Stamp**

Defendants first argue that they are exempted from liability because of the fellow officer rule. As described above, the evidence does not support that Defendants handcuffed Ms. Ward Stamp, drove her to the station, and held her against her will for over three hours at the behest of another agency.[3] Even assuming such an ask had occurred, the fellow officer rule does not apply here.

Defendants were present at the scene and had more information than any CIT or PPD officer who arrivedarrived at the scene later than Defendants . "In order to invoke the fellow officer rule . . . the [] Defendants must establish that they *actually did* rely on another officer's information. There are no facts here,

---

[3] Defendant Bryant does not even swear under oath that she received the order from a CIT source. She testified in deposition that she did not remember the order but did not doubt Ragan's testimony that she gave it. She now offers an "Unsworn Declaration" to the effect that PPD as lead CIT agency had the *capacity* to assign investigative tasks to PCSO personnel, and that CIT decided to transport Plaintiff (*not* that PPD actually did assign her to cause Plaintiff to be transported to the Annex). *See* **ECF 136-7, Def. Ex. K,** Bryant Unsworn Declaration, p. 2. Bryant states in the same document that the CIT made the decision to detain Plaintiff, which is demonstrably false based on the BWC footage, as detailed above.

7

however, suggesting that any [Defendants] ever relayed information to, or received information from, fellow officers based on personal observation . . . . The Tenth Circuit has instructed that the fellow officer rule does not apply in the absence of such information." *Minter v. City of Aurora*, Civil Action No. 20-cv-02172-RMR-NYW, 2022 U.S. Dist. LEXIS 55644, at *45 (D. Colo. Mar. 28, 2022) (citing *Fogarty v. Gallegos*, 523 F.3d at 1157, n.10.); *see also Killmon v. City of Miami*, 199 F. App'x 796, 800 (11th Cir. 2006) ("The rule typically requires that the fellow officer actually communicate to the arresting officer the basis for probable cause. . . . When the arresting officer observed the same events as his fellow officer, the fellow-officer rule does not apply.").

In sum, "the 'fellow officer' rule does not apply here because there is no 'collective knowledge' to impute to the arresting deputies – [no officer] possessed any information supporting even arguable probable cause to arrest" Plaintiff. *Battiste v. Lamberti*, 571 F. Supp. 2d 1286, 1298 (S.D. Fla. 2008). This Court must reject Defendants' argument and recognize as many other courts have that "the 'just following orders' defense has not occupied a respected position in our jurisprudence." *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 (11th Cir. 2004); *see also, e.g., Yessin v. City of Tampa*, 613 F. App'x 906, 907-08 (11th Cir. 2015); *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010); *Harris v. City of Saginaw*, 604 F. Supp. 3d 633, 647 (E.D. Mich. 2022); *N.N. v. Madison Metro. Sch. Dist.*, 670 F. Supp. 2d 927, 933 (W.D. Wis. 2009) ("In the context of § 1983, the reason for rejecting such a defense is the idea that, under the Supremacy Clause, public officials have an obligation to follow the Constitution even in the

midst of a contrary directive from a superior."). Because the "record here makes it clear that [all] officers had the same information available to them[,]" the fellow officer rule does not shield Defendants from liability in this case. *McInerney v. King*, 791 F.3d 1224, 1236 (10th Cir. 2015).

### B. Defendants' actions constituted an arrest

It is axiomatic that "[a]n arrest is distinguished [from an investigative stop] by the involuntary, *highly-intrusive* nature of the encounter." *United States v. White*, 584 F.3d 935, 954 (10th Cir. 2009) (emphasis in original). Kristy Ward Stamp was handcuffed moments after her son Richard was killed, then locked in the back of police cruisers, and, ultimately, driven to the police station from the scene of her younger son's middle school who she had been there to pick up. Her experience of being held against her will lasted for over three hours. It is difficult to imagine a more intrusive set of circumstances, and this was quite clearly an arrest under the caselaw cited in our principal motion.

Further, the cases cited by Defendants offer no support to classifying their interactions with Ms. Ward Stamp as a detention, not an arrest. First, Defendants cite *United States v. White* as supportive; however, in *White* the officers had legal basis to detain a car's occupants during a traffic stop so that a drug sniffing dog could arrive. *White*, 584 F.3d at 954. Instead of waiting for the dog to arrive, the car's occupants followed (in their own car, not handcuffed) the officer down the road to the canine so that the car could be sniffed. *Id.* Read properly, *White* is nothing like this case, in which Ms. Ward Stamp was handcuffed, transported against her will to a police station, and held in total for over three hours. Similarly,

9

Defendants' citation to *Montgomery v. Lore* bears no relation to the facts here. *Montgomery* involved an allegation of shoplifting, during which an officer escorted a suspect back to the store to sort out whether the items had been purchased. *Montgomery v. Lore*, No. 21-cv-02553-PAB-MEH, 2023 U.S. Dist. LEXIS 39848, at *10-11 (D. Colo. Mar. 8, 2023). The Court noted that "courts have upheld the transportation of a suspect back to the crime scene for investigation and identification purposes." *Id.*[4] Indeed, the pro se plaintiff in that case did "not argue that his relocation from the parking lot to the store converted his detention into an unlawful arrest — he merely argue[d] that the relocation itself was unlawful." *Id.* Defendants' actions here were orders of magnitude more "highly intrusive" and indisputably constituted an arrest.

### C. Pueblo County is municipally liable

Defendant Pueblo's argument that it is not municipally liable is based entirely on its claim that there was no underlying wrongful arrest. As detailed above and in her underlying motion, Plaintiff should be granted summary judgment on the underlying arrest. And because all officers and the sheriff testified that the arrest was made according to Pueblo's policies, customs, and training, *see* **Mov't Appx. at 6, 14, 21-22, 27, 30, 38, 46, 51-52, 54-55,** this Court should also grant summary judgment against Pueblo.

DATED this 9th day of December 2024.

---

[4] *United States v. Charley* is also unavailing, as an officer drove a mother back to her home to check on her children, after the mother had called 911 and made concerning statements that she had harmed them. 396 F.3d 1074, 1080-82 (9th Cir. 2005). The Ninth Circuit noted that the mother "not only voluntarily accompanied Sergeant Billie to her home, but that she repeatedly insisted that they go there to check on her children." *Id.* at 1081.

10

        KILLMER LANE, LLP

        *s/ Darold W. Killmer*
        _____
        Darold W. Killmer
        Reid Allison
        1543 Champa Street, Suite 400
        Denver, CO 80202
        (303) 571-1000
        (303) 571-1001 fax
        dkillmer@killmerlane.com
        rallison@killmerlane.com

        Mari Newman
        Andy McNulty
        NEWMAN MCNULTY, LLC
        1490 N. Lafayette Street, Suite 304
        Denver, CO 80218
        (720) 850-5770
        mari@newman-mcnulty.com
        andy@newman-mcnulty.com

        *Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on December 9, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following. I also certify that copies of the conventionally submitted exhibits, which were previously provided to counsel for Defendants in Plaintiffs' Disclosures, will be provided via Dropbox.

Sean Lane
William O'Donnell
Brittney Townsley
The Lane Law Firm, P.C.
3131 S Vaughn Way Suite 220
Aurora, CO 80014
Tel: 720-464-4215
slane@lanelawpc.com
wodonnell@lanelawpc.com
btownsley@lanelawpc.com

*Attorneys for Defendants*

        */s/ Jesse Askeland*