UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 23-CV-00473-CNS-MDB

ESTATE OF RICHARD WARD by and through its personal representative Kristy Ward
Stamp, *et al*.

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity, *et al*.

      Defendants.

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

## I.    INTRODUCTION

On February 22, 2022, Pueblo County Sheriff's Office ("PCSO") dispatch received a "911" call seeking law enforcement assistance at Liberty Point International School (the "School") concerning a suspicious male attempting to open vehicle doors. He acted aggressively with the occupants of at least one vehicle and appeared to be under the influence of drugs and/or alcohol. Deputies Charles McWhorter ("Deputy McWhorter") and Cassandra Gonzales ("Deputy Gonzales") responded to the call. Upon contacting the suspect, Richard Ward ("Ward"), seated in the rear seat of a white 2008 Lexus RX 350 (the "Vehicle") occupied by two other individuals, Deputy McWhorter began to investigate suspected criminal activity. Shortly after making contact, Ward took actions that required law enforcement intervention. Ward was removed from the Vehicle and a struggle ensued. During the violent struggle, Deputy McWhorter, fearing for his

life, removed his firearm from its holster and shot Ward, killing him. Deputies McWhorter and Gonzales ordered two individuals to remain in the Vehicle. Following the shooting of Ward (the "OIS"), the Tenth Judicial District Critical Incident Team ("CIT") was activated to investigate the incident. The Pueblo Police Department ("PPD") was designated as the lead investigative agency. Pursuant to Colorado law, CIT protocol, and policy, PPD effected the seizure and, later, transportation of Plaintiff Kristy Ward Stamp to the PCSO Annex to investigate the OIS and suspected criminal activity, and seized the Vehicle and Plaintiff's property, including her cell phone.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    On February 22, 2022, at approximately 3:21:08 p.m., witness Eric Valencia ("Valencia") called "911" to report a suspicious person outside the School, indicating the suspicious person was acting erratically, aggressively attempting to get into various parked cars and appeared to be under the influence of drugs and/or alcohol. *See* 911 - Reporting Party Call, at 00:00-00:30 ("Exhibit A").

2.    The suspicious person was described by Valencia as "psycho." *See* Exhibit A, at 00:32-00:37.

3.    Deputy McWhorter arrived on scene at 3:28:03 p.m. and Deputy Gonzales arrived on scene very shortly thereafter. *See* McWhorter BWC ("Exhibit B"), at 00:00; Gonzales BWC ("Exhibit C"), at 00:00.

4.    Deputy McWhorter notified dispatch that the suspicious person was located in the back of the Vehicle at 3:29:14 p.m. *See* Exhibit B, at 00:20-00:29.

5.      Plaintiff Kristy Ward Stamp ("Plaintiff") was located in the front passenger seat of the Vehicle wearing a hood and dark sunglasses. *See* Exhibit B, at 00:33-00:47.

6.      As Deputy McWhorter approached the Vehicle, Ward flung open the rear passenger door without prompting. *See* Exhibit B, at 00:28-00:33.

7.      When Deputy McWhorter asked Ward who his little brother was, Ward could not remember his name. *See* Exhibit B, at 00:30-00:48.

8.      Ward swung his leg out of the Vehicle, indicating to Deputy McWhorter, based on his training and experience, that he was a flight risk and may be about to run. *See* Exhibit B, at 00:45-00:50; Charles McWhorter Deposition ("Exhibit D"), at p. 182, ll. 9-13.

9.      Deputy McWhorter asked Ward if he had any identification or any weapons, to which Ward replied that he may have a pocketknife. *See* Exhibit B, at 2:10-2:20.

10.     Ward placed something in his mouth and swallowed it and Deputy McWhorter asked Ward what he placed in his mouth. *See* Exhibit B, at 2:15-2:25; Exhibit C, at 00:35-00:40.

11.     At the same time, Ward placed his hand into his jacket indicative of an individual reaching for a concealed weapon. *See* Exhibit C, at 00:35-00:40; Exhibit D, at p. 212, ll. 3-25, p. 213, ll. 1-17, p. 221, ll. 23-25, p. 222, ll. 1-17; BWC screenshots 1 ("Exhibit E"); Roger Clark Deposition ("Exhibit F"), at p. 38, ll. 14-25, p. 39, ll. 1-10, p. 41, ll. 2-14.

3

12.    McWhorter attempted to remove Ward's hand from his jacket and Ward from the Vehicle.  *See* Exhibit C, at 00:35-00:43; Exhibit D, at p. 212, ll. 3-25, p. 213, ll. 1-17, p. 221, ll. 23-25, p. 222, ll. 1-25, p. 223, ll. 1-8.

13.    Ward resisted his removal from the Vehicle and his detention. *See* Exhibit B, at 2:20-2:40; Exhibit C, at 00:35-00:55; Exhibit D, at p. 312, ll. 9-18; Cassandra Gonzales Deposition ("Exhibit G"), at p. 125, l. 2; Stacy Hoff Interview ("Exhibit H"), at 4:40-4:50, 5:45-6:00.

14.    Ward tackled Deputy McWhorter. *See* Exhibit B, at 2:25-2:35; Exhibit C, at 00:45-00:55; Exhibit D, at p. 261, ll. 8-13; BWC screenshots 2 ("Exhibit I").

15.    Ward stated, "yeah boy" and "come on boy" as he fought with Deputy McWhorter.  *See* Exhibit B, at 2:25-2:35; Exhibit C, at 00:45-00:55; Exhibit H, at 1:28-1:38, 5:30-5:45; Axon_X60333730_EnchancedAudio Recording of BWC ("Exhibit J"), at 2:30-2:40.

