**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-00473-CNS-MDB

ESTATE OF RICHARD WARD, *et al.*,

      Plaintiffs,

v.

PUEBLO COUNTY SHERIFF DAVID J. LUCERO, in his official capacity, *et al.*,

      Defendants.

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DOC. 150]**

---

## I. INTRODUCTION

On February 22, 2022, Defendant Pueblo County Sherriff's ("PCSO") Officer Charles McWhorter killed Richard Ward, who was unarmed, shooting him in the chest three times from point blank range. Defendant McWhorter shot Mr. Ward in the parking lot of Mr. Ward's younger brother's middle school, as classes were letting out for the day and children were walking out to meet their families. After Defendant McWhorter killed Mr. Ward, other named PCSO Defendants unconstitutionally arrested Mr. Ward's mother, Kristy Ward Stamp, at the scene and seized her car and other property, which were then held for months without explanation or justification.

Defendants now seek to keep this case from a jury by claiming Richard Ward was threatening based on his alleged actions (1) that either do not appear on bodycams or are contradicted by the available video, (2) for which there are no supportive witnesses, and (3) which even Defendant McWhorter, contemporaneously, did not mention. In sum, these are hotly disputed facts that a reasonable jury could readily find *did not happen.*

Therefore, this Court must deny Defendants' motion.[1]

## II.    RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACT

**1.**    While Valencia stated that Mr. Ward "became aggressive with one car," he did not say "various parked cars." *See* **Ex. 1,** 911 Call, 00:11-14. Nor did Valencia say that Mr. Ward was acting "erratically". *Id.* No video footage of any attempt by Mr. Ward to enter a car has been produced; to Plaintiffs' knowledge, no such video exists.

**2.**    Admit that Valencia said this.[2]

**3-4.**    Admit.

**5.**    Admit that Plaintiff was wearing a hooded winter jacket on a below-freezing day. Admit that she was wearing sunglasses; Defendants Gonzales and Mahan also wore dark sunglasses that day. *See* **Ex. 2,** Gonzales BWC, 3:58; **Ex. 3,** Mahan BWC, 3:33.

**6.**    Admit that Mr. Ward calmly, politely opened the rear passenger door as Defendant McWhorter approached so that he could speak with Defendant McWhorter.

**7.**    **Deny.** This is demonstrably untrue based on Defendants' own citation: Mr. Ward did remember his brother's name and correctly told McWhorter that it was "Chase."

**8.**    **Deny.** Both of Mr. Ward's legs remained in the vehicle until Defendant McWhorter dragged him from the vehicle. See **Ex. 2,** Gonzales BWC, 00:00-00:45; **Ex. 4**, McWhorter BWC, 02:14-2:24.

**9.**    Admit that Defendant McWhorter first asked Mr. Ward if he had his identification; Mr. Ward began looking in his pockets for the same. McWhorter then asked him if he had

---

[1] This Court must also deny Defendants' motion as to Ms. Ward Stamp's wrongful arrest and property seizure claims for the reasons stated below and in Plaintiff's Motion for Partial Summary Judgment (incorporated herein by reference). *See* [Doc. 131].

[2] Valencia then excitedly told his young children that he was ready to shoot the unarmed Mr. Ward, who had not threatened anyone. *See* **Ex. 1,** 911 Call, 00:38-00:42.

any weapons, to which Mr. Ward responded that he didn't think so, but he might have had a pocketknife. McWhorter advised Mr. Ward not to pull weapons out; he did not command Mr. Ward to stop reaching in his pockets, looking for his ID. *See* **Ex. 4,** McWhorter BWC, 2:09-2:23; *See* **Ex. 5,** McWhorter Dep., 205:5-206:14**.** Mr. Ward did not have any weapon in his possession, and he obeyed McWhorter's directives. *See* **Ex. 4,** McWhorter BWC, 2:09-2:23; **Ex. 6,** Sheriff David Lucero Dep., 151:13-20.

10.    Admit that Mr. Ward placed a prescribed anti-anxiety pill – Lorazepam – in his mouth. *See* **Ex. 7,** CBI Laboratory Report. Admit that McWhorter asked Mr. Ward what he'd put in his mouth, to which he truthfully responded that it was a just a pill. *See* **Ex. 2**, Gonzales BWC, 00:39-00:45.

11.    **<u>Deny.</u>** Mr. Ward's motion was "indicative" of his willing cooperation with Defendant McWhorter's instructions, which Mr. Ward steadfastly offered through the entirety of the interaction until McWhorter baselessly assaulted him. *See* **Ex. 4,** McWhorter BWC, 00:30-2:23. Mr. Ward was unarmed and opened his jacket to continue searching for his identification, **as he had just been directed to by Defendant McWhorter**. **Ex. 4,** McWhorter BWC, 2:10-2:23; **Ex. 6**, Lucero Dep., 151:13-20. Mr. Ward never gave any indication that he would resist, threaten, or otherwise not cooperate with the officers until McWhorter physically assaulted him. *Id.*

12.    **<u>Deny.</u>** In fact, Defendant McWhorter only briefly touched Mr. Ward's right arm, for a split second, then immediately released it to seize Mr. Ward by the head and neck and drag him from the car. McWhorter did not so much as attempt to control Mr. Ward's arms as he pulled him from the car. *See* **Ex. 2**, Gonzales BWC, 00:39-00:45. McWhorter's apparent disinterest in controlling Mr. Ward's arm as he initiated the seizure reflected his

lack of genuine concern that Mr. Ward might obtain a weapon from his pocket; rather, McWhorter's concern was exactly what he clearly and spontaneously announced as he seized and assaulted Mr. Ward: "**What did you just put in your mouth**?" *Id.,* 00:39-00:45. McWhorter reported the same concern—with no mention of any weapon—to a PPD officer in the minutes after he killed Richard Ward: "He was stuffing stuff in his mouth, and trying to turn on us, so I pulled him out." *See* **Ex. 4**, McWhorter BWC, 2:09-2:21, 7:04-7:13. The "trying to turn on us" portion of that statement was false. **Ex. 2,** Gonzales BWC 00:20-0:41.

13.    **Deny** that Mr. Ward resisted removal from the vehicle. Defendants McWhorter and Gonzales never requested that Mr. Ward step out of the vehicle, nor did they otherwise give him an opportunity to do so under his own power. *See* **Ex. 4,** McWhorter BWC, 00:30-2:25; **Ex. 2,** Gonzales BWC, 00:00-00:45. Instead, McWhorter suddenly seized Mr. Ward and yanked him from the car without any warning or opportunity to comply. *Id.* As Defendant McWhorter dragged him from the vehicle, Mr. Ward did not attempt to strike, kick, or grapple with Defendant McWhorter or Defendant Gonzales, or indeed to do anything physically other than flail his arms in an effort to regain his balance. *See* **Ex. 2,** Gonzales BWC**,** 00:39-00:45.