16.    The deputies, and even Plaintiff Kristy Ward Stamp, gave commands for Ward to put his hands behind his back and to "stop resisting", but Ward ignored their commands to "stop resisting." *See* Exhibit B, at 2:28-2:44; Exhibit C, at 00:45-1:02; Kristy Ward Stamp Deposition ("Exhibit K"), at p. 142, ll. 11-23.

17.    Deputy Gonzales attempted to utilize pain compliance techniques on Ward to gain his compliance. *See* Exhibit C, at 00:50-1:02; BWC screenshots 3 ("Exhibit L").

18.    Ward continued to fight Deputy McWhorter, despite Deputy Gonzales' use of pain compliance techniques. *Id.*

4

19.     Ward headbutted Deputy McWhorter, causing Deputy McWhorter to suffer serious bodily injury. *See* Exhibit C, at 3:3:10, 3:20-3:28; Exhibit D, at p. 314, ll. 1-12; Photographs of Deputy McWhorter ("Exhibit M"); Parkview Medical Records ("Exhibit N"); Physician's Report of Worker's Compensation Injury ("Exhibit O").

20.     During the fight, Ward grabbed onto Deputy McWhorter's duty belt, holster, and firearm. *See* Exhibit C, at 3:00-3:10; Exhibit D, at p. 229, ll. 23-25, p. 230, l. 1., p. 261, ll. 8-13; Exhibit G, at p. 185, ll. 4-18, p. 186, ll. 8-19, p. 187, ll. 18-25, p. 188, ll. 1-8; Exhibit H, at 6:27-7:30.

21.     Deputy McWhorter reasonably believed Ward was trying to draw his firearm from its holster. *See* Exhibit C, at 3:00-3:10; Exhibit D, at p. 229, ll. 23-25, p. 230, l. 1., p. 261, ll. 8-13.

22.     In order to defend himself, Deputy McWhorter removed his firearm from its holster and shot Ward three times. *See* Exhibit B, at 2:40-2:50; Exhibit C, at 1:00-1:10.

23.     The end of school day bell rang at 3:30 p.m., approximately one-minute before Deputy Gonzales advised dispatch, "shots fired." *See* Exhibit C, at 1:00-1:10; Bell Schedule ("Exhibit P").

24.     By happenstance, PPD officers were present at the School to pick up their own children at the time of the OIS and PPD was independently notified of the OIS at 3:35:19 p.m. *See* Pueblo Police Department Event Report, at p. 1 ("Exhibit Q").

25.     At 3:38:14 p.m., PPD radioed dispatch that the CRIT/Command page was sent and a request to secure the scene was made. *See* Exhibit Q, at p. 1.

26.     Immediately following the OIS, the CIT was activated to investigate the incident and take charge of the scene. The CIT consisted of members of the PPD, Colorado State Patrol, CBI, and the DA's Office. *See* District Attorney CIT Decision Letter, Amended ("Exhibit R"), at p. 1; Unsworn Declaration of Captain Shelley Bryant ("Exhibit S"), at ¶¶ 3-4.

27.     PPD was designated as the lead investigative agency. *See* Exhibit R, at p. 1; Exhibit S, at ¶¶ 3, 4.

28.     PPD, as the lead investigating agency, was authorized to utilize PCSO personnel and resources in accordance with the CIT protocol. *See* Exhibit S, at ¶¶ 3-7; Shelley Bryant Deposition ("Exhibit T"), at p. 49, ll. 20-25, p. 50, l. 1, ll. 19-22, p. 51, ll. 1-4, p. 63, l. 25, p. 64, ll. 1-19.

29.     Both PCSO deputies and PPD officers verified the scene was secured at 3:42:33 p.m. *See* Exhibit Q; PCSO Call Detail Report ("Exhibit U").

30.     Stacy Hoff ("Hoff") had an unobstructed view of the interaction between Ward and Deputies McWhorter and Gonzales from just feet away. *See* Exhibit H, at 1:35-2:18.

31.     Witnesses confirmed that Ward was resisting detention and fighting the deputies, that the struggle with Deputy McWhorter was violent, and that Ward was attempting to remove Deputy McWhorter's firearm from its holster. *See* Exhibit H, at *passim*; *see also* PPD Case Supplemental Report by Detective Ryan Torres ("Exhibit V"), at Ward 000183.

6

32.     To ensure the safety of the officers and others and preserve the now active crime scene, Deputies McWhorter and Gonzales ordered Plaintiff and Tommy Brown ("Mr. Brown") to remain in the Vehicle immediately following the OIS. *See* Exhibit C, at 1:38-1:42, 2:50-2:55; Exhibit D, at p. 251, ll. 13-18, p. 252, ll. 14-19, p. 267, ll. 8-15.

33.     Once Ward was removed from the Vehicle, neither Plaintiff nor the Vehicle's driver, Mr. Brown, could see the fight between Ward and the deputies, Deputy McWhorter's use of deadly force, or the events immediately preceding the OIS. *See* Exhibit K, at p. 122, ll. 21-25, p.123, ll. 1-19; p. 141, ll. 24-25, p. 142, ll. 1-5, p. 173, ll. 14-25, p. 174, ll. 1-6; Tommy Brown Deposition ("Exhibit W"), at p. 74, ll. 6-15, p. 77, l. 25, p. 78, ll. 1-19, p. 107, ll. 14-20, p. 108, ll. 22-25, p. 109, ll. 1-19.

34.     At the time of the OIS, Deputy McWhorter's investigation into suspected criminal activity had not concluded. *See* Exhibit B, at 00:00-2:25; Exhibit C, at 00:00-00:45; Exhibit D, at p. 181, ll. 6-12.