14.    **Deny.** Mr. Ward did not tackle Defendant McWhorter. As Defendants' citations demonstrate, while Mr. Ward was on the ground (having been thrown there by Defendants), he wrapped an arm around Defendant McWhorter's leg in an effort to prevent Defendant McWhorter from further unlawfully assaulting him.

15.    Admit. Ward also stated, "Get off me boy" as he tried to defend himself from Deputy McWhorter's assault. *See* **Ex. 2,** Gonzales BWC, 00:55-00:56. Before McWhorter shot

Case No. 1:23-cv-00473-CNS-MDB    Document 156    filed 02/14/25    USDC Colorado
pg 5 of 31

him, Mr. Ward attempted to surrender, stating, "Stop man, I'm done." *See* **Ex. 4,** McWhorter BWC, 2:42-2:44; **Ex. 2,** Gonzales BWC, 00:59-1:02.

16.    Admit that Gonzales gave commands. **Deny** that McWhorter and Kristy Ward Stamp gave commands. McWhorter admitted that he didn't recall giving any commands, and body-worn camera footage demonstrates that McWhorter never gave Mr. Ward *any commands* as he dragged him from the car, threw him to the ground, and shot him three times. *See* **Ex. 8**, McWhorter CIT Interview Trans., pp. 34, 53. **Ex. 2,** Gonzales BWC, 00:38-01:03; **Ex. 4**, McWhorter BWC, 2:20-2:46. Ms. Ward Stamp never told Richard to "stop resisting" or to put his hands behind his back, rather, she told the two deputies and Mr. Ward to "Stop" and "Stop now." *See* **Ex. 9,** Kristy Ward Stamp Dep., 142:11-23; **Ex. 2,** Gonzales BWC, 00:38-01:03; **Ex. 4**, McWhorter BWC, 2:20-2:46.

17.    Admit.

18.    Admit that Mr. Ward briefly wrestled with McWhorter in order to defend himself against the unlawful assault committed by Defendants McWhorter and Gonzales.

19.    **Deny.** Mr. Ward did not headbutt Defendant McWhorter. No other witness, including Defendant Gonzales, reported observing a headbutt. *See* **Ex. 10**, Gonzales Dep., 126:8-19. Neither Defendant McWhorter's body worn camera nor Defendant Gonzales' body worn camera captured any alleged headbutt by Mr. Ward. *See* **Ex. 2,** Gonzales BWC, 00:00-1:05; **Ex. 4,** McWhorter BWC, 2:20-2:47.

20-21. **Deny.** *This is one of the most disputed facts in the case*, rendering summary judgment impossible**.** There is no evidence that Mr. Ward ever grabbed McWhorter's holster aside from McWhorter's own self-serving statements. Defendant Gonzales vigorously denied that she ever saw Mr. Ward grab McWhorter's holster or firearm. *See*

**Ex. 11,** Gonzales CIT Interview Trans., pp. 8-9. Neither Defendant Gonzales' body worn camera nor Defendant McWhorter's body worn camera captured *any hint* of this alleged grab; tellingly, Defendants do not cite any body-worn camera footage from the time period during which McWhorter claims Mr. Ward attempted to disarm him. *See* **Ex. 2,** Gonzales BWC, 00:51-01:06. McWhorter also proclaimed his absolute confidence that the locking mechanism on his holster was engaged at the time. *See* **Ex. 5,** McWhorter Deposition, 134:1-12; **Ex. 8,** McWhorter CIT Interview, pp. 13-14; 56-57. As such, McWhorter could not reasonably have believed that he was about to be disarmed by Mr. Ward. *See* **Ex. 12**, Police Practices Expert Report of Roger Clark, pp. 34-37.

**22. <u>Deny</u>** that McWhorter killed Mr. Ward in self-defense. Plaintiffs admit that Defendant McWhorter purposely removed his firearm from where it was secured in his holster and shot Mr. Ward three times. Defendant McWhorter assaulted Mr. Ward without any basis to use force and escalated his use of force over the following approximately 20 seconds until he finally escalated to deadly force. *See* **Ex. 2**, Gonzales BWC, 00:38-1:06.

**23-24.** Admit.

**25.**    Admit. However, 4 minutes before the CRIT/Command page was sent, Defendant McWhorter directed Defendant Mahan to hold Kristy Ward Stamp and in Ms. Ward Stamp's vehicle. *See* Defs' Ex. Q at p. 1; **Ex. 3,** Mahan BWC, 3:54-3:56.

**26-27.** Admit

**28.**    Admit that PPD was authorized; **<u>Deny</u>** that PPD, in fact, directed the PCSO Defendants' arrest of Ms. Ward Stamp. PCSO personnel, the individual defendants herein, took numerous actions at the scene with no direction from any PPD official. For instance, Defendant McWhorter ordered Ms. Ward Stamp to remain in her car after he

killed her son, and directed Defendant Mahan to hold Ms. Ward Stamp in the car once Defendant Mahan arrived on scene. *See* **Ex. 2,** Gonzales BWC*,* 01:38-4:30; **Ex. 4,** McWhorter BWC, 6:19-6:23; **Ex. 3**, Mahan BWC, 3:50-3:57. Defendant Mahan held Ms. Ward Stamp, whom he testified was not free to leave, in the car for several minutes as he barked orders at her to show him her hands. *See* **Ex. 13,** Mahan Dep., 116:1-11; **Ex. 3**, Mahan BWC, 3:57-14:00. Defendant McWhorter ordered Ms. Ward Stamp to remain in her car and directed Defendant Mahan to hold her in her car, and Defendant Mahan began to do so, before the CRIT/Command page was even sent. *See* **Ex. 4,** McWhorter BWC, 6:19-6:23; **Ex. 3,** Mahan BWC, 3:50-5:10; Defs' Ex. Q. Defendant Mahan summoned Defendant Berumen to the vehicle and asked him to assist in removing Ms. Ward Stamp from the vehicle. *See* **Ex. 3,** Mahan BWC, 11:50-12:10. Defendant Berumen ordered Ms. Ward Stamp to exit the vehicle, handcuffed her, and escorted her to Defendant Spencer. *See* **Ex. 14**, Berumen BWC 1, 9:50-11:09. Defendant Berumen directed Defendant Spencer to place Ms. Ward in the back of her PSCO SUV. *Id.,* 10:55-11:08; **Ex. 15,** Spencer BWC*,* 15:14-15:25. Defendant Spencer searched Ms. Ward, seized all of the property in her pockets, and ordered her to sit in the back of Spencer's PCSO SUV. *See* **Ex. 15,** Spencer BWC, 15:36-16:23; **Ex. 16,** Spencer Dep., 49:2-11. Defendant Ragan ordered Defendant Mahan and Defendant Spencer to transfer Ms. Ward Stamp to Defendant Mahan's PCSO SUV; Defendants Spencer and Mahan did so. *See* **Ex. 15**, Spencer BWC*,* 17:03-17:36; **Ex. 3,** Mahan BWC*,* 18:10-19:20. At the direction of Defendant Bryant, Defendant Ragan ordered Defendant Berumen to transport Ms. Ward Stamp to the PCSO Annex. **Ex. 17,** Ragan Dep., 91:15-92:13; **Ex. 18,** Bryant Dep., 79:23-81:7. Defendant Berumen in turn directed Defendant Quintana to drive Ms.