35.     After the scene was verified as secured at 3:42:33 p.m., Plaintiff, Kristy Ward Stamp, was removed from the Vehicle at approximately 3:44:45 p.m. and, for officer safety, was placed in handcuffs pending further investigation by PPD. *See* Exhibit Q; Exhibit S, at ¶¶ 5-8; Exhibit U; Berumen BWC ("Exhibit X"), at 9:40-10:02; Nicolas Berumen Deposition ("Exhibit Y"), at p. 163, ll. 8-21, p. 164, ll. 16-25.

36.     CIT made the decision to detain Plaintiff and directed PCSO to detain Plaintiff pending further investigation. *See* Exhibit S, at ¶ 8; Exhibit T, p. 49, ll. 20-25, p. 50, l. 1, ll. 19-22, p. 51, ll. 1-4, p. 63, ll. 18-25, p. 64, ll. 1-25, p. 65, ll. 1-7, p. 67, ll. 13-

25, p. 68, ll. 1-22, p. 84, ll. 16-25; Exhibit Y, at p. 164, ll. 2-12; Executive Summary ("Exhibit Z").

37.     When placing Plaintiff in handcuffs, Deputy Berumen told Plaintiff, "you're just a passenger being detained, you're not under arrest, nothing like that." *See* Exhibit X, at 9:45-9:55.

38.     The Vehicle and its immediate vicinity remained an active crime scene. *See* Exhibit T, at p. 108, ll. 16-18.

39.     At this time, the temperature in Pueblo, Colorado was approximately 17° Fahrenheit, and it was beginning to snow. *See* February 22, 2022 Weather History in Pueblo, Colorado ("Exhibit AA").

40.     Plaintiff was placed, first, in Deputy Christine Spencer's ("Deputy Spencer") PCSO vehicle to stay warm pending further investigation by PPD, as she could no longer remain in the Vehicle and the temperatures outside were below freezing. *See* Exhibit T, at p. 108, ll. 16-18; Exhibit AA; Deputy Report for Incident – Spencer ("Exhibit BB"), at p. 1.

41.     When Deputy Spencer was assigned elsewhere, Plaintiff was moved to Deputy Mahan's PCSO vehicle pending further investigation by PPD. *See* Exhibit BB.

42.     CIT issued an order to PCSO command staff to transport Mr. Brown and Plaintiff to the PCSO Annex, where members of the investigative unit were waiting to question them concerning the circumstances preceding and surrounding the OIS. *See* Exhibit S; Exhibit T, at p. 49, ll. 20-25, p. 50, l. 1, ll. 19-22, p. 51, ll. 1-4, p. 63, ll. 18-25,

p. 64, ll. 1-25, p. 65, ll. 1-7, p. 67, ll. 13-25, p. 68, ll. 1-22, p. 84, ll. 16-25; Exhibit Y, at p. 164, ll. 2-12.

43.    Plaintiff was released from her handcuffs upon entering the PCSO Annex interview room at approximately 4:33:56 p.m.  *See* ECF 131, at ¶ 48.

44.    Plaintiff was interviewed concerning her involvement in the suspected criminal activity and subsequent OIS. *See* ECF at 131, at ¶ 52.

45.    PPD, not PCSO, seized the Vehicle and Plaintiff's cell phone. *See* Applications and Affidavits for Search Warrants, various dates ("Exhibit CC"), at *passim*.

46.    PPD ID Detective John Guerrero processed the scene on February 22, 2022, the date of the OIS. *See* Exhibit CC, at pp. 5, 12, 19.

47.    On the date of the OIS, Detective Guerrero observed two cell phones inside of the Vehicle; one of which was a Motorola with a pink and black case, belonging to Plaintiff. *Id*.

48.    Following the OIS, the Vehicle was towed to Pueblo Police Department, 200 S. Main St., Pueblo, CO., at the direction of PPD and held in a secured ID bay. *Id*.; *see also* Exhibit S, at ¶¶ 3, 4.

49.    On March 2 and March 14, 2022, judicially authorized warrants were issued to seize and search the Vehicle and Plaintiff's cell phone, respectively. *See* Exhibit CC, at *passim*.

50.    The Application and Affidavit for Search Warrant(s) were executed by Detective Jose Medina of PPD, not by PCSO personnel. *Id*.

51.     PPD seized and possessed the Vehicle and cell phone prior to the issuance of the judicially authorized warrants. *Id*.

52.     PPD continued to possess the Vehicle and cell phone after the issuance of the judicially authorized warrants. *Id*.

53.     PCSO, including Defendants, did not seize the Vehicle or Plaintiff's cell phone. *Id*.

### III.     STANDARD OF REVIEW

Summary judgment must be granted if the evidence demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A fact is material only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In general, the party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If that party does not bear the burden of persuasion at trial, it "need not negate the nonmovant's claim," but rather may satisfy its initial burden "*simply by pointing out . . . a lack of evidence for the nonmovant on an essential element of the nonmovant's claim*." *Adler*, 144 F.3d at 671 (emphasis added); FED.R.CIV.P. 56(c)(1)(B) (a party may support its assertion that there is no genuine dispute of material fact by showing "that an adverse party cannot produce admissible evidence to support the fact"). Unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party, there is no need for a trial and the court must grant summary judgment to the moving

party as a matter of law.  *Anderson*, 477 U.S. at 248; *Kirkland v. United States*, 930 F. Supp. 1443, 1445 (D. Colo. 1996).