Ward Stamp to the Annex, which he did. **Ex. 19,** Quintana BWC, 00:42-1:01, 03:46-20:17.

*None* of the foregoing actions occurred at the direction of *any* non-PCSO official.

**29.** Admit.

**30**. **Deny.** Stacy Hoff's view was substantially obstructed by the bodies of Mr. Ward and

Defendants McWhorter and Gonzales, such that she did not see key moments, including

Mr. Ward looking for his identification in his pockets, Mr. Ward swallowing a pill, and the

tussle on the ground during which McWhorter falsely claims that Mr. Ward attempted to

disarm him. **Ex. 20,** Hoff Interview Video, 5:00-5:11; 7:43-8:19.

**31**. **Deny.** Neither Ms. Hoff nor Valencia had a vantage point that would have allowed

them to see whether Mr. Ward attempted to grab McWhorter's firearm in its holster. **Ex.**

**20,** Hoff Interview, 5:00-5:11; 7:43-8:19. Indeed, Valencia took a video from his vantage

point that shows he could not have seen details of Defendants' assault on Mr. Ward. **Ex.**

**21,** Valencia Interview Video.

**32-33.** Admit.

**34.**     **Deny.** In fact, having found no probable cause to arrest Mr. Ward, McWhorter

concluded the investigation himself by dragging the unarmed and cooperative "suspicious

person" that he was investigating from his mother's car and shooting him three times in

the chest. *See* **Ex. 2,** Gonzales BWC, 00:00-1:02. McWhorter had no reasonable

suspicion *whatsoever* to investigate Ms. Ward Stamp for *any* crime. **Ex. 5,** McWhorter

Dep., 283:9-22, 284:19-285:8

**35.**     **Deny** that officer safety was the reason to handcuff Ms. Ward Stamp, who was

unarmed and posed no threat to Defendants. Admit that Defendant Berumen ordered

Kristy Ward Stamp to crawl out of her car across the center console and then handcuffed

her. *See* **Ex. 14,** Berumen BWC 1, 9:02-10:10. Defendants held Ms. Ward Stamp in handcuffs until 4:33:56 p.m.—approximately 49 minutes—and drove her to the PCSO Annex for interrogation. *See* **Ex. 19,** Quintana BWC, 2:34-26:06. Defendants held Ms. Ward Stamp at the Annex until 6:29 p.m., approximately **three hours** after Defendant McWhorter killed her son, and returned her home approximately half an hour later. *See* **Ex. 22,** Kristy Ward Stamp Interview Video, 6:28:55-6:19:10**; Ex. 23,** Berumen BWC 2 00:20-1:00; 27:52-28:10; **Ex. 2,** Gonzales BWC, 1:00-1:05.

**36. Deny.** *See* response to **RSUF No. 28**, which details at length how PCSO employees—the Defendants in this action—arrested Plaintiff without any direction to do so by CIT.

**37.**    Admit that Berumen said this; **Deny** that his statement means that the actions Defendants took did not constitute an arrest.

**38.    Deny.** The vehicle had no connection to any crime. It was simply the location Mr. Ward had been sitting with his mother before McWhorter killed him without justification.

**39.**    Admit that this was the weather; **Deny** that it has any relevance to whether Defendants' concerted actions amounted to an unconstitutional arrest.

**40.    Deny.** Ms. Ward Stamp could have, in fact, remained in the vehicle. *See* **Ex. 3**, Mahan BWC, 3:50-14:00; **Ex. 14**, Berumen BWC 1, 9:02-9:51.

**41.**    Admit.

**42.    Deny.** None of the materials cited by Defendants reference any order issued by any CIT official to any member of PCSO command staff to transport Kristy Ward Stamp to the PCSO Annex. Rather, none of the cited materials, with the exception of Exhibit Y, suggests that CIT or PPD even had the *authority* to issue such an order, and none evidences that any such order was actually given in this case. The citation to Exhibit Y

does not appear to bear any relevance to such an order. Even in her unsworn declaration, Defendant Bryant *never claims that she received an order to transport Ms. Ward Stamp, nor does Defendant Bryant deny that she ordered Defendant Ragan to transport Ms. Ward as he testified. See* Defs' Ex. S; **Ex. 17,** Ragan Dep., 91:15-92:13. Tellingly, the PPD executive summary of the CIT investigation makes no reference to the decision to transport Plaintiff to the Annex. *See* **Ex. 24,** CIT Executive Summary. Closer examination of all the PPD reports reveals only two mentions of Plaintiff's transportation to the Sheriff's Annex—by Sgt. Christopher Flores and Det. Jose Medina, the Detective who led the CIT investigation for PPD. These reports explicitly state that Medina and Flores responded not to the scene, but to the Sheriff's Annex, meaning they were informed of the transportation *after* it had already happened at someone else's direction. *See* **Ex. 25**, Medina and Flores Reports.

**43.**    Admit that Defendants released Ms. Ward Stamp from the handcuffs over 45 minutes later, and after having taken her from the car and the school where she was attempting to pick up her disabled middle-school-aged son.

**44.**    **<u>Deny.</u>** Ms. Ward was not questioned about her involvement in any "suspected criminal activity." *See* **Ex. 26,** Kristy Ward Stamp Interview Transcript. Ms. Ward Stamp was not involved in any criminal activity and no Defendant or other law enforcement officer even had reason to *suspect* her of any criminal activity. Admit that Ms. Ward Stamp was interrogated concerning Defendant McWhorter's interaction with her son.

**45.**    **<u>Deny.</u>** After the shooting, while Ms. Ward Stamp was still handcuffed on-scene, PCSO had control of her property. Admit that PPD later obtained warrants.

**46-48.** Admit.

49.     Admit that after already having kept Ms. Ward Stamp from her property for over a week, PPD officers sought and obtained warrants on March 2, 2022.