Once the movant meets its initial burden, the nonmovant "must do more than refer to allegations of counsel contained in a brief to withstand summary judgment." The facts proffered by the party resisting summary judgment must be supported by admissible evidence, from which a reasonable jury could find in favor of the nonmoving party on the material fact allegedly at issue.  *Celotex*, 477 U.S. at 324; *Adler*, 144 F.3d 670–71; *see also Adams v. American Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). "The mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient." *Anderson*, 477 U.S. at 252.

## IV.    ARGUMENT

### A. Summary judgment is appropriate concerning Plaintiffs' First, Second, and Third Claims for Relief.

"… *[A]ll* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard …" *Graham v. Connor*, 490 U.S. 386, 395 (1989) (brackets and ellipses added) (emphasis in original). "Determining whether the force used to affect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id*., at 396, citing *Tennessee v. Garner*, 471 U.S. 1, 6 (1985).  This balancing recognizes that "[t]he test of reasonableness

11

under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. An officer may be found to have acted reasonably in using deadly force even if he had a mistaken belief as to the facts establishing the existence of exigent circumstances. *See Thomas v. Durasanti*, 607 F.3d 655, 666, n. 16 (10th Cir. 2010); s*ee also Estate of Larsen ex re. Sturdivan v. Murr,* 511 F.3d 1255, 160 (10th Cir. 2008) (noting "even if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back…the officer would be justified in using more force than in fact was needed"). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.,* at 396-97.

To "assess the reasonableness of an officer's use of force," courts should undertake an analysis of the three non-exclusive factors set forth in *Graham*. These factors include but are not limited to: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Estate of George v. City of Rifle, Colorado,* 85 F.4th 1300, 1316 (10th Cir. 2023) citing *Graham* (internal citations and quotations omitted); *see also Palacios v. Fortuna,* 61 F.4th 1248, 1256 (10th Cir. 2023) ("The second [*Graham*] factor is generally the most important to

determine whether an officer acted reasonably"). However, "the *Graham* factors are nonexclusive and not dispositive; the inquiry remains focused on the *totality of the circumstances*." *Id.,* citing *Palacios,* 61 F.4th at 1256 (emphasis added). Divisions of the Colorado Court of Appeals have already applied *Graham* when evaluating § 1983 excessive force claims. *See Woodall v. Godfrey*, 553 P.3d 249, 257 (Colo. App. 2024). "…[W]hen determining whether the force used to effect a seizure is reasonable under article II, section 7 of the Colorado Constitution, courts should apply the 'objective reasonableness' standard articulated in *Graham*." *Id*. Therefore, Plaintiff's state law claims alleging excessive force and battery should be analyzed pursuant to *Graham*.

Prior to the deputies' arrival at the School, the "911" caller, Valencia, advised dispatch that there was a "white male trying to open doors on cars and he looks like he's intoxicated on something … he was aggressive with one car … he should not be here … school is about to get out … yeah, that guy's psycho." *See* Statement of Undisputed Material Facts ("SUMF"), at ¶¶ 1, 2. Deputy McWhorter, supplied with the information provided by Valencia, knew that a white male was attempting to break into cars in the School parking lot, was acting aggressively, was, presumably, under the influence of drugs and/or alcohol, that students were about to be released for the day and that Ward had been described as "psycho." SUMF, at ¶¶ 1-3. Upon approaching the Vehicle occupied by Ward, Deputy McWhorter was unaware of the identities of the Vehicle's other occupants, one of whom was wearing a hood and dark sunglasses. SUMF, at ¶¶ 4, 5. When nearing the Vehicle, Ward, without prompting, flung the rear passenger door open in anticipation of law enforcement contact. SUMF, at ¶ 6. During

his initial *Terry* Stop investigation, Deputy McWhorter asked Ward several questions to assess whether a crime had been committed and, more importantly, to determine who he was and why he was at the School. Deputy McWhorter asked Ward for identification and if he had any weapons. After additional prompting, Ward responded that he may have a pocketknife. SUMF, at ¶¶ 7-9.

As Ward searched through his pockets, he swung one leg out of the Vehicle indicating to Deputy McWhorter that he may be a flight risk and was preparing to run. SUMF, at ¶ 8. While Deputy McWhorter attempted to continue his investigation, Ward covertly stuck something in his mouth and swallowed it, appearing to destroy evidence of a possible crime. SUMF, at ¶ 10. At approximately the same time, Ward placed his hand inside his jacket with a motion indicative of reaching for a firearm secured in a shoulder holster or jacket pocket. SUMF, at ¶ 11. When Ward reached into his jacket, Deputy McWhorter reasonably believed that Ward could have been reaching for a weapon. SUMF, at ¶¶ 11, 12. In fact, Plaintiffs' own expert, Roger Clark ("Mr. Clark"), testified that, "… if you had a gun on you and you had it in a shoulder holster, you would reach in that way – and you were going to get it, that's what you would have to do." *Id*. In an effort to preserve evidence and to ensure officer and public safety throughout the remainder of his investigation, Deputy McWhorter attempted to remove Ward's hand from his jacket and Ward from the Vehicle. SUMF, at ¶ 12; s*ee also Estate of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1260 (10th Cir. 2008) ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often … too late to take safety precautions'"). However, Ward resisted his removal and began to

14

physically fight with Deputy McWhorter and Deputy Gonzales. SUMF, at ¶¶ 13-21, 31. Ward grabbed onto Deputy McWhorter, tackled him, headbutted him breaking Deputy McWhorter's nose, and placed himself on top of Deputy McWhorter while yelling "yeah boy" and "come on boy". *Id*. Deputy Gonzales attempted to utilize pain compliance techniques but was unsuccessful. SUMF, at ¶¶ 17, 18. Ward continued to actively resist arrest, fighting with the deputies. SUMF, at ¶¶ 17-21, 31. During the struggle, Deputy McWhorter felt Ward grabbing the weapon side of his duty belt and felt his holster being pulled on with "… the same sensation as when your firearm is being removed." SUMF, at ¶ 21. Hoff agreed that "… it was either going to be the deputy getting shot or the suspect," adding, "oh yeah, [Ward] was going after the gun." SUMF, at ¶ 31. Due to their positions in the Vehicle, neither Plaintiff, nor Mr. Brown, observed the violent struggle between the deputies and Ward. SUMF, at ¶ 33.