50.     Admit. No PCSO Defendant intervened to stop this unconstitutional seizure of Ms. Ward Stamp's property.

**51-52.** Admit.

53.     **Deny.** The PCSO Defendants caused Ms. Ward Stamp's property to be seized by unlawfully arresting her, taking her from the scene (and from her property), and failing to intervene in PPD's seizure of property that had no connection to any crime.

### III.     PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS

**1.**     Defendants McWhorter and Gonzales made no attempt to ascertain whether Valencia was a reliable witness—or to make any contact with him at all—before their contact with and killing of Mr. Ward. *See* **Ex. 1,** 911 Call; **Ex. 4,** McWhorter BWC, 00:00-00:35; **Ex. 2,** Gonzales BWC, 00:00-01:02.

**2.**     Defendant McWhorter never saw a weapon in Mr. Ward's pocket (or anywhere else), and Mr. Ward never had a weapon. Defendant McWhorter testified that he had "no idea" of what Mr. Ward was trying to find in his pocket, even though Mr. Ward's search through his pockets began in immediate, obvious response to Defendant McWhorter's demand for his identification. *See* **Ex. 6,** Lucero Dep., 151:13-20; **Ex. 5,** McWhorter Dep. 66:24-67:7; **Ex. 4,** McWhorter BWC, 2:09-2:21.

**3.**     Defendant McWhorter made a spontaneous outcry as to his motive for seizing Mr. Ward, which had nothing to do with any weapon, real or imagined by McWhorter. As he began his assault on Mr. Ward, McWhorter shouted, "What did you just put in your mouth?" McWhorter reported the same motive to a PPD officer in the minutes after he

killed Ward: "He was stuffing stuff in his mouth, and trying to turn on us, so I pulled him out." *See* **Ex. 4,** McWhorter BWC, 2:09-2:21, 7:04-7:13.

4.      Defendant McWhorter did not make any mention of any concern that Mr. Ward had a firearm or other weapon to his partner Defendant Gonzales, as he violently dragged Mr. Ward from the car, or at any time during the encounter with Mr. Ward. *See* **Ex. 4,** McWhorter BWC, 00:00-2:50; **Ex. 2,** Gonzales BWC, 00:00-1:02.

5.      Ms. Ward Stamp never made any attempt to conceal her identity, her relationship to her son Richard Ward, or her motivation for coming to the school: to pick up her younger son. Once Defendants spoke with her, she readily volunteered this information. *See* **Ex. 15,** Spencer BWC, 15:23-15:34, 16:39-17:02, 17:48-17:59, 18:40-19:30.

6.      Defendants never had probable cause to arrest Ms. Ward Stamp. *See* **Ex. 5,** McWhorter Dep., 283:9-22, 284:19-285:8; **Ex. 10,** Gonzales Dep., 220:15-21; **Ex. 18,** Bryant Dep., 130:25-131:23; **Ex. 27,** Berumen Dep., 142:2-12; **Ex. 17,** Ragan Dep., 114:25-115:5; **Ex. 28,** Quintana Dep., 89:4-24, 75:2-6; **Ex. 16,** Spencer Dep., 56:18-57:23; **Ex. 13,** Mahan Dep., 48:12-19; **Ex. 6,** Lucero Dep., 184:8-18.

7.      Defendant Ragan testified that Defendant Captain Bryant gave the order to transport Ms. Ward Stamp to the PCSO Annex. *See* **Ex. 17,** Ragan Dep., 91:15-92:13. Defendant Bryant does not remember giving Defendant Ragan the order but does not doubt his testimony that she did so. *See* **Ex. 18**, Bryant Dep., 79:23-81:7. Defendant Bryant has not testified or otherwise declared that any PPD or other CIT official ordered her to effect transport of Ms. Ward Stamp to the PCSO Annex.

8.      Plaintiffs' nationally-recognized police practices expert opined that "based on his own sworn testimony that he knew his gun had clicked back into its holster and the

retention had reengaged, Deputy McWhorter knew that there was no reasonable possibility of Mr. Ward obtaining his gun." **Ex. 12,** Clark Report at pp. 34-37. In his expert opinion, McWhorter "cannot plausibly claim that he was justified in shooting Mr. Ward to prevent Mr. Ward from taking his gun, as the gun was … fully holstered and locked." ***Id.*** at p. 36.

**9.**     PCSO Sheriff David Lucero testified everything Defendants did in this case was pursuant to Pueblo policy and training. *See* **Ex. 6,** Lucero Dep. 61:15-24; 89:11-22.

**10.**     Every involved PCSO officer testified that they acted in accordance with the training, policies, customs, and practices of Pueblo County while engaging in the conduct which forms the basis of Plaintiff Ward Stamp's claims. **Ex. 27,** Beruman Dep. 153:3-11*;* **Ex. 18,** Bryant Dep. 28:20-24*;* **Ex. 13,** Mahan Dep. 49:11-50:14*;* **Ex. 28,** Quintana Dep. 104:6-22; **Ex. 16,** Spencer Dep. 56:18-57:23*;* **Ex. 17,** Ragan Dep. 114:2-115:5*;* **Ex. 5,** McWhorter Dep. 278:19-23*;* **Ex. 10,** Gonzales Dep. 320:12-321:11*.*

**11.**     McWhorter's and Gonzales' actions were taken pursuant to the polices, customs, and training of the PCSO. **Ex. 10,** Gonzales Dep. 216:3-217:3.

### IV.     STANDARD OF REVIEW

Summary judgment is appropriate only if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). The nonmovant is given "wide berth to prove a factual controversy exists," *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995), and all reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 484 (10th Cir. 1995). "Where different ultimate inferences may be drawn

from the evidence presented by the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifan Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984).

At the summary judgment stage of an excessive force lawsuit where a defendant asserts qualified immunity, "the court considers whether the evidence, *viewed in the light most favorable to the party asserting the injury*, shows that the alleged wrong-doer violated a constitutional right." *Hays v. Ellis*, 331 F. Supp. 2d 1303, 1307 (D. Colo. 2004) (emphasis added); *see also Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (stressing that the same summary judgment analysis applies to defining the context of a case for purposes of the clearly established prong of qualified immunity). "The judge's function at the summary judgment stage 'is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *French v. City of Cortez*, 361 F. Supp. 1011, 1021 (D. Colo. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## V.  ARGUMENT

### A. A reasonable jury could find that Defendants McWhorter and Gonzales violated Mr. Ward's clearly established right to be free from excessive force

When analyzing a claim of excessive deadly force, courts consider "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Estate of Smart v. City of Wichita*, 951 F.3d 1161, 1171 (10th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "[O]fficers are not justified in using deadly force unless objectively reasonable officers in the same position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1213-14 (10th Cir.