*Graham* first requires an analysis of the severity of the alleged crime at issue. At the time Ward was seized, he was under investigation for Disorderly Conduct, COLO.REV.STAT. § 18-9-106; Harassment, COLO.REV.STAT. § 18-9-111; First-Degree Trespass, COLO.REV.STAT. § 18-4-502; Tampering with Physical Evidence, COLO.REV.STAT. § 18-8-610; Attempted Theft, COLO.REV.STAT. § 18-4-401; and Conspiracy to Commit Theft, COLO.REV.STAT. § 18-2-201, among other potential crimes. At the time of Ward's commission of the suspected offenses, First Degree Trespass was a class five felony. Due to Ward's suspected commission of multiple crimes, including a felony, on School grounds during operational hours, this factor weighs in favor of Defendants.

15

The second *Graham* factor considers whether the suspect posed an immediate threat to the safety of officers or others and is, generally, the most important factor to determine whether an officer acted reasonably. *See Palacios,* 61 F.4th at 1256. When Ward was removed from the Vehicle, he immediately resisted detention (analyzed below) and began to fight with the deputies. Most important to this analysis are the events that occurred immediately preceding Deputy McWhorter's use of force. *See Thompson v. Salt Lake Cnty.*, 584 F.3d 1304, 13-14-15 (10th Cir. 2009) ("Another important aspect of this inquiry is 'whether the officers were in danger at the precise moment that they used force'").

While on the ground, prior to Deputy McWhorter's use of force, Ward tackled Deputy McWhorter landing on top of him, grasped his uniform with one hand, headbutted Deputy McWhorter breaking his nose, refused to comply with the deputies' commands, failed to submit to pain compliance techniques, and attempted to remove Deputy McWhorter's duty weapon from its holster. Throughout the violent struggle, Ward yelled "yeah boy" and "come on boy," giving no indication that he intended to submit to the deputies. After Deputy McWhorter felt Ward attempt to remove his duty weapon from its holster, reasonably fearing for his life and the lives of Deputy Gonzales and others, he removed his duty weapon from its holster and fired three shots into Ward, killing him. Clearly, Ward posed an immediate, and credible, risk to the deputies at the moment force was used. This factor weighs heavily in favor of Defendants.

The third and final *Graham* factor asks whether the suspect is actively resisting arrest or attempting to evade arrest by flight. After Ward swallowed an unknown

16

substance leading the deputies to believe he was attempting to destroy evidence of a crime and reached into his jacket with a motion indicative of reaching for a concealed firearm, and he was subsequently removed from the Vehicle, he actively, and violently, resisted detention. Ward was removed from the Vehicle and came to rest, momentarily, in a seated position. While seated, Ward grabbed Deputy McWhorter around the knees and tackled him to the ground, mounting him. As Deputy McWhorter and Ward struggled on the ground, Deputy Gonzales attempted to utilize pain compliance techniques to no avail. During the struggle, Ward yelled, "yeah boy" and "come on boy," indicating to the deputies and Hoff, the nearest witness, that Ward intended to continue to resist his detention. Ward, indeed, continued to fight Deputy McWhorter. Ward headbutted Deputy McWhorter breaking his nose, and, using his left hand, grabbed on to Deputy McWhorter's duty belt, holster, and firearm. It cannot meritoriously be disputed that Ward actively, and violently, resisted detention. This factor weighs heavily in support of Defendants.

Each of the three *Graham* factors, and consideration of the totality of the circumstances, support the objective reasonableness of Deputies McWhorter's and Gonzales' seizure of Ward and, ultimately, Deputy McWhorter's use of deadly force. Ward violently resisted his seizure, verbally antagonized the officers indicating his intent to continue violent resistance, headbutted Deputy McWhorter breaking his nose, and attempted to disarm Deputy McWhorter. Plaintiffs cannot produce admissible evidence in opposition to these facts. *See Adler*, 144 F.3d at 671; FED.R.CIV.P. 56(c)(1)(B).

Therefore, summary judgment in favor of Defendants is appropriate concerning Plaintiffs' First, Second, and Third Claims for Relief.

### B. Summary judgment is also appropriate concerning Plaintiffs' Fourth, Fifth, Sixth, and Seventh Claims for Relief.

"An investigative detention is a 'seizure within the meaning of the Fourth Amendment', but unlike an arrest, it need not be supported by probable cause." *Oliver v. Woods,* 209 F.3d 1179, 1186 (10th Cir. 2000). "An officer is empowered to stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion that criminal activity may be afoot." *Cortez v. McCauley,* 478 F.3d 1108, 1115 (10th Cir. 2007).