2019). Regarding the threat posed, the Tenth Circuit has considered non-exclusive factors, including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon toward[] the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). Since 1985, the *sine qua non* of the constitutional use of deadly force has been "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

### 1. Defendants did not have probable cause to believe that Mr. Ward posed a threat of serious harm to the officers or anyone else

On February 22, 2022, Defendants McWhorter and Gonzales were faced with a run-of-the-mill suspicious person call. They responded to a middle school parking lot where family members were waiting to pick up students being let out for the day. When they contacted Mr. Ward, he was responsive and cooperative with them while sitting in the back of his mother's car. After explaining his anxiety around law enforcement, Mr. Ward placed a prescribed anti-anxiety pill in his mouth. Defendant McWhorter immediately and without warning yanked Mr. Ward out of the car, demanding to know what he had put in his mouth. McWhorter and Gonzales wrestled with Mr. Ward for approximately 20 seconds, and McWhorter pulled his gun and killed Mr. Ward. Nothing that Mr. Ward had done in his interaction with the officers before they unjustifiably attacked him indicated that Mr. Ward was at all threatening to anyone.

Defendants now claim (and this crucial fact is keenly disputed) that Mr. Ward attempted to grab McWhorter's holstered gun. The video does not show this, and no

witness supports McWhorter's self-serving *post hoc* story, because it did not happen. McWhorter did not verbalize any concern over his gun in the moment. Gonzales, who was standing over both of them observing the scene, did not say anything about Ward reaching for McWhorter's gun, nor did she draw her own gun, which would be expected if a suspect were grabbing a weapon. A reasonable jury could find that McWhorter's story did not happen, and that McWhorter (and his lawyers) are now simply flailing to state a false pretextual justification for an unreasonable and unjustifiable shooting of an unarmed and non-threatening man in a middle school parking lot.

A reasonable jury, based on the considerable evidence in the record, could instead find that throughout their interaction with Mr. Ward before they unjustifiably pulled him out of the car, Defendants McWhorter and Gonzales were simply talking to a person was suspected of *no crime* (or, at worst, a very minor infraction) and that he was being responsive and cooperative with them. Mr. Ward was unarmed, made no hostile motions with any weapon or otherwise, and his "manifest intentions" indicated that he was not a threat to the officers or anyone else, and that at worst he hoped to briefly resist arrest after the officers initiated their physical force against him. *Estate of Larsen*, 511 F.3d at 1260. Defendants' pulling Mr. Ward out of the car without warning and throwing him to the ground was, itself, excessive force in this context. *See, e.g., Davis v. Clifford*, 825 F.3d 1131, 1135-1137 (10th Cir. 2016) (reversing grant of qualified immunity to officers who had pulled a non-threatening suspect of only minor crimes out of her car and throwing her to the ground after she had briefly refused to exit under her own power). Considering the totality of the circumstances, Defendants McWhorter and Gonzales did not have "probable cause to believe that [Mr. Ward] pose[d] a threat of serious physical harm, either

to the officer or to others." *Garner*, 471 U.S. at 11. After *Garner* and its progeny, such facts constitutionally prohibited McWhorter from shooting Mr. Ward. *See, e.g., Clerkley v. Holcomb*, 121 F.4th 1359, 1367 (10th Cir. 2024) ("It was therefore clear in 2019 that an officer responding to a potentially dangerous situation could not use deadly force against and unarmed, nonthreatening person.").

Under clearly established law, reasonable officers in Defendants McWhorter's and Gonzales' positions would have known that their conduct was unlawful. For example, the Tenth Circuit has reversed a grant of qualified immunity to officers who shot a suicidal man holding a knife, concluding that the man posed a danger only to himself. *See Walker v. City of Orem*, 451 F.3d 1139, 1144-45, 1160 (10th Cir. 2006); *see also Estate of Harmon v. Salt Lake City*, 2021 U.S. App. LEXIS 39942, at *7-15 (10th Cir. Nov. 10, 2021) (reversing district court's dismissal of excessive force claim where plaintiff had plausibly pleaded that decedent was not a threat to the officer, despite some physical contact between the two, when the officer shot him). As the *Harmon* Court stated, "there have been numerous cases in this circuit involving an officer shooting an unarmed (or knife-wielding) person," which have concluded that a reasonable jury could find excessive force. *Id.* at *15. Importantly, the Tenth Circuit has long made clear that the law does not provide that "any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death." *Cordova v. Aragon*, 569 F.3d 1183, 1190-95 (10th Cir. 2009); *Ceballos*, 919 F.3d at 1218 ("the mere possibility that [the suspect] might have presented a threat to the general public" was not sufficient to justify the officer's use of deadly force).

Moreover, "[t]he excessive force inquiry includes not only the officers' actions at

the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force . . . if the conduct is 'immediately connected' to the suspect's threat of force." *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997) (citing cases); *Casey v. City of Federal Heights*, 509 F.3d 1278, 1283, 1285 (10th Cir. 2007); *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995); *see also Hastings v. Barnes*, 252 F. App'x 197, 201-207 (10th Cir. 2007) (affirming denial of qualified immunity where officers escalated uses of force against initially non-threatening person who then advanced on them with a samurai sword and was killed). Nothing about Mr. Ward's actions justified the Defendants even going hands-on with him. Put simply, Defendants' actions in grabbing Ward, pulling him out of the car, and throwing him to the ground "took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tack[.]" *Smith v. Ray*, 781 F.3d 95, 104 (4th Cir. 2015) (denying qualified immunity based on this fact alone); *accord Casey*, 509 F.3d at 1283 ("[The] arrest was transformed from 'a routine encounter' only by [the] use of force.").

In addition to Tenth Circuit case law, out of circuit cases "would have put any reasonable… officer in Defendants' position on notice his conduct violated the Constitution." *Ullery v. Bradley*, 949 F.3d 1282, 1292, 1294 (10th Cir. 2020) (The Tenth Circuit "consider[s] both binding circuit precedent and decisions from other circuits in determining whether the law is clearly established."). For example, in *Cantu v. City of Dothan*, 974 F.3d 1217, 1230-1231 (11th Cir. 2020), the Eleventh Circuit reversed a district court's grant of summary judgment to officers who shot and killed a man who had wrestled with them, broke free twice, and generally resisted arrest. *Id.* The man was

suspected of minor, nonviolent crimes, and "never threw any punches, never kicked any of the officers, [and] never hit any of them." *Id.* The shooting officer claimed that the man had gained control of a taser, but the Eleventh Circuit concluded that a jury could find that the presence of backup meant that even if the man had attempted to use the taser, he could have been subdued short of deadly force. *Id.* The Eleventh Circuit deemed that this right was established with "obvious clarity," *id.* at 1232-1235, and that "resisting alone is not enough to justify the use of deadly force." *Id.* at 1230; *see also, e.g., Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 905 (4th Cir. 2016) ("physical resistance is not synonymous with risk of immediate danger.").