In order to assess whether an investigative detention was reasonable under the Fourth Amendment, the court employs a two-step process. *Lundstrom v. Romero,* 616 F.3d 1108, 1120 (10th Cir. 2010). First, courts consider whether the detention was justified at its inception. *Id.* To determine whether the detention was justified at its inception, the "totality of the circumstances" is considered. *Id.* Next, courts consider "whether the officer's actions were reasonably related in scope to the circumstances that first justified the interference." *Id.* "There is no litmus-paper test for determining when an investigative detention enters the realm of arrest." *Id.* This analysis requires "a fact-intensive inquiry to distinguish between arrests and *Terry* stops, which considers both the officer's forceful measures and the detention's length." *Hemry v. Ross,* 62 F.4th 1248, 1254 (10th Cir. 2023).

The Supreme Court has found, "there is some latitude for police to detain where 'the intrusion on citizen's privacy was so much less severe than that involved in a traditional arrest that the opposing interests in crime prevention and detection and in the police officer's safety' could support the seizure as reasonable." *Bailey v. U.S.,* 568 U.S. 186, 193 (2013). Although use of forceful measures, such as handcuffs, can, at times, transform an investigative detention into an arrest, that is not always the case. *Maresca v. Bernalillo County,* 804 F.3d 1301, 1308-09 (10th Cir. 2015). Law enforcement may use forceful measures, even during an investigative stop, when reasonably necessary. *United States v. Merkley,* 988 F.2d 1062, 1064 (10th Cir. 1993).

Police officers may also detain individuals pursuant to their community caretaking functions. *United States v. Garner,* 416 F.3d 1208, 1212-13 (10th Cir. 2005). "Like an investigative detention for law enforcement purposes, such a community caretaking detention must be based upon ''specific and articulable facts which … reasonably warrant [an] intrusion' into the individual's liberty.'" *Id*., at 1213. This is, of course, in line with the Supreme Court's finding that detention or control of both suspects and non-suspects "may be necessary to ensure officer safety and to maintain the officers' control over a crime scene so long as the steps are reasonably necessary to protect their safety and to maintain the status quo." *United States v. Hensley,* 469 U.S. 221, 235 (1985).

Police may move a suspect without exceeding the bounds of an investigative detention. *Id., citing United States v. White,* 584 F.3d 935, 953 (10th Cir. 2009). It is *objectively reasonable* to move a witness/suspect from one scene to another if it is a "reasonable means of achieving the legitimate goals of the detention given the *specific*

circumstances of the case." *Id.* (emphasis added) In fact, relevant case law depicts a grey area concerning just when an investigative detention becomes an arrest; it necessitates the need for a comprehensive analysis of the facts of the case. *See Holmstrom v. Board of County Commissioners for County of Chaves,* 181 F.Supp.3d 862, 872-73 (D.N.M. 2016).

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984). Much like seizures of individuals, a warrantless seizure of property must be reasonable. *See U.S. v. Shrum*, 908 F.3d 1219, 1229 (10th Cir. 2018). "Officers may…seize property prior to a warrant to protect evidence when probable cause exists." *U.S. v Montes*, 440 F.Supp.3d 1258, 1265 (D.N.M. 2020) citing *Harman v. Pollack*, 586 F.3d 1254, 1266 (10th Cir. 2009). "Historically, pre-warrant seizures are seen when officers suspect that a defendant's car holds contraband, but personal property may be seized for the purpose of obtaining a warrant when the facts create 'more than a mere suspicion of criminal activity and would [lead] a reasonable person to believe there w[as] evidence of a crime] [in the seized item].'" *Id.* (brackets added).

Pursuant to C.R.S. § 16-2.5-301,

Each police department, sheriff's office, and district attorney within the state shall develop protocols for participating in a multi-agency team, which shall include at least one other police department or sheriff's office, or the Colorado bureau of investigation, in conducting any investigation, evaluation, and review of an incident involving the discharge of a firearm by a peace officer that resulted in injury or death, or other use of force by a peace officer that resulted in death. The law enforcement agencies participating need not be from the same judicial district.

C.R.S. § 16-2.5-301(1).

"'A police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable.'" *Maresca v. Bernalillo County*, 804 F.3d 1301, 1312 (10th Cir. 2015). "Police work often requires officers to rely on the observations, statements, and conclusions of their fellow officers. An officer who is called to the scene to conduct a search incident to arrest is not required to reevaluate the arresting officer's probable cause determination in order to protect herself from personal liability.'" *Id.*, citing *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1259-60 (10th Cir. 1998). "This rule makes sense, because '[e]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and … officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.'" *Id.*, citing *Oliver v. Woods*, 209 F.3d 1179, 1191 (10th Cir. 2000). "Accordingly, the 'good faith' defense shields objectively reasonable good faith reliance on the statements of a fellow officer …" *Id.*, citing *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 882 (10th Cir. 2014) (ellipses added).

"Because vicarious liability is inapplicable to … § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "In general, state actors may be held liable under § 1983 only for their own acts and not for

Case No. 1:23-cv-00473-CNS-MDB    Document 150    filed 01/10/25    USDC Colorado
pg 22 of 29

the acts of third parties." *Schaefer v. Las Cruces Public School Dist.*, 716 F.Supp.2d 1052, 1064 (D.N.M. 2010); *see Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022).