In sum, when the case's context is properly stated, by February 22, 2022, it was clearly established that an officer could not legally attack an unarmed, nonthreatening suspect of (at worst) minor, nonviolent crimes, wrestle with him for twenty seconds and then shoot him. It should be (and is) rare to find a use of deadly force on similarly non-threatening facts with an unarmed suspect of minor crimes, but that does not entitle these officers to qualified immunity—quite the opposite, in fact. *See, e.g., Lowe v. Raemisch*, 864 F.3d 1205, 1211 (10th Cir. 2017) ("[I]t would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt."). "[Q]ualified immunity does not protect an officer where the constitutional violation was so obvious under general well-established constitutional principles that any reasonable officer would have known the conduct was unconstitutional." *Rosales v. Bradshaw*, 72 F.4th 1145, 1156-1157 (10th Cir. 2023). Neither the Tenth Circuit nor any other circuit has ever come close to concluding that twenty seconds of wrestling by an unarmed person would give an officer justification to

shoot that person. Based on the circumstances Defendant McWhorter observed, any reasonable officer would have known that he was constitutionally prohibited from using deadly force against Mr. Ward; therefore, he is not entitled to qualified immunity. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).[3]

### 2.  Disputes of material fact preclude summary judgment on Plaintiff's excessive force claims

Defendants' only counter-argument to the above analysis flies in the face of clear summary judgment and qualified immunity law from the Supreme Court and Tenth Circuit, by presenting the purported "evidence" in the light most favorable to *themselves* rather than Plaintiff. Defendants repeatedly claim that Mr. Ward was a threat based on things that do not appear on the BWCs and for which there are no witnesses, only McWhorter's own self-serving statements made long after he shot Mr. Ward. Plaintiff hotly disputes that Mr. Ward was at any point a threat to the officers and insists that McWhorter has come up with post hoc falsehoods—including that Mr. Ward purportedly headbutted him and tried to take his gun—to justify his unjustifiable killing. Defendants can argue this to the jury if they choose, but it is certainly not undisputed.

The Supreme Court has made clear that "courts may not resolve genuine disputes

---

[3] Plaintiff's state law excessive force claim should be analyzed similarly or under an even less onerous standard in light of the state law's greater accountability for victims of police violence. *See, e.g., Woodall v. Godfrey*, 2024 COA 42 ¶ 13 (Colo. Ct. App. 2024) (federal cases interpreting the Fourth Amendment are persuasive authority for the analogous sections of the Colorado Constitution); *c.f. Watchdog v. Colorado Republican Comm.*, 488 P.3d 284, 288 (Colo. App. 2017) ("[T]he corollary is that where state and federal laws differ, [courts] are not required to follow federal law in construing the state statutory scheme."). Notably, Defendants cannot be afforded qualified immunity as a matter of law under the Colorado Constitutional claims. *See* C.R.S. 13-21-131(2). Plaintiff's Claim 3 of McWhorter's willful and wanton killing of Mr. Ward should be analyzed the same and also be allowed to proceed to a jury. *See* Doc. 150 at 24-25 (subsuming Defendants' argument on this claim within the reasonable force analysis).

of fact in favor of the party seeking summary judgment," and the Court's "qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant." *Tolan*, 572 U.S. at 656-57. "[C]ourts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* In *Carr v. Castle*, for example, the Tenth Circuit rejected an officer's statement of the context of the case for clearly established purposes, holding that it "credited the Officers' version of events rather than—as is proper—the factual matrix most favorable to Carr." 337 F.3d 1221, 1224-25 (10th Cir. 2003); *see also Reavis v. Frost*, 967 F.3d 978, 990 (10th Cir. 2020) ("When the defendant has moved for summary judgment based on qualified immunity, we still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor.") (citing *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)).

The Fifth Circuit has stressed the proper standard in the deadly force context:

> [Whether officers] reasonably perceived a threat when they fired upon [a suspect] is a factual question. It is one that the district court found genuinely disputed. Our inquiry takes the facts in a light most favorable to the [plaintiffs], and in that light a factual premise of our analysis is that there was no reasonably perceived threat. … [The officers] are not entitled to qualified immunity at this point in the case.

*Cole v. Carson*, 905 F.3d 334, 345-47 (5th Cir. 2018); *see also Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 276 (5th Cir. 2015). Similarly, the Sixth Circuit has

> established that summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force. When the legal question… is completely dependent upon which view of the facts is accepted by the jury, the District Court cannot grant a defendant police officer immunity from a deadly force claim…. This is because the reasonableness of the use of force is the linchpin of the case. If the jury determines the officer shot the suspect without a reasonable belief that he posed a significant threat of death or serious physical injury to the officer or others, then the officer's actions were legally unreasonable under

21

the Fourth Amendment. On the other hand, if the jury believes the officer's
version of the facts and finds the officer's conduct was reasonable, then he
will be entitled to qualified immunity. Where, as here, the legal question of
qualified immunity turns upon which version of the facts one accepts, the
jury, not the judge, must determine liability.

*Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) (citation omitted). It is

especially important for courts to be vigilant in applying this standard in deadly force cases

because often the officer has killed the best non-officer witness. *See, e.g., Stanton v.

Elliott*, 25 F.4th 227, 234 (4th Cir. 2022); *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044,

1061 (9th Cir. 2024). "Courts should be careful at summary judgment to avoid simply

accepting an officer's self-serving statements and must consider all contradictory

evidence." *Stanton*, 25 F.4th at 234.

For many years before McWhorter killed Richard Ward, courts around the country

have considered very similar disputes of fact to those hotly disputed here. For example,

the Fifth Circuit summary judgement decision that the Supreme Court reversed in *Tolan*

involved disputes about where the suspect's hands were, whether he reached toward

his waistband, and whether the officer issued any warning before shooting. 538 F. App'x

374, 377 (5th Cir. 2013) (Dennis, J., dissenting); *see also Monticciolo v. Robertson*, 2017

U.S. Dist. LEXIS 167895, at *28-29 (D.N.J. Oct. 11, 2017); *Marshall v. Valdez*, 2004 U.S.