Following the OIS, the CIT was activated to investigate the incident. SUMF, at ¶ 26. The CIT consisted of members of the PPD, Colorado State Patrol, CBI, and the DA's Office. *Id*. PPD was designated as the lead investigative agency. SUMF, at ¶ 27. Once PPD was designated, PCSO was required to step aside to allow PPD to conduct its investigation. SUMF, at ¶¶ 26-28. PPD had substantive decision-making authority concerning its investigation. *Id*. PPD began its investigation and utilized PCSO members pursuant to Officer-Involved Incident Protocol of the Tenth Judicial District. *Id*. Neither PCSO, nor Captain Shelley Bryant (PCSO Captain of Investigations), were in charge of or responsible for making substantive decisions related to the ongoing investigation. *Id*. CIT directed PCSO personnel, including directions provided to Defendants, to detain Plaintiff and transport her to the PCSO Annex for questioning due to below freezing, and dropping, temperatures in Pueblo, Colorado, accompanied by snowfall. SUMF, at ¶¶ 26-28, 36, 42. Following the OIS, upon PPD's designation as lead investigative agency, Defendants reasonably relied upon CIT's findings, determinations, and directions.

Defendants, and each of them, were legally entitled to rely on PPD's determinations as the lead investigative agency who would, reasonably, be expected to know considerably more than Defendants who were simply directed to detain and/or transport Plaintiff to the PCSO Annex at CIT's direction, concerning the very determinations made by CIT justifying Plaintiff's detention and transport. Simply put,

Defendants reasonably relied upon CIT's indication that it had obtained information necessary to justify Plaintiff's detention and transport to the PCSO Annex. Defendants then detained Plaintiff and transported her to the PCSO Annex on CIT's authority, and at its direction. Defendants who detained Plaintiff and/or transported her to the PCSO Annex did so in good faith, in reasonable reliance upon the authority and direction of CIT, led by PPD. Therefore, summary judgment in favor of Defendants concerning Plaintiff's Fourth and Fifth Claims for Relief is appropriate.

Plaintiffs' Second Amended Complaint alleges Defendants seized, and detained for months, Plaintiff's Vehicle, cell phone, and wallet. Plaintiffs' allegations are not supported by the evidence. PPD, apparently, made the initial determination that probable cause existed to seize the Vehicle, Plaintiff's phone, and property. PPD, not PCSO, seized the Vehicle and Plaintiff's cell phone. SUMF, ¶ 45. PPD ID Detective John Guerrero processed the scene on February 22, 2022, the date of the OIS. SUMF, at ¶ 46. On that date, Detective Guerrero observed two cell phones inside of the Vehicle; one of which was a Motorola with a pink and black case, belonging to Plaintiff. SUMF, at ¶ 47. On February 22 or 23, 2022, the Vehicle was towed to Pueblo Police Department, 200 S. Main St., Pueblo, CO., at the direction of PPD and held in a secured ID bay. SUMF, at ¶ 48. On March 2, 2022, and March 14, 2022, properly supported and judicially authorized warrants were issued permitting the seizure and search of the Vehicle and Plaintiff's cell phone, respectively. SUMF, at ¶ 49. The Application and Affidavit for Search Warrant(s) were executed by Detective Jose Medina of PPD. SUMF, at ¶ 50. The Vehicle and property contained therein, including

23

Plaintiff's phone, were seized and held by PPD, not by PCSO. SUMF, at ¶¶ 45-52. Therefore, summary judgment in favor of Defendants concerning Plaintiff's Sixth and Seventh Claims for Relief is appropriate.

Additionally, Plaintiff's Second Amended Complaint does not establish how each individual Defendant's actions violated the Constitution. Instead, Plaintiff relies upon a theory of vicarious liability, which is inapplicable to § 1983 suits. *See Bledsoe*, 53 F.4th at 609; *see also Shimomura v. Carlson*, 17 F.Supp.3d 1120, 1129 (D.Colo. 2014); *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990); *Dixon v. City of Lawton, Okl.*, 898 F.2d 1443, 1449 (10th Cir. 1990). Because Plaintiff has not asserted conspiracy claims and because she cannot establish that each Defendant, through their own actions violated Plaintiff's constitutional or statutory rights, Defendants are entitled to summary judgment in their favor concerning Plaintiff's Fourth, Fifth, Sixth, and Seventh Claims for Relief.

### C. Defendant McWhorter is entitled to summary judgment concerning Plaintiff's Third Claim for Relief.

A public entity enjoys governmental immunity unless the Colorado Governmental Immunity Act, COLO.REV.STAT. § 24-10-101, *et seq*. ("CGIA"), waives immunity. *See Springer v. City and County of Denver*, 13 P.3d 794, 800 (Colo. 2000). "A public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by the claimant …" COLO.REV.STAT. § 24-10-106(1). Plaintiff's Third Claim for Relief is alleged against Defendant McWhorter in his individual and official capacities. Plaintiff alleges Deputy McWhorter's actions were willful and wanton. However, because Deputy

24

McWhorter employed only reasonable force, established *supra*, no reasonable jury could find that Deputy McWhorter acted willfully or wantonly in utilizing deadly force. *See Rodeman v. Foster*, 767 F.Supp.2d 1176, 1187-88 (D.Colo. 2011). Therefore, Deputy McWhorter is immune from Plaintiff's Third Claim for Relief and is entitled to summary judgment in his favor.

Notwithstanding, Pueblo County Sheriff and Pueblo County Board of County Commissioners are immune from Deputy McWhorter's *alleged* willful and wanton act, and Plaintiff's Third Claim for Relief against Defendant McWhorter in his official capacity fails as a matter of law. *See McKenzie v. City and County of Denver*, 2023 WL 5488465, *42 (D.Colo. 2023) citing *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) ("To the extent [the plaintiff] brings a claim against [the defendant] in his official capacity, it is the same as bringing a suit against the county.") Therefore, summary judgment in favor of Deputy McWhorter in his official capacity is proper.