Dist. LEXIS 23961, at *13-14 (N.D. Tex. Nov. 30, 2004); *Bernard v. City of Hous.*, 2017

U.S. Dist. LEXIS 42251, at *14-15 (S.D. Tex. Mar. 2, 2017). This Court must abide by the

Supreme Court's insistence that courts don't resolve disputes of material fact when

considering qualified immunity at summary judgment. *Tolan*, 572 U.S. at 656-57. That is

the jury's job. "[T]o award qualified immunity at the summary judgment stage," when the

record reflects significant factual disputes, "would signal absolute immunity for fear-based

use of deadly force, which we cannot accept." *Banks v. Hawkins*, 999 F.3d 521, 531 (8th Cir. 2021) (quoting *Estate of Jones ex rel. Jones v. City of Martinsburg*, 961 F.3d 661, 673 (4th Cir. 2020).

**B. A reasonable jury could find that the Individual Defendants unlawfully arrested Ms. Ward Stamp and unconstitutionally seized her property.**

Plaintiff has substantial evidence that the Individual Defendants violated her federal and state[4] constitutional rights to be free from unlawful arrest. Because an arrest is "the most intrusive of Fourth Amendment seizures," an arrest is "reasonable only if supported by probable cause." *United States v. White*, 584 F.3d 935, 944-45 (10th Cir. 2009). "It has long been established that an arrest . . . without probable cause that a crime has been committed violates the Fourth Amendment." *Shroff v. Spellman*, 604 F.3d 1179, 1188 (10th Cir. 2010). "An arrest is distinguished from an investigative *Terry* stop by the involuntary, highly intrusive nature of the encounter." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (cleaned up).

**1. Defendants arrested Ms. Ward Stamp without probable cause**

As detailed in Plaintiff's Motion for Partial Summary Judgment [Doc. 131] it is indisputable that after McWhorter shot and killed Ms. Ward Stamp's son in the school parking lot, Defendants acted in concert to handcuff Ms. Ward Stamp, lock her in the back of multiple police cars, and drive her to the Sheriff's Office. Ultimately, she was held against her will for well over three hours before PCSO officers finally released her. Under clearly established law, Defendants' actions constituted an arrest.

---

[4] Again, on Plaintiff's unlawful arrest and wrongful seizure of property claims under the Colorado Constitution, Defendants are not entitled to qualified immunity, *see* C.R.S. 13-21-131(2)—this Court must simply decide whether a reasonable jury could conclude that Defendants violated Ms. Ward Stamp's Colorado Constitutional rights.

For decades it has been established that:

There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. . . . And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Hayes v. Florida*, 470 U.S. 811, 815-16 (1985). This clearly established law has been reiterated time and again. *See, e.g., Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (per curiam) ("Such involuntary transport to a police station for questioning is sufficiently like arrest to invoke the traditional rule that arrests may constitutionally be made only on probable cause.") (internal quotation omitted); *United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996) ("Transportation of a defendant to the police station cannot be justified absent probable cause to believe the defendant committed a crime.").

Because Defendants' handcuffing of Ms. Ward Stamp, driving her to the police station, and holding her against her will for well over three hours constituted an arrest, the state and federal Constitutions required that Defendants' actions be supported by probable cause to believe she had engaged in criminal activity. However, as noted above and in Plaintiff's Summary Judgment motion [Doc. 131], no Defendant in this case even claims to have had probable cause to suspect her of any crime. *See* **SAUF No. 6**, above.

The cases cited by Defendants offer no support to classifying their interactions with Ms. Ward Stamp as detention, not an arrest. First, Defendants cite *United States v. White* as supportive; however, in *White* the officers had legal basis to detain a car's occupants

during a traffic stop so that a drug sniffing dog could arrive. *White*, 584 F.3d at 954.

Instead of waiting for the dog to arrive, the car's occupants followed (in their own car, not

handcuffed) the officer down the road to the canine so that the car could be sniffed. *Id.*

*White* is nothing like this case, in which Ms. Ward Stamp was handcuffed, transported

against her will to a police station, and held in total for over three hours. Similarly,

Defendants' citation to *Holmstrom v. Bd. of Cnty. Comm'rs for Chaves*, 181 F. Supp. 3d

862, 873 (D.N.M. 2016) is unavailing. *Holmstrom* involved a woman placing a "civil

standby" call to her home. *Id.* at 867-68. During officers' escort of the woman, the officers

used substantial force against her husband and son and arrested both of them. *Id.* When

the woman asked officers why they had done this, they handcuffed her and drove her to

the hospital where her husband had been taken. *Id.* at 868. In concluding that the officers

had protectively detained the woman, rather than arresting her, the Court took "special

notice" that she was driven to the hospital and not a police station:

> "While there are admittedly no bright lines in this area of jurisprudence,
> courts have reiterated that transporting a suspect to a police station weighs
> heavily in the reasonableness analysis." [*United States v. White*, 935, 955
> (10th Cir. 2009)] (citing *Kaupp v. Texas*, 538 U.S. 626, 630, 123 S. Ct. 1843,
> 155 L. Ed. 2d 814 (2003) (internal citations omitted); *United States v.
> Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996) (internal citations omitted)).

*Holmstrom*, 181 F. Supp. 3d at 873-874. The Court also noted that "the length of time

Defendants held Plaintiff Zina was minimal—the hospital was less than ten miles from her

home, and the deputy immediately released her upon arrival at the hospital." *Id.*

In contrast, Defendants drove Ms. Ward Stamp against her will to a police station, and

held her against her will for over *three hours* and interrogated her in custody rather than

for the short duration of a ten-mile drive. On their face, Defendants' actions here were

orders of magnitude more "highly intrusive" and indisputably constituted an arrest, for

exactly the same reasons that the *Holmstrom* court relied on as being absent.

Finally, Defendants' reliance on the fellow officer rule to justify their unconstitutional arrest is misplaced. Defendants had more information than any CIT officer who arrived at the scene later. "In order to invoke the fellow officer rule . . . the [] Defendants must establish that they *actually did* rely on another officer's information. There are no facts here, however, suggesting that any [Defendants] ever relayed information to, or received information from, fellow officers based on personal observation . . . . The Tenth Circuit has instructed that the fellow officer rule does not apply in the absence of such information." *Minter v. City of Aurora*, 2022 U.S. Dist. LEXIS 55644, at *45 (D. Colo. Mar. 28, 2022) (citing *Fogarty v. Gallegos*, 523 F.3d at 1157, n.10.); *see also McInerney v. King*, 791 F.3d 1224, 1236 (10th Cir. 2015). This Court should deny Defendants' motion and instead grant Plaintiff's pending summary judgment on her federal and state unlawful arrest claims. *See* [Doc. 131].