### D. Plaintiffs' claims against the Board of County Commissioners fail.

"Under both the Colorado Constitution and applicable statutes, sheriffs and boards of county commissioners are treated as separate public entities having different powers and responsibilities." *Tunget v. Board of County Com'rs*, 992 P.2d 650, 651-52 (Colo. App. 1999). "Colo. Const. art. XIV, §§ 8 and 8.5, treat boards of county commissioners and sheriffs as separate entities, and various statutory provisions enumerate the respective specific responsibilities and powers of a county sheriff, a county, and a county board of commissioners." *Id*., at 652; *see also* COLO.REV.STAT. § 30-10-506. Sheriffs, rather than counties or county boards of county commissioners, are

liable for the improper official actions of their deputies. See *Seeley v. Board of County Commissioners,* 791 P.2d 696 (Colo.1990); *Barton v. Continental Oil Co.,* 5 Colo.App. 341, 38 P. 432 (1894). The Board does *not* make policy for the PCSO and is not liable for the official acts of the Sheriff or his deputies, nor is the Board responsible for the training and supervision of PCSO personnel. Plaintiffs' claims against the Board fail as a matter of law. Therefore, summary judgment in favor of the Pueblo County Board of County Commissioners is proper.

### E. Defendants are entitled to qualified immunity concerning Plaintiffs' First, Fourth, and Sixth Claims for Relief.

Unlike other motions for summary judgment where the moving party carries the burden of proof to demonstrate that there are no genuine issues of material fact, when a defendant has asserted the defense of qualified immunity, the burden then shifts to the plaintiff to prove that the defendant claiming such a defense is not entitled to qualified immunity. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) citing *Nelson v. McMullen*, 207 F.3d 1202, 1205- 06 (10th Cir. 2000); *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000); and *Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995). "Qualified immunity having been claimed, 'the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of defendant's unlawful conduct.'" *Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016) citing *Estate of Booker v. Gomez,* 745 F.3d 405, 411 (10th Cir. 2014). In this matter, the record must clearly demonstrate that Plaintiffs have satisfied this heavy two-part burden. If Plaintiffs fail to

do so, each Defendant is entitled to qualified immunity for their actions, or lack thereof. *See Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001). Defendants are entitled to qualified immunity on Plaintiff's First, Fourth, and Sixth Claims in this matter.

Plaintiffs must first clearly demonstrate that each Defendants' actions, or conversely their inaction, violated one or more of Plaintiffs' federal constitutional or statutory rights. The burden is not met by identifying a right "in the abstract," and simply stating that Plaintiff's rights were violated. Plaintiff must articulate the clearly established constitutional right(s) at issue and the conduct of each Defendant alleged to have violated the right with specificity, and further demonstrate a substantial correspondence between the conduct in question and the prior law establishing that the *Defendants' own actions* were clearly prohibited. *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995).

If a plaintiff is able to establish that a cognizable constitutional or statutory right was violated, the plaintiff must then demonstrate that the law was clearly established at the time of the conduct. *Saucier v. Katz*, 533 U.S. 199, 200 – 01 (2001); *Maestas v. Lujan*, 351 F.3d 1001, 1006 – 07 (10th Cir. 2003). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful given the situation with which he was confronted. *Saucier*, 533 U.S. at 202. The law is clearly established when a United States Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other jurisdictions shows that the right must be as a plaintiff maintains. *Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003). In analyzing this

27

issue, the Tenth Circuit has concluded, "in determining whether a right is 'clearly established,' the courts assess the objective legal reasonableness of the action at the time of the alleged violation and ask whether the right was sufficiently clear that a reasonable officer would understand that what he was doing violated that right." *See Medina*, 252 F.3d at 1128 citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999).

In this matter, Plaintiff cannot establish that Defendants violated one or more of Plaintiffs' constitutional or statutory rights. Notwithstanding, even if Plaintiffs establish a violation of their constitutional rights, they cannot demonstrate that the law was clearly established at the time of the conduct giving rise to this matter. Therefore, Defendants are entitled to qualified immunity concerning Plaintiffs' First, Fourth, and Sixth Claims for Relief.

WHEREFORE, Defendants request this Honorable Court enter summary judgment in favor of Defendants, and against Plaintiffs, and dismiss Plaintiffs' Second Amended Complaint in its entirety with prejudice.

Respectfully submitted this January 10, 2025.

By:    s/    *Sean J. Lane*
            Sean J. Lane, Esq.
            Alex M. Pass, Esq.
            William O' Donnell, Esq.
            Brittney Townsley, Esq.
            **THE LANE LAW FIRM, P.C.**
            3131 S Vaughn Way, Suite 220
            Aurora, Colorado 80014
            Tel:  720-464-4215
            Email: slane@lanelawpc.com
                    apass@lanelawpc.com
                    wodonnell@lanelawpc.com
                    btownsley@lanelawpc.com
            ATTORNEYS FOR DEFENDANTS
            28

**CERTIFICATE OF SERVICE**

I hereby certify that on this January 10, 2025, a true and correct copy of the above and foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was, unless otherwise indicated, filed electronically with the Court who provides notice to the following:

Darold Killmer, Esq.
Reid Allison, Esq.
Killmer Lane, LLP
1543 Champa St Suite 400
Denver CO 80202
Tel:  303-571-1000
Fax:  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
Email:  dkillmer@killmerlane.com
Email:  rallison@killmerlane.com


Mari Newman, Esq.
Andy McNulty, Esq.
Madeline Leibin, Esq.
Newman McNulty, LLC
1490 N Lafayette Street Suite #04
Denver, CO 80218
Tel: 720-850-5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com
madeline@newman-mcnulty.com


*A Duly Signed Original is on File at The Lane Law Firm, P.C.*

s/     *Sarah Merrill*
Sarah Merrill