### 2. Ms. Ward Stamp's car and property were seized as a result of Defendants' unlawful arrest and their failure to intervene to stop the unconstitutional property seizure

At the time Defendants arrested Ms. Ward Stamp without probable cause and took her from the scene, they had no warrant to search or seize her vehicle or other property. Defendants did not have probable cause to believe that Ms. Ward Stamp had committed any crime which could justify a search of her property incident to a lawful arrest. Thus, the warrantless seizure of Ms. Ward Stamp's vehicle and other property after she was unlawfully arrested and taken from the scene was itself unjustified.

"[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se*

unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). "[E]xceptions to the warrant requirement are few in number and carefully delineated, and . . . the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984) (internal quotation omitted). Any reasonable officer in Defendants' position would have known that warrantless searches and seizures are presumptively unreasonable and that the exceptions to the warrant requirement are very narrow. *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful."). Any reasonable officer would have known that they had no right to seize Ms. Ward Stamp's property incident to an unlawful arrest.

In addition, each Individual Defendant failed to intervene to prevent their fellow officers' (both PCSO and PPD/CIT) multiple violations of Ms. Ward Stamp's rights, from their unlawful arrest to the seizure of her property. *See, e.g., Estate of Booker*, 745 F.3d at 421-423 (making clear officers' duty to intervene to prevent constitutional violations and explaining how such a duty can overlap with law enforcement officers who act in concert to violate constitutional rights). Because of the obvious lack of probable cause regarding Ms. Ward Stamp, and the lack of probable cause that her car had been used in the commission of any crime, Defendants' warrantless seizure of her vehicle and other property violated her clearly established rights.

**C.** **A reasonable jury could find that the Individual Defendants' actions were caused by Defendant Pueblo's customs, policies, and training.**

A municipality is liable for constitutional torts if the municipality's policy, practice, or custom *caused* an injury of constitutional dimensions. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978). To show municipal liability, Plaintiffs must establish "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). A policy or custom can be established in many ways, including demonstrating the existence of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees.

*Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation omitted).

In this case, Pueblo County has left no doubt about whether Defendant McWhorter's killing of Richard Ward was carried out according to the County's policies, customs, and training: PCSO **awarded McWhorter a Purple Heart** for the killing.[5] Moreover, PCSO Sheriff David Lucero testified that everything that the PCSO Defendants did in this case was pursuant to Pueblo County policy and training. *See* **Ex. 6,** Lucero Dep. 61:15-24; 89:11-22; **Ex. 10,** Gonzales Dep. 216:3-217:3 (testifying the same). Such testimony is sufficient to maintain Pueblo as a defendant *See, e.g., Harris*, 489 U.S. at 389-91; *Moore v. Miller*, 2014 U.S. Dist. LEXIS 72452, at *27 (D. Colo. 2014) (Kane, J.)

---

[5] "Purple Heart awarded to deputy in fatal shooting during middle school pickup prompts backlash." NBC News, Feb. 27, 2023. https://www.nbcnews.com/news/us-news/purple-heart-awarded-deputy-fatal-shooting-middle-school-pickup-prompt-rcna72505.

("[I]f Defendant Police Officers testify that they acted in accordance with their training and it is found that they committed constitutional violations, the reasonable inference is that, had the City implemented a different training policy on the use of force, [plaintiff] would not have been subjected to the amount force used in this case."); *Ortega v. Denver,* 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013) (Martinez, J.).

Similarly, deliberately indifferent training can be shown "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Municipal "policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989); *see also Connick v. Thompson*, 563 U.S. 51, 63-64 (2011). Pueblo County awarding McWhorter a Purple Heart for killing a non-suspect who was (at most) merely resisting reveals an absence of appropriate training on deadly force, and a full adoption by the County of McWhorter's actions.

Lastly, Plaintiff has substantial evidence showing "multiple harms that occurred to the plaintiff," "misconduct that occurred in the open," and "the involvement of multiple officials in the misconduct," which can be determinative of whether officers acted in accordance with a municipality's customs, policies, practices, and training. *Arakji v. Hess*, Civil Action No. 15-cv-00681-CMA, 2015 U.S. Dist. LEXIS 161600, at *16-17 (D. Colo. Dec. 2, 2015) (quoting *Taylor*, 2011 U.S. Dist. LEXIS 97985, at *3). Here, Defendants

McWhorter and Gonzales unjustifiably attacked Mr. Ward in a middle school parking lot, and within twenty seconds Defendant McWhorter shot him. After McWhorter killed Ms. Ward Stamp's son, half a dozen PCSO officers acted in concert to unlawfully arrest her and seize her property. These officers did so out in the open, with students and parents (and each other) watching on. And each officer participated directly in the unconstitutional acts, rather than doing anything to intervene to stop the violations of Plaintiffs' rights. Because of the many separate wrongful actions (and inactions) committed by Defendants, including supervisory officers, the events underlying the Defendants' violations of Ms. Ward Stamp's rights alone is sufficient evidence of a custom, policy, practice, and training to hold Pueblo County liable under *Monell. See Jacoby v. DuPage Cty. Ill.*, 2013 U.S. Dist. LEXIS 89934, at *9 (N.D. Ill. June 26, 2013) (holding that where there was evidence that employees "repeatedly" violated an individual's rights there was a plausible inference "that there was a widespread practice that had the force of policy"); *Rykard v. City of Dothan*, 2011 U.S. Dist. LEXIS 101135, at *9 (M.D. Ala. Aug. 9, 2011) (inferring "that a policy and custom exists where multiple city employees repeatedly" violated an individual's rights).

## VI. CONCLUSION

For the reasons stated above, this Court should deny Defendants' Motion in its entirety and allow Plaintiff's meritorious civil rights claims to proceed to a jury.

DATED this 14th day of February 2025.

KILLMER LANE, LLP

*s/ Darold W. Killmer*

_____
Darold W. Killmer
Reid Allison

1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 fax
dkillmer@killmerlane.com
rallison@killmerlane.com

NEWMAN MCNULTY, LLC

*s/ Mari Newman*

_____
Mari Newman
Andy McNulty
1490 N. Lafayette Street, Suite 304
Denver, CO 80218
(720) 850-5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following. I also certify that copies of the conventionally submitted exhibits, which were previously provided to counsel for Defendants in Plaintiffs' Disclosures, will be provided via Dropbox.

Sean Lane
William O'Donnell
Brittney Townsley
Alex M. Pass
The Lane Law Firm, P.C.
3131 S Vaughn Way Suite 220
Aurora, CO 80014
Tel: 720-464-4215
slane@lanelawpc.com
wodonnell@lanelawpc.com
btownsley@lanelawpc.com
apass@lanelawpc.com

*Attorneys for Defendants*

*/s/ Jesse Askeland*
Jesse Askeland, paralegal

31